UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ACANTHA LLC,

    Plaintiff,

v.                                                              Case No. 15-C-1257

DEPUY SYNTHES SALES, INC., et al.,

    Defendants.

## DECISION ON CLAIM CONSTRUCTION

In this action for patent infringement, Plaintiff Acantha, LLC accuses Defendants DePuy Synthes Sales, Inc., DePuy Synthes Products, Inc., DePuy Synthes, Inc., Johnson & Johnson, Inc., Synthes, Inc., Synthes USA, LLC, DePuy Orthopaedics, Inc., and DePuy Spine, LLC of infringing its patent: U.S. Reissued Patent No. RE43,008 (the '008 Patent). The case is before the Court for claim construction following briefing and a *Markman* hearing.

## LEGAL STANDARD GOVERNING CLAIM CONSTRUCTION

A patent includes both a written description of the invention and claims. The written description, which usually includes figures, is often referred to as the "specification" of the patent. The specification ends with one or more numbered sentences that are the patent's "claims." These claims describe the invention and set forth the metes and bounds of the patent.

Claim construction is an issue of law for the Court. If a material issue in the case, such as infringement or validity, involves a dispute about the meaning of certain claim language, the Court needs to construe that disputed claim language. *See Markman v. Westview Instruments, Inc.*, 52

F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The only claim language that needs to be construed is the language "in controversy, and only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Claim construction begins with and focuses on the words of the claim. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619–20 (Fed. Cir. 1995). How a person of ordinary skill in the art understands those claim terms provides an objective baseline for claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). In attempting to determine the meaning of disputed claim language, the Court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* at 1314. "Those sources include the words of the claims themselves, the remainder of the specifications, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (internal quotation marks omitted). Extrinsic evidence includes sources such as the testimony of experts and knowledgeable technical witnesses, dictionaries, and learned treatises. *Id.* at 1317–18. Extrinsic evidence is "less significant" and "less reliable" than the intrinsic record in determining the meaning of the claim language. *Id.* Thus, to the extent that the Court considers extrinsic evidence, it does so in the context of the intrinsic evidence and is cognizant of "the flaws inherent" in such evidence. *Id.* at 1319.

"The claims, not specification embodiments, define the scope of patent protection. The patentee is entitled to the full scope of his claims" and is not limited "to his preferred embodiment" and the Court will not "import a limitation from the specification into the claims." *Kara Tech. Inc.*

2

*v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (cautioning "against confining the claims to [preferred] embodiments."). Even where "a patent describes only a single embodiment, the claims should not be construed as limited to that embodiment" absent a clear disavowal of claim scope. *Phillips*, 415 F.3d at 1323; *see also Linear Tech Corp. v. ITC*, 566 F.3d 1049, 1057–58 (Fed. Cir. 2009) (explaining that it is improper to limit a claim to embodiments described in the specification where "there is no clear intention to limit the claim scope").

The Court may also consider the patent's prosecution history, including reexamination proceedings. *Phillips*, 415 F.3d at 1317. The prosecution history, which is part of the "intrinsic evidence," consists of the "complete record of the proceedings before the USPTO and includes the prior art cited during the examination of the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The prosecution history includes any arguments or amendments made by the applicant in securing patent rights and these arguments and amendments may be considered during the claim construction process. *Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). The correct claim construction must be consistent with the arguments the applicant made to overcome a prior art rejection. *See id.*

## CLAIM CONSTRUCTION AND ANALYSIS

The '008 Patent describes an "orthopedic implant assembly comprising a stabilizing element, a securing element which attaches the stabilizing element to the bone, and a stopping member in the

3

stabilizing element which inhibits the securing element from loosening or backing out of the bone." ('008 Patent Abstract, ECF No. 1-3.) As a preliminary matter, I adopt all of the "Agreed Constructions" as set forth by the parties as follows:

| Term | Agreed Construction |
|---|---|
| enlarged integral portion | Portion of the securing [element/member] having a larger diameter than that of the elongated body of the securing [element/member] |
| head | Portion of the securing member anterior to the elongated body |
| groove | Plain and ordinary meaning |

The parties have disputes over certain terms in the '008 Patent, as will be discussed below.

**A. Anterior/Posterior**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| anterior bore portion/section of the transverse passageway | (No construction necessary) *Alternatively*: outer portion of the bore farther away from the bone | Portion of the bore above the posterior surface of the stopping member | No construction necessary |
| posterior bore portion/section of the transverse passageway | (No construction necessary) *Alternatively*: inner portion of the bore closer to the bone | Portion of the bore below the posterior surface of the stopping member | No construction necessary |

Plaintiff argues that no construction is necessary for these phrases, or alternatively, that "anterior" should be defined as the "outer portion of the bore farther away from the bone" and

4

"posterior" should be defined as the "inner portion of the bore closer to the bone." Indeed, the specification unequivocally states that

> The term posterior should be understood to mean an inner portion of the assembly closer to the bone to which the assembly is attached, and the term anterior should be understood to mean an outer portion of the assembly farther away from the bone.

('008 Patent col. 1 ll. 44–48.) Plaintiff asserts that the patent's use of anterior and posterior is only intended to provide directional guidance. Defendants contend the dispute is not the definition of anterior and posterior but rather whether a demarcation of where the anterior bore portion ends and the posterior bore portion begins is necessary. They assert that the demarcation is critical to understanding the claimed invention's scope because some claims require that certain elements of the invention be located in certain bore portions. As such, they argue that the stopping member sufficiently establishes the dividing line between these sections of the bore.

Yet, Defendants' proposed limitation does not appear anywhere within the claim language or the specification and may unnecessarily create confusion. A careful reading of the entire patent makes clear that the patent's use of the terms "anterior" or "posterior" in this context is relative, not spatially specific. In other words, the use of the terms "posterior portion of the bore" and "anterior portion of the bore" in the claims is intended to convey where the members are located in relation to each other, as opposed to the specific area within the bore in which they are situated. By way of illustration, Claim 59 reads in pertinent part:

An orthopedic attachment assembly, comprising:

a. an elongated securing element having an enlarged integral portion with a length, an anterior surface, a posterior surface and a transverse dimension;

b. an attachment element which has an anterior surface and a posterior surface and which has at least one bore extending through the attachment element

5

> from the anterior surface to the posterior surface and is configured to receive the securing element, the bore having *an anterior bore portion, and a posterior bore portion, the posterior bore portion having at least one transverse dimension smaller than the transverse dimension of the enlarged integral portion of the securing element to facilitate retention of the enlarged integral portion of the securing member with the posterior bore portion* . . . .

('008 Patent col. 14 ll. 53–67 (emphasis added).) This language conveys the idea that the smaller transverse dimension of the bore portion is within the bore in a posterior direction from the anterior surface of the attachment element (plate) and thus will prevent the enlarged integral portion (head) of the securing element (screw) from coming out through the opening at the posterior surface of the attachment element. There is no indication from either the claim language or the specification that the patentee intended to explicitly specify where within the bore the smaller transverse dimension was to be located. Claim 59 continues:

> c. a biased stopping member which has a posterior stopping surface, a first configuration which extends within the bore that is elastically deformed to a second configuration as the enlarged portion of the securing member passes into the posterior bore portion, the biased stopping member returning to the first configuration upon passage of the enlarged integral portion into the posterior bore portion, the posterior surface of the biased stopping member configured to engage with the anterior surface of the enlarged integral portion of the securing member facilitating retention of the enlarged portion of the securing member within the posterior bore portion of the attachment member.

('008 Patent col. 15 ll. 1–13.) Here, again, the claim language indicates where the members are in relation to each other. The enlarged portion of the securing member (the head of the screw) passes the elastically deformed stopping member into the posterior bore portion. Upon passage of the enlarged portion of the securing member, the stopping member returns to the first configuration thereby blocking the enlarged portion from moving anteriorly out of the attachment member. In this

6

way, the stopping member retains the securing member in the posterior bore portion. While it is not clear whether, as a practical matter, identifying the anterior or posterior bore portion in terms of its position above or below the stopping member's surface would, as a practical matter, impermissibly add limitations to the claim, there is no reason to adopt such a construction. The meaning of the phrases, read in the context in which they appear, are apparent. Therefore, no construction is needed.

**B. Stopping Member, Collar, and Annular Collar**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| stopping member | (No construction necessary) *Alternatively*, for the stopping member terms: component for restraining the securing [element/member] | A circular component that changes shape from a first configuration to a second configuration | A mechanical component that prevents the securing element from backing out of the stabilizing member |
| collar | Stopping member that is positioned at least partially below the anterior opening of the [bore/ transverse passageway] *Alternatively*: no construction necessary | A circular component that changes shape from a first configuration to a second configuration | A component or part of a component that is generally round and is used to restrain motion or hold something in place |
| annular collar | (No construction necessary) *Alternatively*: collar with a passageway therethrough [or] ring-shaped collar | A circular component that changes shape from a first configuration to a second configuration | A ring-like collar with an opening |

7

The parties dispute the meaning of the terms "stopping member," "collar," and "annular collar." Plaintiff contends that the terms should be construed separately so that the construction preserves the "hierarchy" of the terms, where annular collars are a subset of collars and collars are a subset of stopping members. (Pl.'s Br. at 21, ECF No. 60.) Defendants argue that these terms should be "construed consistently and afforded the same meaning" because Plaintiff is using slightly different words to say the same thing. (Defs.' Br. at 18, ECF No. 59.) Yet, Defendants' proposed construction, "a circular component that changes shape from a first configuration to a second configuration," violates the fundamental claim construction rule that limitations from the specification should not be read into the claims. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("We do not read limitations from the specification into claims; we do not redefine words."); *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1322 (Fed. Cir. 2016) ("When the claims leave little doubt as to what is intended, re-shaping the claims with material from the written description is clearly unwarranted.").

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). When the meaning of a claim term is not immediately apparent, the court may look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (citations omitted). *Phillips* instructs that the specification is "the primary basis for construing the claims." *Id.* (quoting *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)). It is usually dispositive and is "the single best guide to the meaning of a

8

disputed term." *Phillips*, 415 F.3d at 1315 (internal quotation marks omitted). Nonetheless, the court noted the fine line "between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim." *Id.* at 1323 (citing *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186–87 (Fed. Cir. 1998)).

Generally, "[c]laim terms are properly construed to include limitations not otherwise inherent in the term only 'when a patentee sets out a definition and acts as his own lexicographer,' or 'when the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1283 (Fed. Cir. 2012) (quoting *Thorner*, 669 F.3d at 1365). Disavowal of claim scope occurs "[w]here the specification makes clear that the invention does not include a particular feature." *Thorner*, 669 F.3d at 1366 (quoting *SciMed Life Sys., Inc. v. Advanced Cardivascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)). Disavowal requires "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). "Ambiguous language cannot support disavowal." *Poly–Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) (citation omitted). A patentee may disavow claims lacking a particular feature by distinguishing prior art based on the absence of a feature or by describing a characteristic feature of the invention. *Id.* When a patentee makes a clear disavowal, "that feature is deemed to be outside the reach of the claims, even though the language of the claims, read without reference to the specification, might be considered enough to encompass the feature in question." *Thorner*, 669 F.3d a 1366 (quoting *SciMed*, 242 F.3d at 1341). The fact that the embodiment contains a particular limitation is not sufficient to rise to the level of clear disavowal. *Thorner*, 669

9

F.3d at 1366. "To constitute disclaimer, there must be a clear and unmistakable disclaimer." *Id.* at 1366–67.

Neither exception to the general claim construction rules applies here. The patentee has neither acted as his own lexicographer nor made an unequivocal disavowal or clear and unmistakable disclaimer. Defendants' proposed construction rests upon the depictions of the stopping member's shape in the '008 Patent's embodiments to support their contention that the terms "stopping member," "collar," and "annular collar" should be afforded the same meaning. Specific embodiments, however, do not amount to "a clear and unmistakable disclaimer" of claim scope. *Id.*; *see also Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."). It is clear from the specification and the claim language that Plaintiff envisioned alternative embodiments to the one presented. The specification does not indicate that Plaintiff intended to limit the claims to the preferred embodiment depicted in Figure 1 by disclaiming a design where the stopping member can only be circular. Rather, the specification instructs that the biased stopping member in Figure 1 "comprises an annular collar, although a variety of suitable members may be used, as for example, one or more contractible fingers biased to extend into the transverse passageway." ('008 Patent col. 4 ll. 21–24.)

Defendants argue that the '008 Patent does not explain what an embodiment with "contractible fingers" would look like or how it would function. (Defs.' Br. at 23 n.9.) But "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Innova*, 381 F.3d at 1117 (internal quotation marks omitted).

10

The record does not suggest that such an intention was presented here. Moreover, "the fact that the drawings are limited to a particular embodiment does not similarly limit the scope of the claims." *TI Group Automotive Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1138 (Fed. Cir. 2004) (citing *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306–07 (Fed. Cir. 2003)). Plaintiff is entitled to the full claim scope that is supported by the claims and the specification. Neither the claims nor the specification restricts the meaning of "stopping member" to a circular component. Therefore, the appropriate definition of "stopping member" is "a mechanical component that prevents the securing element from backing out of the stabilizing member." This construction will provide context for lay jurors while avoiding importation of the limitation included in Defendants' proposed construction.

As to the construction of "collar" and "annular collar," Defendants argue that the terms should be construed consistently because they do not mean anything different in the '008 Patent. Plaintiff contends that "collar" and "annular collar" have distinct meanings; an annular collar must be round while a collar has no definite shape. Plaintiff's contention that a collar is not required to be circular finds support in the language of the claims themselves. Claim 2 describes the width of the collar in terms of its diameter. ('008 Patent col. 8 ll. 18–21 ("wherein the head of the securing element has a maximum diameter greater than the unexpanded inner diameter of the collar and less than the expanded inner diameter of the collar").) The collar for the assembly of claim 2 indicates that this collar "is a reversibly expandable annular collar." (*Id.* col. 8 ll. 30–31.) A separate part of the claim set describes that the stopping element "comprises a biased collar" and that "the stopping member has inner transverse dimensions that are smaller than transverse dimensions of the enlarged integral portion of the securing member to facilitate retention of the enlarged integral portion of the

11

securing member within the posterior bore portion . . . ." (*Id.* col. 15 ll. 15–20; col. 16 l. 30.) In other words, the latter collar's width is not measured in terms of its diameter. This suggests that the term "collar" in the '008 Patent does not have to be circular. Moreover, these claims do not explicitly require that the collar in this portion of the claims be an annular collar.

Defendants assert that the specification only defines collar as circular. They argue that the specification describes the collar as being measured by its diameter regardless of whether the collar is a collar or an annular collar. ('008 Patent col. 4 ll. 37–44; col. 4 ll. 63–67, col. 5 ll. 1–6.) While disavowal need not be explicit, *Poly–Am.*, 839 F.3d at 1136, it does not appear from the language in the specification that the patentee intended to limit the shape of collars to be exclusively circular. One dictionary defines "collar" as "something resembling a collar in shape or use (as a ring or round flange to restrain motion or hold something in place)." Merriam–Webster's Collegiate Dictionary 225 (10th ed. 1999); *see Phillips*, 415 F.3d at 1322 ("Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words."). From this definition, I take it that while collars are generally round, they need not be circular, like a ring. This is enough to distinguish a collar from an annular collar as those terms are used in the claims of the '008 patent. I therefore agree with Plaintiff that the terms "collar" and "annular collar" are not identical. "Collar" will be defined as "a component or part of a component that is generally round and is used to restrain motion or hold something in place." And "annular collar" is construed to mean "a ring-like collar with an opening." These constructions are based on the plain meaning of the terms and are supported by the specification.

12

**C. Biased**

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction | Court's Construction |
|---|---|---|---|
| biased | (No construction necessary) *Alternatively*: absent external force, tends to remain in or return toward its initial position or shape | Changes in shape in response to an external force, and returns to its original shape by the release of such external force | The tendency of a structure or component to return to a certain position or shape absent external force |

The parties also dispute the meaning of the term "biased." At the *Markman* hearing, Plaintiff agreed that biased means "the tendency of a structure or component to return to a certain position or shape absent external force." Defendants challenge this construction, arguing that there must be a change in position *and* shape. Yet, Defendants' proposed construction, "changes shape in response to an external force, and returns to its original shape by the release of such external force," improperly reads limitations into the claim. The claim language sufficiently denotes when a change in shape is required. For instance, the patent describes instances where the stopping member is "biased" to the second figuration and where the biased collar is "elastically deformable" to the second configuration. ('008 Patent col. 13 ll. 50–51; col. 16 ll. 32–33.) Plaintiff asserts that because "elastically deformable" is a change in shape, "biased" must mean something else. It contends that the claim language instructs that a change in shape is not always required.

Defendants argue that the specification only defines bias as shape-changing. The patent indicates that in "one embodiment, the stopping member defines a reversibly expandable passageway, and is biased to the unexpanded or smaller diameter, passageway configuration." (*Id.* col. 1 ll. 49–51.) In another embodiment, "the biased stopping member is secured to the stabilizing element

13

within the transverse passageway, and is deflectable. The deflectable stopping member reversibly flexes as the head of the securing element is posteriorly displaced through the deflectable stopping member to expand the passageway defined by the stopping member. The deflectable stopping member is biased to the undeflected or smaller diameter passageway configuration." (*Id.* col. 1 ll. 62, col. 2 ll. 1–3.) From this, Defendants contend that biased "refers to the fact that the stopping member expands (changes shape) in response to an external force (the head of the screw engaging the snap-ring and forcing it to expand), and then retracts to its original shape (changes shape again) once the external force is released (the head of the screw passes through the stopping member)." (Defs.' Resp. Br. at 29, ECF No. 62.) They conclude that there is no disclosure in the patent of a multiple configuration stopping member that is biased only as to its position, and as such, biased must mean a change in position and shape. However, the patentee has not made a clear disavowal. *Thorner*, 669 F.3d at 1366 ("The fact that the embodiment contains a particular limitation is not sufficient to rise to the level of clear disavowal."). As such, I find that Defendant's proposed construction is an improper attempt to read limitations from the specification into the claim. Therefore, the term "biased" is construed to mean "the tendency of a structure or component to return to a certain position or shape absent external force."

## CONCLUSION

The disputed claim language is constructed as noted in the far right hand column of each above chart for the reasons set forth above. The Clerk is directed to set the matter on the Court's calendar for a telephone conference to address further scheduling.

14

**SO ORDERED** this  13th  day of March, 2017.

                                                s/ William C. Griesbach
                                                William C. Griesbach, Chief Judge
                                                United States District Court