UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ACANTHA LLC,

        Plaintiff,

v.                                                    Case No. 15-C-1257

DEPUY ORTHOPAEDICS INC., et al.,

        Defendants.

## DECISION AND ORDER GRANTING-IN-PART
## ACANTHA'S MOTION FOR RECONSIDERATION

Plaintiff Acantha LLC accuses Defendants DePuy Synthes Sales, Inc., DePuy Synthes Products Inc., Depuy Synthes Inc., Johnson & Johnson Inc., Synthes Inc., Synthes USA LLC, DePuy Orthopaedics Inc., and DePuy Spine LLC of infringing its patent, U.S. Reissued Patent No. RE43,008 (the '008 Patent). Presently before the court is Acantha's motion for reconsideration of the court's orders granting partial summary judgment on infringement and limiting damages. ECF Nos. 213–14. For the following reasons, the motion will be granted-in-part.

## LEGAL STANDARD

A motion for reconsideration serves a very limited purpose in federal civil litigation. It should only be used "to correct manifest errors of law or fact or to present newly discovered evidence." *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665–66 (N.D. Ill. 1976), *aff'd* 736 F.2d 388 (7th Cir. 1984)). "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'"

*Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (quoting *Sedrak v. Callahan*, 987 F. Supp. 1063, 1069 (N.D. Ill. 1997)). Such motions are disfavored and should be "rare." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990).

At the same time, "a motion for reconsideration performs a valuable function where 'the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.'" *Id.* (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983)). "Reconsideration is a useful mechanism when the court has clearly erred and immediate correction will save time and expense in the long run." *Eivaz v. Edwards*, No. 12-cv-910, 2015 WL 59347, at *1 (E.D. Wis. Jan. 5, 2015).

**ANALYSIS**

On April 25, 2018, the court granted Defendants' motions for partial summary judgment on infringement, finding that Defendants' Vectra and Zero-P VA products did not directly infringe the '008 Patent and that the Zero-P VA does not infringe the '008 Patent because it does not include a biased stopping member or anterior and posterior surfaces. It also granted Defendants' motion for partial summary judgment based on Acantha's failure to mark in accordance with 35 U.S.C. § 287(a). Acantha maintains that, in granting Defendants' motions, the court erred in a number of ways. The court will address each argument in turn.

**A. No Direct Infringement**

Acantha requests that the court reconsider its conclusion that no accused product directly infringes the '008 Patent. First, it argues that the court improperly concluded that the preamble limited the claims. In its decision, the court found that the term "assembly" is a claim limitation

because it recites essential elements of the invention pertaining to its structure. That is, to make sense of the body of the claim, all three elements of the orthopedic implant assembly—the stabilizing element, the stopping member, and the securing element—must be assembled to meet the limitations of the claim. After further consideration, however, the court finds that the body of the claims set out the complete invention. Therefore, the preamble does not constitute a limitation as it is not necessary to give life, meaning, and vitality to the claim. *See Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310 (Fed. Cir. 2002) (where the body of the claim sets out the complete invention, the preamble is not ordinarily treated as limiting the scope of the claim). Instead, the preamble merely gives a name to a structurally complete invention. *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) ("The phrase 'control apparatus' in the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention.").

In addition, to make sense of the language in various claims, assembly cannot be treated as a limitation. Some claims describe certain characteristics of the device before it is assembled. For instance, claim 3 discusses a stopping member "configured to be displaceable . . . ." '008 Patent col. 8 l. 25. Claim 13 considers a stabilizing element that is "configured to conform to and extend between at least two bone segments." *Id.* col. 9 ll. 5–7. The language in these claims, and others, are inconsistent with the notion that the device must be assembled in every claim.

Finally, there is no clear indication that Acantha relied on the preamble during prosecution to distinguish the patent from prior art. Defendants asserted in their brief in support of their motion for summary judgment that the PTO rejected one of the claims in Acantha's reissue application, which was directed to an orthopedic attachment member, in light of the Errico reference. In

3

response to the rejection, Acantha amended the claim by adding another component and changing the preamble language from "member" to "assembly." ECF No. 193 at 5. But this prosecution history fails to show clear reliance on the preamble language to distinguish the invention from prior art. *See Symantec Corp. v. Computer Assocs. Intern., Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008) ("Absent clear reliance on the preamble in the prosecution history, . . . the preamble 'generally is not limiting.'" (quoting *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002)). Acantha changed not only the preamble but also substantial portions of the body of the claim to explain how the invention is different from the Errico reference. For these reasons, the court finds that the preamble is not a claim limitation and does not require that complete assembly is required.

Acantha also asserts that the court failed to address whether Defendants sell assembled products. As explained in the court's order, the screws for the accused products are provided separately from the plates because the products are compatible with various screw types. Prior to surgery, a variety of plates and screws are removed from their packaging and placed on a tray for the surgeon to choose which product to use. After the surgery, the hospital submits an invoice for the components that were actually used by the surgeon. ECF No. 213 at 4–5. Although 35 U.S.C. § 271 does not define "sell," the Federal Circuit has explained that the "definition of 'sale' is: '1. The transfer of property or title for a price. 2. The agreement by which such a transfer takes place. The four elements are (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised.'" *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005) (quoting BLACK'S LAW DICTIONARY 1337 (7th ed. 1999)). Defendants maintain that the accused products are sold, for the purposes of § 271, when they are

4

provided to the hospital in their unassembled state, regardless of when the money actually changes hands. Conversely, Acantha contends that the sale occurs when the product is used in surgery and the hospital subsequently submits an invoice to Defendants. But the record does not contain any evidence explaining what the distribution agreements between Defendants and the hospitals actually are. Even if the hospital invoices Defendants, it is unclear when the hospital promises to pay for the product. The court concludes a dispute of fact exists as to how the accused products are actually sold.

Finally, Acantha contends the court erred in concluding Defendants do not directly infringe claims 21, 36, and 37, which are method claims. In its decision, the court concluded Defendants do not infringe these method claims during testing because they do not position a stabilizing element against the surface of a living patient's bone. Acantha asserts the court erred in construing the word "patient" to mean a "living patient." But to suggest that patient means anything other than a living being is absurd. The dictionary definition of the word "patient" is "an individual awaiting or under medical care and treatment" or "the recipient of any of various personal services." WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998). Plaintiff asserts "patient" means "the recipient of any of various personal services." ECF No. 247 at 16 (citing *Volk v. Ace Am. Ins. Co.*, 748 F.3d 827, 828–29 (8th Cir. 2014) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1655 (1981))). Even this definition requires that a patient be a person or thing that receives *personal services*, however. A cadaver or dummy spine cannot be the recipient of these services. In short, the court's decision that Defendants do not directly infringe these method claims remains sound.

Accordingly, Acantha's motion for reconsideration will be granted in part and denied in part. The motion is granted insofar as the court vacates its award of summary judgment in favor of

5

Defendants with respect to no direct infringement of claims 3, 9, 59, 63, 72, 79, and 85 of the '008 Patent. The motion is denied with respect to claims 21, 36, and 37, as Acantha has not established that Defendants directly infringe these method claims.

**B. Non-infringement**

Acantha also asks the court to reconsider its conclusion that the Zero-P VA product does not infringe. Acantha first contends that the court improperly resolved a factual dispute by finding that no reasonable juror could conclude that the Zero-P VA product included a biased stopping member. The Zero-P VA uses a spring-loaded "snapper" mechanism to deal with the problem of screw back-out that the '008 patent was intended to address. The Zero-P VA snapper mechanism consists of three separate components: a catch (or finger), a spring, and a set screw, all held in their relative orientation by the plate portion. Acantha asserts there is a dispute as to whether the finger of the cylindrical catch or the entire "snapper" assembly, comprised of the cylindrical catch, spring, and set screw, is the Zero-P VA's stopping member. In it's claim construction order, the court construed "stopping member" to mean "[a] mechanical component that prevents the securing element from backing out of the stabilizing member" and "biased" to mean "[t]he tendency of a structure or component to return to a certain position or shape absent external force." ECF No. 64 at 7, 13.

The parties did not seek construction of the term "member," that is, whether the stopping member must be a single element or can be a mechanism comprised of multiple parts. When parties do not seek construction of the terms at issue, courts give those terms their "'ordinary and customary meaning . . . to a person of ordinary skill in the art in question at the time of the

6

invention.'" *Belden Techs. Inc. v. Superior Essex Comm'cns LP*, 733 F. Supp. 2d 517, 545 (D. Del. 2010) (quoting *Phillips v. ARW Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).

In its infringement decision, the court concluded that only the finger, or the cylindrical catch, is the stopping member because it is the object that extends into the passageway and prevents the screw from backing out of the stabilizing member. Acantha argues that to "construe 'stopping member' to foreclose multi-component assemblies or limit the term to something necessarily less than 'the entire blocking mechanism,' the Court would have been required to find that the inventors acted as lexicographers or that they clearly and unmistakably disclaimed multi-component stopping members." ECF No. 224 at 9. But that is true only if the '008 patent, by its terms, claimed a multi-component mechanism like the snapper mechanism. Acantha argues that the patent does arguably encompass such an assembly, pointing to the following language in the specification: "In the embodiment illustrated in FIG. 1, the biased stopping member comprises an annular collar, although a variety of suitable members may be used, as for example, one or more contractible fingers biased to extend into the transverse passageway (not shown)." '008 patent col. 4 ll. 21–24. Acantha argues that this language is broad enough to encompass the snapper mechanism of the Zero-P VA.

The court initially rejected this argument on the ground that the finger by itself was not biased, but was moved by an external force, i.e., the spring. As noted above, the court had construed the term biased to mean an inherent tendency of the stopping member "to return to a certain position or shape absent external force." ECF No. 64 at 13. This is what is shown in the embodiments displayed in the specification. But, of course, the claims, not the specification embodiments, define the scope of patent protection. *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (cautioning "against confining the claims to [preferred] embodiments"). Viewing the spring in the

7

snapper mechanism as an external force, the court concluded that no infringement could be shown because the Zero-P VA lacked this essential element of the claimed invention. It is clear from Dr. Sachs' testimony and reports, however, that in his view, the catch or finger of the Zero-P VA is a biased stopping member as claimed by the '008 patent, while in the view of Defendants' expert it is not. Having reconsidered the arguments of counsel and the evidence in the case, the court now concludes that whether the spring-loaded snapper mechanism would be considered a biased stopping member within the meaning of the claims by a person of ordinary skill in the art presents a factual issue that the jury must decide.

In its decision granting Defendants' motion for summary judgment on infringement, the court also held that the Zero-P VA did not infringe because the anterior surface of that product is at least equidistant if not closer to the bone than its posterior surface. ECF No. 213 at 18. Acantha claims that the court erred because a person of ordinary skill at the time of the invention would not understand "'anterior surface' or 'posterior surface' to have any bearing on the manner in which the attachment element is situated on the spine or between vertebra" and instead would understand "that the inventors were merely describing the surfaces of the *attachment element* in relation to the screw trajectory through a bore." ECF No. 224 at 14–15. That is, the "surface through which the screw enters is the anterior surface" and the "surface through which it exists is the posterior one." *Id.* at 15. Again, how a person of ordinary skill in the art would understand "anterior" and "posterior" is a question of fact that must be resolved by the jury. In short, Defendants' non-infringement arguments turn on factual questions of how one skilled in the art would interpret the terms. Because these factual disputes must be resolved by the factfinder, and not the court, the motion for reconsideration is granted. The court's prior decision granting partial summary judgment of non-

infringement by the Zero-P VA is therefore vacated and summary judgment is denied as to that claim.

**C. Failure to Mark**

Acantha asserts that the court should reconsider its order limiting damages as a matter of law for its failure to comply with § 287(a). Although compliance with the marking statute is a question of fact, the issue is properly decided upon summary judgment when no reasonable jury could infer constructive notice. The court remains convinced, generally for the reasons stated in its original decision, that no reasonable juror could find that Acantha provided the proper notice to Defendants. To satisfy the marking requirements of § 287(a), marking "must be substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

Acantha does not dispute that in 2009, 93% of the licensed product Stryker sold was unmarked; in 2010, 95% of the licensed product was unmarked; in 2011, 94% of the licensed product was unmarked; in 2012, 95% of the licensed product was unmarked; and in 2013, 95% of the licensed product was unmarked. It nevertheless asserts that the court erred in applying a rigid bright line rule to find that the fact that Acantha listed its patent number in its surgical technical guides doe not constitute proper marking. Acantha contends the court should be lenient in determining whether it complied with the marking statute. Indeed, courts have construed the statute to allow discretion to the patentee to alternatively mark its product. For instance, in the context of deciding whether a patentee complied with § 287(a) by marking the product even though the product itself was capable of being marked, the Supreme Court has focused on whether the method of marking the patented product provided notice, rather than on the precise mechanistic compliance

9

with the statute. *See Sessions v. Romadka*, 145 U.S. 29 (1982); *see also Rutherford v. Trim–Tex, Inc.*, 803 F. Supp. 158, 161 (N.D. Ill. 1992) (analyzing *Sessions*); *Global Traffic Tech. LLC v. Morgan*, 620 F. App'x 895 (Fed. Cir. 2015). This makes sense. The statutory language plainly states that marking is proper when it appears on the product or the package containing the product. 35 U.S.C. § 287(a) ("Patentees . . . may give notice to the public that the [patented article] is patented, either by fixing thereon the word 'patent' . . . together with the number of the patent . . . to it, or to the package wherein one or more of them is contained, a label containing a like notice.").

Courts have gone a step further and have found that patentees could satisfy the statute when they mark the product and the box with the word "patented" and include an instruction manual that provides the patent number within the box. *See McAfee Enters., Inc. v. Ashley Entm't Corp.*, No. 16-cv-2618, 2016 WL 4063169 (N.D. Ill. July 29, 2016); *Rexnord, Inc. v. Laitram Corp.*, No. 85-C-1039, 1988 WL 141526 (E.D. Wis. 1988). But it goes too far to say that a patentee may forgo the two methods of marking the statute explicitly contemplates and instead list the patent number on a technical guide that is not placed in the box or connected to the box in which the product is contained. *See Metrologic Instruments, Inc. v. PSC, Inc.*, No. 99-4876, 2004 WL 2851995 (D.N.J. Dec. 13, 2014) (explaining that "marking the user's guide is yet another step removed from the product. And it is, in addition, a step beyond that which the explicit language of the marking statute contemplates."); *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 891 F. Supp. 751 (E.D.N.Y. 1995), *aff'd* 96 F.3d 1409 (Fed. Cir. 1996); *Calmar, Inc. v. Emson Research, Inc.*, 850 F. Supp. 861 (C.D. Cal. 1994). Acantha has presented no evidence that the surgical technical guides are included in the box with the product. The other avenues through which the surgical technical guide is distributed, such as at hospitals, trade shows, educational forums, online, or during surgeries, does not satisfy

the constructive notice requirement of the marking statute. In short, Acantha has not established that the court erred in concluding that listing the patent number on its technical guides is insufficient notice under § 287(a) as a matter of law.

Again, that leaves Acantha with marking at most 7% of its patented products each year. Acantha nevertheless argues that the court erred in failing to excuse its conduct by finding that it did not comply with its duty to mark even under the rule of reason approach established in *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996). *Maxwell* recognized that "[w]hen a third party is involved in the marking process, the number of [products] sold without the proper marking is not conclusive of the issue whether the patentee's marking was 'substantially consistent and continuous.' When the failure to mark is caused by someone other than the patentee, the court may consider whether the patentee made reasonable efforts to ensure compliance with the marking requirements." *Id.* at 1111–12. Even though the patentee is not required to show that its marking was "substantially consistent and continuous" under the rule of reason approach, the patentee must still show that it "substantially complied" with the statute. *Id.* ("A 'rule of reason' approach is justified in such a case and substantial compliance may be found to satisfy the statute."). That is not to say that substantial compliance means that Acantha was required to mark substantially all of its products. *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998) ("[F]ull compliance with the marking statute was not achieved until the patentee 'consistently marked substantially all' of the patented products, and was no longer distributing unmarked products."). But even considering Acantha's efforts to ensure Stryker complied with the marking requirements, no reasonable juror could conclude that Acantha substantially complied with the statute when only five to seven percent of the licensed product was marked.

11

Finally, Acantha has not shown that the court erred in concluding that Acantha raised no issue of material fact concerning consistent marking after Stryker agreed to mark the product's label after July 31, 2013. Again, Acantha does not dispute that in 2013, 95% of the licensed product Stryker sold was unmarked. It has not shown that its marking "substantially complied" with § 287(a) after Stryker agreed to the label change. *Maxwell*, 86 F.3d at 1111. In sum, Acantha's arguments do not convince the court that it erred in finding that Acantha failed to mark its products in accordance with § 287(a).

**D. Relief Under Rule 54(b) Judgment and Interlocutory Appeal**

Finally, Acantha requests that the court enter a final judgment pursuant to Rule 54(b) in order to appeal the court's non-infringement decision, certify the remaining orders for interlocutory appeal, and stay all remaining issues. Acantha's request for relief under Rule 54(b) with respect to noninfringement is now moot, and its motion to certify an interlocutory appeal regarding the court's marking decision will be denied. Interlocutory appeals are governed by 28 U.S.C. § 1292(b). The invocation of § 1292(b) must be limited to "exceptional cases" in which an appellate decision "may obviate the need for protracted and expensive litigation . . . ." *Fed. Deposit Ins. Corp. v. First Nat. Bank of Waukesha, Wis.*, 604 F. Supp. 616, 620 (E.D. Wis. 1985). Before a district court certifies an order for immediate appellate review, the following statutory requirements must be satisfied: "(1) the appeal presents a question of law; (2) it is controlling; (3) it is contestable; (4) its resolution will expedite the resolution of the litigation; and (5) the petition to appeal is filed in the district court within a reasonable amount of time after entry of the order sought to be appealed." *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Development*, 291 F.3d 1000, 1007 (7th Cir. 2002) (citing *Ahrenholz v. Bd. of Trustees of Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000)). Acantha

has failed to show how an interlocutory appeal would advance the ultimate termination of the lawsuit. Even if the Federal Circuit considers the issue, a resolution favorable to Acantha will not extinguish any of the infringement claims. The interest of both the court and the litigants in securing final judgment on all aspects of this case as quickly and efficiently as possible far outweighs any benefit Acantha might gain from appealing the court's marking decision. In short, Acantha has not shown that this is an exceptional case in which § 1292(b) should be invoked for an interlocutory appeal.

## CONCLUSION

For these reasons, Acantha's motion for reconsideration (ECF No. 241) is **GRANTED-IN-PART and DENIED-IN-PART**. The motion is granted with respect to the court's summary judgment decision of no direct infringement of claims 3, 9, 59, 63, 72, 79, and 85, and as to non-infringement by the Zero-P VA, but denied in all other respects. The clerk is directed to schedule a telephone conference to address the current trial date and any further scheduling.

**SO ORDERED** this  19th  day of May, 2018.

            s/ William C. Griesbach
            William C. Griesbach, Chief Judge
            United States District Court