# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | | |
|---|---|---|
| ACANTHA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:15-cv-01257-WCG |
| v. | ) | |
| | ) | |
| DEPUY SYNTHES SALES, INC., | ) | |
| DEPUY SYNTHES PRODUCTS, INC., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## ACANTHA'S RULE 59 MOTION FOR ENHANCED DAMAGES AND OTHER POST-TRIAL LEGAL AND EQUITABLE RELIEF

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................... 1

II.    THE COURT SHOULD AWARD ENHANCED DAMAGES FOR
      DEFENDANTS' PRE-VERDICT WILLFUL INFRINGEMENT. .................................. 1

     A.     Legal Standards Governing Enhanced Damages. .................................. 1

     B.     The Totality of the Circumstances, as Analyzed Under the *Read* Factors,
         Warrants at Least Doubling the Jury's Damages Award. ....................................... 3

        1.    Defendants Copied Acantha's Patented Ideas. ....................................... 3

        2.    Defendants' Failure to Formulate a Good-Faith Belief in Non-
           Infringement or Invalidity Favors Enhancement. .................................... 7

        3.    Defendants' Behavior as a Party to the Litigation Favors Enhancement. ........... 13

        4.    Defendants' Size and Financial Condition Favors Enhancement. ........................ 17

        5.    The Case Was Not Close. ....................................................................... 18

        6.    The 13-Year Infringement Period Factors Enhancement ..................................... 24

        7.    Defendants' Lack of Remedial Measures Favors Enhancement. ........................ 26

        8.    Defendants' Motivation to Harm Weighs in Favor of Enhancement. .................. 27

        9.    Defendants' Concealment of Certain Categories of Evidence Weighs At
           Least Slightly in Favor of Enhancement. .............................................. 28

       10.   Summary Regarding Enhancement ....................................................... 30

III.   THE COURT SHOULD DECLARE THIS CASE "EXCEPTIONAL" AND
      AWARD ACANTHA ITS ATTORNEYS FEES UNDER 35 U.S.C. § 285. ................. 34

IV.    THE COURT SHOULD AWARD ACANTHA COSTS .................................................. 35

V.     THE COURT SHOULD AWARD ACANTHA SUPPLEMENTAL DAMAGES ......... 36

VI.    THE COURT SHOULD IMPOSE AN ENHANCED ONGOING ROYALTY ............. 37

VII.   THE COURT SHOULD AWARD PRE- AND POST-JUDGMENT INTEREST .......... 44

i

A.    The Court Should Award Pre-Judgment Interest. ................................................... 44

B.    The Court Should Award Post-Judgment Interest. ................................................ 45

VIII.  CONCLUSION ............................................................................................................... 45

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Accord Roy v. Forest Cty. Potawatomi Grp. Health Dental Vision & Short Term
Disability Plan*, No. 03-C-1265, 2006 WL 416214 (E.D. Wis. Feb. 22, 2006) ...................... 46

*Advanced Display Sys., Inc. v. Kent State Univ.*
No. 3-96-CV-1480-BD, 2002 WL 1489555 (N.D. Tex. July 10, 2002)................................... 34

*Alps S., LLC v. Ohio Willow Wood Co.*
No. 808CV1893T35MAP, 2013 WL 12164769 (M.D. Fla. May 10, 2013) ........................... 34

*Amado v. Microsoft Corp.*
517 F.3d 1353 (Fed. Cir. 2008) ....................................................................... 41, 44

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*
198 F. Supp. 3d 1343 (S.D. Fla. 2016) *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017)................. passim

*Avia Grp. Int'l, Inc. v. L.A. Gear California, Inc.*
853 F.2d 1557 (Fed. Cir. 1988) *abrogated on other grounds*
*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008)....................................... 2

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*
No. CV 03-0597-PHX-MHM, 2013 WL 5670909 (D. Ariz. Oct. 17, 2013), *aff'd*
776 F.3d 837 (Fed. Cir. 2015) ........................................................................... 12

*Barry v. Medtronic, Inc.*
250 F. Supp. 3d 107 (E.D. Tex. 2017)................................................................... 4

*Beatrice Foods Co. v. New England Printing & Lithographing Co.*
923 F.2d 1576 (Fed. Cir. 1991) ......................................................................... 1

*Bernard v. Woodside Ranch, LLC*
No. 16-CV-461-SLC, 2017 WL 3524692 (W.D. Wis. Aug. 15, 2017)................................... 32

*Boston Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259 (D. Del. 2012), *aff'd*
497 F. App' x 69 (Fed. Cir. 2013) ...................................................................... 33

*Briese Lichttenchnik Vertriebs Gmbh v. Langton*
No. 09 CIV. 9790, 2013 WL 12061874 (S.D.N.Y. Dec. 18, 2013) ...................................... 34

iii

*Broadcom Corp. v. Qualcomm Inc.*
No. SACV 05-467-JVS, 2007 WL 2326838 (C.D. Cal. Aug. 10, 2007) *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007) ......................................................... 24

*Burlington Indus. v. Dayco Corp.*
849 F.2d 1418 (Fed. Cir. 1988) ............................................................ 15

*Canon, Inc. v. Color Imaging, Inc.*
292 F. Supp. 3d 1357 (N.D. Ga. 2018) ......................................... 8, 26, 27

*Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*
No. 07CV0894 DMS (DHB), 2012 WL 12845892 (S.D. Cal. Aug. 6, 2012) ......................... 33

*Cent. Soya Co. v. Geo. A. Hormel & Co.*
723 F.2d 1573 (Fed. Cir. 1983) ............................................................ 34

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*
315 F. Supp. 3d 977 (N.D. Ill. 2018) ............................................... 18, 26

*Cioffi v. Google, Inc.*
No. 2:13-CV-103, 2017 WL 4011143 (E.D. Tex. Sept. 12, 2017) ......................................... 39

*CleanCut, LLC v. Rug Doctor, Inc.*
No. 2:08-CV-836, 2013 WL 441209 (D. Utah Feb. 5, 2013) .................................................. 30

*Cobalt Boats, LLC v. Brunswick Corp.*
296 F. Supp. 3d 791 (E.D. Va. 2017) ............................................... 7, 28

*Crane Security Techs., Inc. v. Rolling Optics AB*
No. CV 14-12428-LTS, 2018 WL 4039355 (D. Mass. Aug. 23, 2018) ..................................... 4

*DataTreasury Corp. v. Wells Fargo & Co.*
No. 2:06-CV-72 DF, 2010 WL 5140718 (E.D. Tex. Sept. 27, 2010) ...................................... 33

*Dukane Precast, Inc. v. Perez*
785 F.3d 252 (7th Cir. 2015) .............................................................. 31

*Eidos Display, LLC v. Chi Mei Innolux Corp.*
No. 6:11-CV-00201-JRG, 2018 WL 1156284 (E.D. Tex. Mar. 5, 2018) ................................. 33

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*
No. 2:15-CV-1202-WCB, 2017 WL 3034655 (E.D. Tex. July 18, 2017) ................... 39, 41, 43

iv

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*
   No. 2:15-CV-00011-RSP, 2018 WL 2149736 (E.D. Tex. May 10, 2018) ................................ 8

*Fiskars, Inc. v. Hunt Mfg. Co.*
   221 F.3d 1318 (Fed. Cir. 2000) ............................................................. 16

*Gen. Motors Corp. v. Devex Corp.*
   461 U.S. 648, 655 (1983)..................................................................... 44

*Georgetown Rail Equip. Co. v. Holland L.P.*
   No. 6:13-CV-366, 2016 WL 3346084 (E.D. Tex. June 16, 2016), *aff'd*
   867 F.3d 1229 (Fed. Cir. 2017) ............................................................ 4

*Golight, Inc. v. Wal-Mart Stores, Inc.*
   355 F.3d 1327 (Fed. Cir. 2004) .......................................................... 34

*Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*
   300 F. Supp. 3d 610 (D. Del. 2018)...................................................... 7

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*
   136 S. Ct. 1923 (2016)............................................................... 1, 9, 31

*Hoechst Celanese Corp. v. BP Chemicals Ltd.*
   846 F. Supp. 542 (S.D. Tex. 1994), *aff'd,* 78 F.3d 1575 (Fed. Cir. 1996) .............................. 33

*I/P Engine, Inc. v. AOL Inc.*
   No. 2:11CV512, 2014 WL 309245 (E.D. Va. Jan. 28, 2014), *vacated on other grounds*
   No. 2:11-CV-512, 2016 WL 9667228 (E.D. Va. Jan. 29, 2016) ........................................ 39, 42

*i4i Ltd. P'ship v. Microsoft Corp.*
   670 F. Supp. 2d 568 (E.D. Tex. 2009)................................................... 36

*I-Flow Corp. v. Apex Med. Tech., Inc.*
   No. 07cv1200, 2010 WL 114005 (S.D. Cal. Jan. 6, 2010) ...................................... 24

*Insta-Foam Prod., Inc. v. Universal Foam Sys., Inc.*
   906 F.2d 698 (Fed. Cir. 1990) ............................................................. 10

*Invitrogen Corp. v. Biocrest Mfg., L.P.*
   No. A-01-CA-167-SS, 2006 WL 8435710 (W.D. Tex. Oct. 31, 2006).................................... 33

*Johns Hopkins Univ. v. CellPro*
   978 F. Supp. 184 (D. Del. 1997)........................................................... 17

v

*Jurgens v. CBK, Ltd.*
  80 F.3d 1566 (Fed. Cir. 1996) ........................................................... 3, 7

*Krippelz v. Ford Motor Co.*
  670 F. Supp. 2d 815 (N.D. Ill. 2009) ...................................................... 17

*Maxwell v. Angel-Etts of California*
  No. CV9910516DT(AJWX), 2001 WL 34133507 (C.D. Cal. July 9, 2001) *aff'd*
  53 Fed. Appx. 561 (Fed. Cir. 2002) ....................................................... 17

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*
  370 F.3d 1354 (Fed. Cir. 2004) ........................................................... 17

*Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*
  833 F. Supp. 2d 333 (E.D.N.Y. 2011) ..................................................... 33

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*
  288 F. Supp. 3d 872 (E.D. Wis. 2017)................................................. 44, 45

*Modine Mfg. Co. v. Allen Grp., Inc.*
  917 F.2d 538 (Fed. Cir. 1990) ............................................................ 34

*Mondis Tech. Ltd. v. Chimei InnoLux Corp.*
  822 F. Supp. 2d 639 (E.D. Tex. 2011) *aff'd sub nom.*
  *Mondis Tech. Ltd. v. Innolux Corp.*, 530 Fed. Appx. 959 (Fed. Cir. 2013) ............ 42

*Napoles v. Johnson*
  No. 12 CV 10220, 2015 WL 755388 (N.D. Ill. Feb. 20, 2015)............................. 32

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*
  134 S. Ct. 1749 (2014)............................................................... 34, 35

*Paice LLC v. Toyota Motor Corp.*
  609 F. Supp. 2d 620 (E.D. Tex. 2009) *dismissed by party agreement*
  455 F. App'x 955 (Fed. Cir. 2010) ............................................... 38, 41, 43

*Parker v. Four Seasons Hotels, Ltd.*
  845 F.3d 807 (7th Cir. 2017) .............................................................. 32

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*
  No. 511CV761GLSDEP, 2016 WL 6537977 (N.D.N.Y. Nov. 3, 2016)..................... 18, 24, 27

vi

*R-BOC Representatives, Inc. v. Minemyer*
   233 F. Supp. 3d 647 (N.D. Ill. 2017) ........................................................ 32

*Read Corp. v. Portec, Inc.*
   970 F.2d 816 (Fed. Cir. 1992) ........................................................ passim

*Sanitary Refrigerator Co. v. Winters*
   280 U.S. 30 (1929) ........................................................ 8

*SDS Korea Co. v. SDS USA, Inc.*
   No. 2:10-CV-4053 WJM, 2012 WL 3114753 (D.N.J. July 31, 2012) .................................... 33

*SDS Korea Co., Ltd. v. SDS USA, Inc.*
   No. 2:10-cv-4053, 2012 WL 3114753 (D.N.J. July 31, 2012) .................................. 33

*Shum v. Intel Corp.*
   629 F.3d 1360, 1366-67 (Fed. Cir. 2010) ............................................ 35

*Smith & Nephew Inc. v. Arthrex, Inc.*
   603 Fed. App'x 981 (Fed. Cir. 2015) ........................................................ 36

*SRI Int'l, Inc. v. Cisco Sys., Inc.*
   254 F. Supp. 3d 680 (D. Del. 2017) ........................................................ 33

*Stryker Corp. v. Zimmer, Inc.*
   No. 1:10-CV-1223, 2017 WL 4286412 (W.D. Mich. July 12, 2017).................... 2, 18, 26, 29

*Summit 6, LLC v. Samsung Elecs. Co.*
   802 F.3d 1283 (Fed. Cir. 2015) ........................................................ 37

*SynQor, Inc. v. Artesyn Techs., Inc.*
   709 F.3d 1365 (Fed. Cir. 2013) ........................................................ 42

*T&M Inventions, LLC v. Acuity Brands Lighting, Inc.*
   Case No. 14-CV-947, 2016 WL 8290851 (E.D. Wisc. Sept. 21, 2016) .................................. 35

*TCL Commc'n Tech. Holdings, Ltd.*
   No. 2:15-CV-00011-RSP, 2018 WL 2149736 (E.D. Tex. May 10, 2018) ................................ 7

*ThermoLife Int'l, LLC v. Sechel Holdings, Inc.*
   No. 11-CV-01256-PHX-PGR, 2012 WL 1038775 (D. Ariz. Mar. 28, 2012) ........................ 33

vii

*Third Wave Techs, Inc. v. Stratagene Corp.*
    405 F. Supp. 2d 991 (W.D. Wisc. 2005) .................................................................. 16

*Trustees of Boston Univ. v. Everlight Elecs. Co.*
    187 F. Supp. 3d 306 (D. Mass. 2016) ..................................................................... 45

*Veracode, Inc. v. Appthority, Inc.*
    137 F.Supp.3d 17 (D. Mass. 2015) .......................................................................... 5

*VirnetX Inc. v. Apple Inc.*
    No. 6:13-CV-211, 2014 WL 12672822 (E.D. Tex. Mar. 6, 2014) ..................................... 40, 43

*Visto Corp. v. Seven Networks, Inc.*
    No. 2:03-CV-333-TJW, 2006 WL 3741891 (E.D. Tex. Dec. 19, 2006) ................................. 33

*Warsaw Orthopedic, Inc. v. Nuvasive, Inc.*
    824 F.3d 1344 (Fed. Cir. 2016) .............................................................................. 7

*WBIP, LLC v. Kohler Co.*
    No. CIV.A. 11-10374-NMG, 2014 WL 585854 (D. Mass. Feb. 12, 2014).................. 5, 30, 38

*WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358 (Fed. Cir. 2016)
    *rev'd on other grounds*, 138 S. Ct. 2129 (2018) ......................................................... 1

*Whirlpool Corp. v. TST Water, LLC*
    No. 2:15-CV-01528-JRG, 2018 WL 1536874 (E.D. Tex. Mar. 29, 2018)....................... passim

*Whitserve, LLC v. Computer Packages, Inc.*
    694 F.3d 10 (Fed. Cir. 2012) ................................................................................ 36

*Wisconsin Alumni Research Found. v. Apple, Inc.*
    261 F. Supp. 3d 900 (W.D. Wis. 2017) ................................................................... 37

*Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*
    No. 204-CV-01971-MCE-EFB, 2009 WL 113771 (E.D. Cal. Jan. 15, 2009)....................... 33

*XY, LLC v. Trans Ova Genetics*
    890 F.3d 1282 (Fed. Cir. 2018) ............................................................................. 37

*Zenith Elecs. LLC v. Vizio, Inc.*
    No. 5:06-CV-246-DF, 2010 WL 11475581 (E.D. Tex. July 13, 2010).............................. 33

viii

**Statutes**

28 U.S.C. § 1961 .................................................................................................................... 45

35 U.S.C. § 284 ..................................................................................................................... 44

35 U.S.C. § 285 ..................................................................................................................... 34

35 U.S.C. § 287 ..................................................................................................................... 25

**Rules**

Fed. R. Civ. P. 54(d) ....................................................................................................... 35, 36

Fed. R. Civ. P. 54(d)(1)......................................................................................................... 36

Fed. R. Civ. P. 54(d)(2)......................................................................................................... 35

Fed. R. Civ. P. 54(d)(2)(C) .................................................................................................... 35

# I.  INTRODUCTION

After a 7-day trial, the jury returned a verdict finding infringement of all asserted claims of the '008 patent, that none of those claims were invalid, and that Defendants' infringement of the '008 patent had been willful.  The jury also awarded $8,248,560 in damages.  The Court entered judgment on the verdict three days later.  Acantha moves under Rule 59(e) to amend that judgment to grant Acantha the relief requested below:

- Enhanced damages addressing Defendants' willful infringement;
- Attorneys' Fees and Costs;
- Supplemental damages for sales occurring after March 31, 2018 but before the Court's altered Final Judgment is entered;
- An ongoing royalty through the expiration of the patent;
- Pre-judgment and post-judgment interest.

# II.  THE COURT SHOULD AWARD ENHANCED DAMAGES FOR DEFENDANTS' PRE-VERDICT WILLFUL INFRINGEMENT.

## A.  Legal Standards Governing Enhanced Damages.

In light of the jury's willfulness verdict, the Court is empowered to enhance the damages award by up to three times.  35 U.S.C. § 284; *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) ("*Halo* emphasized that subjective willfulness alone . . . can support an award of enhanced damages."), *rev'd on other grounds*, 138 S. Ct. 2129 (2018).

Enhanced damages serve two primary goals:  punishment of the individual defendant for the conduct determined to be willful, *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1579 (Fed. Cir. 1991); and creation of an adequate economic incentive for the Defendant and other would-be infringers to evaluate potential infringements and voluntarily take licenses or make design changes to avoid others' patent rights, *Avia Grp. Int'l,*

1

*Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1566 (Fed. Cir. 1988) ("One purpose of an increased damage award is to deter willful patent infringement."), *abrogated on other grounds*, *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008). The Court has wide discretion as to the amount to award to serve these dual purposes. And although enhancement is not necessarily required, "[a]n enhancement of damages often follows a finding of willful infringement," and in fact the Court would have to "provide reasons for *not* increasing a damages award" in a case such as this. *Stryker Corp. v. Zimmer, Inc.*, No. 1:10-CV-1223, 2017 WL 4286412, at *3 n.2 (W.D. Mich. July 12, 2017) (citing cases).

"The paramount determination in deciding enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992). In exercising their discretion, district courts typically consider a non-exclusive set of factors (the "*Read* Factors"). These include: (1) whether Defendants copied Acantha's patented ideas; (2) whether Defendants, knowing of Acantha's patent protection, investigated the scope of the patent and formed a good-faith belief of non-infringement or invalidity; (3) Defendants' behavior as a party to the litigation; (4) Defendants' size and financial condition; (5) the closeness of the case; (6) the duration of Defendants' infringement; (7) whether Defendants engaged in any remedial action to cease infringement; (8) whether Defendants had a motivation for harm; and (9) whether Defendants attempted to conceal their conduct. *Id.* at 826–27.

In evaluating these factors, the Court's discretion is bound by the jury's verdict. While the Court may weigh the totality of the circumstances in many different ways, it is required to credit facts necessarily determined by the jury—like the fact that Defendants' infringement was

2

willful, and that Defendants did not have a good faith belief of non-infringement or invalidity. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1372 (Fed. Cir. 1996) ("Although the trial court many times has discretion to weigh the closeness of the case and the scope of the infringer's investigation in deciding whether to increase a damages award, *it does not have discretion to reweigh this evidence once the matter has been decided by the jury . . . .*" (emphasis added)).

## B. The Totality of the Circumstances, as Analyzed Under the *Read* Factors, Warrants at Least Doubling the Jury's Damages Award.

A *Read* factor analysis indicates that a substantial enhancement is warranted in this case. Defendants have infringed on Acantha's intellectual property on a huge scale for well over a decade. Significant evidence indicates that Defendants copied Acantha's patent or at a minimum copied a patent-practicing licensed product, likely knowing that it practiced Acantha's patent. Defendants have apparently done nothing to remedy the infringing nature of their actions, and the jury determined decisively that Defendants had no reasonable beliefs in non-infringement or invalidity—emphatically rejecting the reasonableness of Defendants' alleged reliance on opinions of counsel of dubious quality. Compounding these issues, despite having no reasonable belief of non-infringement or invalidity, Defendants nevertheless demonstrated utter disregard for Acantha's patent rights by threatening Dr. Lloyd for contemplating patent enforcement. These circumstances warrant a financial deterrent to ensure that Defendants avoid similar conduct in the future. For the reasons described in more detail below, Acantha believes that an enhancement of at least doubling, or even trebling, is warranted under the circumstances.

### 1. Defendants Copied Acantha's Patented Ideas.

The first *Read* factor is whether Defendants "copied the ideas of another" in releasing their infringing products. This factor weighs in favor of enhancement whenever there is credible

3

evidence indicating that the infringer copied the patent itself, the patentee's commercial embodiment, or a patent-practicing licensed embodiment. *Read*, 970 F.2d at 827 n.7. Neither "slavish copying" nor a "smoking gun" is required. *See Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 112 (E.D. Tex. 2017). Here, there is strong evidence to support inferences that Defendants copied Acantha's actual patent, Stryker's licensed Reflex product, or both, when they began they infringement of Acantha's patent.

As the jury heard, Defendants have known about Acantha's patent since Mr. Talaber first informed them of it by letter in March of 2002. *E.g.*, PX48 (Mr. Talaber's letter to Synthes Spine). The Vectra product was not released until June 2005. Given the similarities between the Vectra product and the inventions claimed in Acantha's patent, this alone is strong evidence of copying. *Georgetown Rail Equip. Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 WL 3346084, at *17 (E.D. Tex. June 16, 2016) (development of "similar system" after prior disclosure "is strong evidence of copying."), *aff'd*, 867 F.3d 1229 (Fed. Cir. 2017); *see also Crane Security Techs., Inc. v. Rolling Optics AB*, No. CV 14-12428-LTS, 2018 WL 4039355, at *6 (D. Mass. Aug. 23, 2018) ("The Court observes that the similarities of RO's technology to Crane's patented invention, combined with RO's extensive knowledge of Crane's intellectual property rights and products, support the inference of copying that favors enhancement.").

But the inference of copying is particularly strong here given the timing of Defendants' product development. Mr. Talaber's March 2002 letter to Synthes was sent to Nisra Thongpreda. *See* PX48. Ms. Throngpreda worked with both Lan Ahn Duong and Sean Suh on the ACCS product, the predecessor to Vectra, which began development as early as 2001. TT (Duong) at 895:10–11; 939:24–940:6. Yet despite being months into the ACCS development, it

was not until mere weeks after Ms. Thongpreda received Mr. Talaber's letter (enclosing a copy of his patent) that Ms. Duong and her team turned their focus to a biased "washer" design eerily similar to the preferred embodiment in Acantha's patent and practiced by Acantha's eventual licensee, Stryker. TT at 886:14–887:21 (Ms. Duong describing her trip to Home Depot in early summer of 2002); DTX-1048-004 (depicting an early "c-washer" concept for the ACCS).[1]

Furthermore, there is significant evidence that Defendants copied Stryker's licensed Reflex product. By Synthes's own admission, Stryker was one of Defendants' main competitors in this market. *See* PX251 at slide 9. Defendants unquestionably knew about the Stryker Reflex product when developing the ACCS and later the Vectra. TT (Duong) at 942:7–9. Again, this alone can support an inference of copying. *See Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 85 (D. Mass. 2015) ("[C]ompeting product development after learning about the patentee's product [permits] the inference of copying for factor 1." (citing *WBIP, LLC v. Kohler Co.*, No. CIV.A. 11-10374-NMG, 2014 WL 585854, at *6 (D. Mass. Feb. 12, 2014))). Synthes employees studied the Reflex closely; they even undertook detailed materials analyses of the Stryker product during the development of the ACCS and Vectra. PX315. And when the ACCS ran into negative feedback related to locking mechanism visibility, Defendants looked to how Reflex had solved the same problems, specifically contrasting the negative ACCS feedback with the Reflex design and noting the Reflex had improved visibility. PX272. Defendants therefore

---

[1] Synthes's modifications to this c-washer design—modifications unrelated to the requirements of the claims, which the jury found still infringe—do not negate Defendants' copying. *Cf. Whirlpool Corp. v. TST Water, LLC*, No. 2:15-CV-01528-JRG, 2018 WL 1536874, at *3 (E.D. Tex. Mar. 29, 2018) ("An attempted design around that ultimately fails to actually design around and is adjudged to be infringing necessarily copies where, as here, the adjudged infringer begins with a copy [of] already existing technology and then proceeds to make changes.").

5

changed the ACCS by creating a product that looks functionally identical to the Acantha-licensed Reflex—the infringing Vectra system:

 

PX15.6-4 (Stryker Reflex); PX255-8 (Synthes Vectra). Defendants made these changes in part because Vectra was specifically designed to "go head to head with . . . Stryker's Reflex Hybrid . . . to reclaim the leadership position in [anterior plating]." PX359-3.

In so doing, Defendants had every reason to know that the product they were copying was covered by Acantha's patent. Acantha's license agreement with Stryker was executed in May of 2003. PX20. By August of 2003, Stryker's surgical technique guides for the Reflex product began bearing Acantha's patent number. PX15.4-16. Meanwhile, Synthes personnel were aware of and monitoring those technique guides as part of their competitive analysis—indeed, the images of the Reflex product contained in Synthes's marketing documents come directly from a version of the same technique guide. *Compare* PX251 at slide 6 *with* PX15.4-1.

 

6

In short, as confirmed by the jury's willfulness verdict, there was compelling evidence that Defendants copied the "designs of another": Acantha's patent, the licensed Reflex product, or both. These facts weigh strongly in favor of enhancement.

### 2. Defendants' Failure to Formulate a Good-Faith Belief in Non-Infringement or Invalidity Favors Enhancement.

The second *Read* factor relates to whether an infringer formed a reasonable belief that it did not infringe the patent or that the patent was invalid when it learned of the patent. This factor also weighs strongly in favor of enhancement, having already been decided by the jury. The Court must credit facts necessarily determined by the jury. *Jurgens*, 80 F.3d at 1372. And in finding willfulness and induced infringement of the asserted method claims, the jury necessarily rejected the notion that Defendants held good-faith beliefs in non-infringement or invalidity. *See, e.g.*, *Warsaw Orthopedic, Inc. v. Nuvasive, Inc.*, 824 F.3d 1344, 1351 (Fed. Cir. 2016) (holding that inducement is shown where "plaintiff establish[es] that a defendant's asserted belief in non-infringement was unreasonable"). In these circumstances, courts routinely find that this factor favors enhancement. *Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 628–31 (D. Del. 2018) (finding factor weighed in favor of enhancement when jury returned a willfulness verdict); *TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2018 WL 2149736, at *11 (E.D. Tex. May 10, 2018) ("The jury's finding that TCL's infringement was both culpable and egregious necessarily means that the jury did not credit TCL with a good faith belief about the '501 Patent."); *Cobalt Boats, LLC v. Brunswick Corp.*, 296 F. Supp. 3d 791, 800–04 (E.D. Va. 2017) (finding factor 2 weighing in favor of enhancement because "the jury found and the Court concurs that [patentee's] cited evidence is more persuasive on willfulness.").

7

Furthermore, as will be described in further detail in response to Defendants' likely Rule 50(b) motions, these binding findings by the jury are based on evidence that is far more than substantial. As an initial matter, despite the existence of clearance opinions obtained by Defendants, the jury heard no evidence that any employee actually considered the opinions and believed them. At most, the jury heard evidence that employees blindly trusted their lawyers.[2] *E.g.*, TT (Roth) at 1027:9–12 ("It is not my responsibility to read it, it is the responsibility of our Synthes in-house lawyer . . . ."). Courts conducting a *Read* analysis discount such unsupported statements of belief. *See, e.g.*, *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-CV-00011-RSP, 2018 WL 2149736, at *11 (E.D. Tex. May 10, 2018) (not crediting Defendants' argument that it had a good faith belief in non-infringement where, regardless of the merits of Defendants' litigation position, employees called at trial had not read the patent or formed a belief of non-infringement). But even assuming Defendants had offered any evidence that they truly believed the substance of the opinions, the evidence shows that belief was unreasonable.

*Defendants Did Not Formulate a Good Faith Belief of Non-Infringement.* For the Zero-P VA product, Defendants did not even argue that they had a good-faith belief of non-infringement—their clearance opinion on that product raised only invalidity grounds for the single asserted Zero-P VA claim it addressed. DTX1020. When there is no evidence of an investigation, this obviously weighs in favor of enhancement. *Canon, Inc. v. Color Imaging,*

---

[2] Ms. Duong's generic claims that her own patent led her to believe her invention was "unique," TT at 929:23–25, do not cure this failure. Courts reject allegations of good faith belief based on a nebulous belief that the new product was "inventive" because of patents related to its design. *Whirlpool Corp.*, 2018 WL 1536874, at *5 ("Filing a patent application, without more, does not demonstrate that a good faith belief has been formed."); *see also Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 43 (1929) (later issued patents not a defense to infringement).

*Inc.*, 292 F. Supp. 3d 1357, 1362–69 (N.D. Ga. 2018) (finding that it could not credit a good faith belief when there was no evidence of investigation). And Defendants' litigation-derived infringement defenses cannot excuse their behavior at the time infringement began. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016) ("[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct.").

For the Vectra product, the non-infringement opinions set out in the clearance documents were cursory and contrary to Defendants' own documents. For example, Defendants offered no evidence whatsoever as to a reasonable belief of non-infringement for the reissued claims that included the phrase "enlarged integral portion," because the clearance opinions never addressed Acantha's reissued claims. *See generally, e.g.*, DTX1239. And even for the Vectra claims for which Defendants offered a non-infringement opinion—the claims containing the word "head" rather than "enlarged integral portion"—there was significant evidence supporting the jury's findings that, after the screw passes through the clip, "the clip will spring back and *cover* both sides of the head." PX450. In another Synthes-authored document, Defendants described the Stryker Reflex—which also has a drive mechanism above the blocking mechanism—as having a "locking ring [that] contracts *over* screwhead to prevent backout." PX 709.2. And while Defendants' clearance opinion suggests that a screw head is not "between" the stopping member and bottom of the plate, DTX1239-019, Defendants do not employ that rigid view of the word "between" in their own work—they repeatedly characterized the Zero-P VA as a product that sits "between" two vertebral bodies, while admitting that the Zero-P VA in fact includes "stops" that sit on the outer surface of those bodies. *See, e.g.*, TT (McDonough) at 1092:21–1093:10. In other words, when not trying to dodge infringement, Defendants acknowledge that a component

9

can be "between" two boundaries even if not *entirely* between them; but when expedient for trial, the Vectra screw head was allegedly not "between" the clip and plate. Defendants' reliance on an overly restrictive interpretation of the term in their clearance opinions was unreasonable.[3]

*Defendants Did Not Formulate a Good Faith Belief of Invalidity.* As reflected in the jury's willfulness verdict, Defendants also did not formulate a good faith belief that the '008 patent was invalid. For one, Defendants did not even contend at trial that the claims *were* invalid. Instead, Defendants' expert merely hypothesized that the asserted claims *would* be invalid in his view *if* one were to "adopt [Acantha's] view and the way [Acantha] assert[s] the claims"—a proposition with which Defendants disagreed. TT (Sherman) at 1266:1–11. This cannot reflect a good faith belief in invalidity, because Defendants disputed that very interpretation at trial. *See* TT (Sherman) at 1225:12–20; 1233:6–14 (describing theories based on what "Acantha says," but opining that some limitations were not in fact present in prior art).

The jury was also correct in its rejection of the reasonableness of Defendants' invalidity clearance opinion related to the release of the Zero-P VA product. That opinion relied on three references: Campbell '089, Michelson '721, and Errico '402. DTX 1020 at 21. The jury

---

[3] Additionally, even assuming for the sake of argument that Defendants' rejected understanding of head was at least reasonable, the clearance opinions' failure to adequately address the doctrine of equivalents would still negate the notion of a reasonably held good faith belief in non-infringement. The opinion does not identify the function recited in the claims and describe how the Vectra operates differently; it merely describes unclaimed portions of the specification, treats those portions as limitations without explanation, and reiterates that there is an anterior portion of the securing member that resides above the clip. DTX-1239 at 19–20; *Insta-Foam Prod., Inc. v. Universal Foam Sys., Inc.*, 906 F.2d 698, 702 (Fed. Cir. 1990) ("It is the limitations and functions of the invention described in the claims, not the elements or functions of the accused device, which establish the reference point for the doctrine of equivalents analysis. Thus, infringement under the doctrine of equivalents is not precluded merely because the accused device performs functions in addition to those performed by the claimed device.").

essentially saw these same arguments at trial; while Michelson '721 was not asserted, that patent addresses a cam lock system and specifically describes the Codman plate. *See* U.S. Patent No. 6,193,721 at 5:39–42 ("The Codman Shurtleff plating system utilizes the side of a preinstalled rivet having a head rotatable to press against the side of the head of a bone screw so as to secure that one screw to the plate."). The jury, of course, still returned a verdict of willfulness.

The timing of the clearance opinion also firmly supports the lack of a good faith belief in invalidity. Defendants' outside counsel opinion that the claims of the original '291 patent were invalid in light of these three references is dated August 25, 2010. DTX 1020 at 1. At this point, the '291 patent had been in reissue for seven years—yet the written opinion fails to acknowledge the existence of these reissue proceedings. *See* PX10 ('008 file history). The PTO ultimately granted the reissue patent—including all of the original claims—over the three cited references. *Id.* Defendants nowhere addressed this changed circumstance in any opinion. Worse, the PTO had issued notices of allowance concerning claims either identical to or broader in scope than the asserted claims *before the written opinion of invalidity was finalized*.

By December 2006, the Examiner was aware of each of these three references. PX10 at 45–46 (showing Michelson '721 and Errico '402 as disclosed to the Examiner in a November 10, 2003 IDS); *id.* at 173 (showing Campbell '089 as disclosed in a December 7, 2006 IDS). On August 8, 2010—more than two weeks before the date of the written opinion—the examiner allowed dozens of claims, including claims identical to what would become asserted claims 21, 59, 79, 85. PX10 at 513 (allowing proposed claims 3, 9, 21, 60, 114, and 120); *compare* PX10 at 481–86 (proposed claims 60, 114, and 120), *with* '008 Patent (claims 59, 79, and 85); *compare also* PX10 at 447 (claim 21) *with* '008 Patent (claim 21). Asserted claims 3 and 9 were allowed

11

but were in fact broader in scope at that time.  *Compare* PX10 at 479 (setting forth proposed

independent limitations of claims 3 and 9), *with* '008 Patent (claims 1, 3 and 9).  In other words,

at the time Defendants were allegedly formulating their good-faith belief of invalidity, the Patent

Office had already considered the same arguments and rejected them—arguments that were

again rejected by the Patent Office in connection with Defendants' *inter partes* review requests.

Where the Patent Office has already rejected the grounds on which an infringer allegedly

formulates a good faith belief, courts do not hesitate to find the lack of a reasonable good faith

belief, and those courts weigh this factor in favor of enhancement.  *Bard Peripheral Vascular,*

*Inc. v. W.L. Gore & Assocs., Inc.*, No. CV 03-0597-PHX-MHM, 2013 WL 5670909, at *12 (D.

Ariz. Oct. 17, 2013) (enhancing damages where "Defendant relied on the same references . . . to

support its invalidity defense that the PTO previously had considered and found were not

invalidating), *aff'd*, 776 F.3d 837 (Fed. Cir. 2015); *Whirlpool Corp.*, 2018 WL 1536874, at *4

(weighing factor in favor of enhancement where most of the references alleged to reflect a good-

faith belief of invalidity had been previously considered in reexamination filed by third party);

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 198 F. Supp. 3d 1343, 1350–51 (S.D.

Fla. 2016) (weighing factor in favor of enhancement in part because relied upon prior art was

cited on the face of two asserted patents), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017).

In sum, despite the existence of a "clearance process," the nature of Defendants'

investigation into Acantha's patent rights does not reflect a reasonable good faith belief in non-

infringement or invalidity.  The jury necessarily rejected the existence of such a belief and that

rejection is confirmed by the evidence.  This factor weighs strongly in favor of enhancement.

12

3. Defendants' Behavior as a Party to the Litigation Favors Enhancement.

Faced with their long record of willful infringement, and despite their professed confidence in their infringement and invalidity positions, Defendants responded to this litigation with bully tactics more indicative of desperation and guilt. No narrative is more indicative of that litigation misconduct than Defendants' approach to invalidity in this case.

When Dr. Lloyd contacted a DePuy Synthes employee in 2014, pre-suit, to discuss a possible licensing arrangement, he received an early warning of how Defendants would approach this litigation—the employee told Dr. Lloyd that Defendants "would invalidate [Acantha's] patent and that they would bankrupt [the] company." TT (Lloyd) at 377:3–9. And Defendants attempted to follow through on their threat. Shortly after Acantha filed suit, Defendants filed three IPR proceedings at the Patent and Trademark Office, and they immediately sought a stay in this Court before even learning whether those proceedings would be instituted by the PTAB. Dkt. 31. Yet after Defendants wasted Acantha's resources on the IPRs and the resources of the parties and the Court on the needless motion to stay, the PTAB declined to institute any of the three proceedings, finding that "there is not a reasonable likelihood that [DePuy Synthes] would prevail with respect to any of the claims challenged as obvious over [different combinations of Errico, Koshino, and Campbell '089]." Dkts. 44-2, 44-3, 44-4.

Still, Defendants were not deterred from their plan to intimidate Acantha with their invalidity allegations, no matter how meritless. Despite the higher burden of proof in district court litigation than the one they had just failed to overcome at the PTAB, Defendants served initial invalidity contentions that featured, with only a few exceptions, the exact same prior art the PTAB had just rejected. Ex. A at 5–6. One glaring exception was the inclusion of the

13

Campbell '255 patent (a later-filed patent by the same inventor of the Campbell '089 patent asserted at trial) as the sole anticipation reference,[4] despite the fact that the '255 patent's priority date was over a year *after* Acantha's filing date. Ex. B (Campbell '255 patent). Ostensibly, Defendants had realized that their assertion of the Campbell *'089* patent in the IPRs had failed, and recognized the weakness of not having any anticipation arguments. Yet to keep the heat on Acantha in any way possible, they asserted whatever they could find, even if not actually prior art. The non-prior-art Campbell '255 patent remained on Defendants' invalidity contentions for ten months, right up to the close of fact discovery, wasting the parties' resources evaluating and taking discovery on a patent that amounted to nothing more than a wild goose chase.

Meanwhile, as Defendants began to realize that this Campbell '255 gambit would fail just like the IPRs, they shifted tactics again. First, in April 2017, they developed for the first time a basis for asserting anticipation by the Campbell '089 patent—a year and a half after filing IPRs featuring that same reference, and six months after their preliminary contentions. Ex. C. It was no wonder that the Court later granted judgment as a matter of law against that assertion, since it was not even apparent to Defendants until midway through the litigation. The same is true with the Codman ACP prior art reference, which was identified by Defendants for the first time on the very *last* day of fact discovery, even though it was their own product. *See generally* Dkt. 121.

Second, in addition to constantly shuffling and stretching their obviousness and anticipation assertions, Defendants also added, months into the litigation, frivolous allegations of inequitable conduct by Acantha's inventors, related to a declaration made by Mr. Talaber in

---

[4] The Campbell '089 patent was cited in these contentions, but only in obvious combinations.

14

Acantha's reissue application process. *See generally* Dkt. 92. As explained in Acantha's Motion for Judgment on the pleadings, the claim was based on a misreading of the relevant law, and did not even allege an actual misrepresentation, much less an actionable one that amounted to fraud on the PTO. *Id.* The Court acknowledged as much and dismissed the allegations, holding that "[b]ecause the declaration is objectively true, Defendants' allegations of inequitable conduct necessarily fail." Dkt. 137 at 4.

But as with the IPR decisions, even this Court's dismissal could not dissuade Defendants from their kitchen sink approach. At the summary judgment stage, Defendants *again* alleged inequitable conduct by Mr. Talaber and Dr. Lloyd, this time only in *response* to Acantha's motion for summary judgment on Defendants' unsupported "unclean hands" defense. *See generally* Dkt. 170. As explained in Acantha's Reply, those allegations fared no better than the previous ones in substance, and were all the more remarkable since they had never been pleaded or hinted at, and might never have been had *Acantha* not moved for summary judgment. Dkt. 187 at 1–2. The Court agreed that Defendants had "neither taken the appropriate steps to add this theory to the case nor acted diligently to do so . . . ." Dkt. 212 at 3. For the second time in the case, the Court dismissed unsupported allegations of inequitable conduct. *Id.*

The Federal Circuit has noted that "[t]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps." *Burlington Indus. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988). The Court observed that "[a] patent litigant should be made to feel, therefore, that an unsupported charge of 'inequitable conduct in the Patent Office' is a

negative contribution to the rightful administration of justice." *Id.* Enhancing damages, particularly where a Defendant has made not one but *two* unsupported charges of fraud, would help to accomplish that goal. Indeed, Courts have issued sanctions against defendants for pursuing weak inequitable conduct defenses like these. *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1328 (Fed. Cir. 2000) ("[Defendant's] decision to pursue the counterclaim caused [Plaintiff] to incur additional expenses, created extensive work for the court and cast a cloud over the integrity of the inventor and his original counsel."). This case should be no different.

Finally, Acantha observes that Defendants' questionable tactics did not begin and end with invalidity and unenforceability. They also refused to make admissions in discovery even where no disputes existed;[5] presented evasive witnesses;[6] violated a motion *in limine*—or at least failed to adequately ensure their witness would not violate it—relating to Campbell's priority date, necessitating a curative instruction;[7] and sought to undermine the credibility of Acantha's witnesses rather than engage on the merits.[8] Defendants' behavior in this case, especially with regard to its ever-shifting, kitchen sink invalidity case, strongly favors enhancement.

---

[5] *See* PX704 (refusing to admit that Defendants were aware of the licensed Reflex product). Courts have found nearly identical conduct relevant to enhancement. *Third Wave Techs, Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 1017 (W.D. Wisc. 2005) ("Defendant's litigation behavior includes . . . evasive answers to requests for admission (such as saying that it lacked sufficient information to respond to a request concerning its and its attorneys' awareness of the patents in suit without adding that it had made reasonable inquiry, as required by Fed.R.Civ.P. 36 . . . .").

[6] TT at 1443 at 13–14, 1446 at 16–17, 1453 at 10–14, 1471 at 21–22, 1478 at 1–3 (the five times the Court had to instruct Defendants' damages expert Mr. Haas to answer the question asked).

[7] *See* TT at 1219:19–21 (the Court noting that Defendants' counsel ought to have instructed the witness about the motion *in limine* earlier); *id.* at 1222:12–22 (curative instruction).

[8] *Compare* TT at 1158:1–3 (Mr. Sherman critiquing Mr. Talaber for saying he didn't know where 45 degrees came from), *with* 1337:7–1338:1 (Mr. Sherman acknowledging that he did not review

*(Cont'd on next page)*

16

### 4. Defendants' Size and Financial Condition Favors Enhancement.

Courts also consider an infringer's size and financial condition, both relative to the plaintiff and overall. The purpose of this factor is twofold: to ensure that an infringer is financially able to withstand payment of an enhanced damages award and to also ensure that the scope of any enhancement, if warranted, is large enough to actually serve the intended deterrent function. *See Johns Hopkins Univ. v. CellPro*, 978 F. Supp. 184, 195 (D. Del. 1997) ("Punishing a larger company in a stronger financial condition may call for higher damages, where a lower number may be equally effective in punishing a smaller company.")

Defendants' parent company, Johnson & Johnson, has a market capitalization of over $74 billion. In just 2017, the Johnson & Johnson group received $26 billion in worldwide revenue related to its medical device segment alone. In 2012, J&J paid $12 billion for Synthes alone. It is not debatable that Depuy Synthes has the capacity to pay even the maximum enhancement without "unduly prejudic[ing] [their] non-infringing business." *Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 822 (N.D. Ill. 2009) (internal citations omitted); *see also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1371 (Fed. Cir. 2004) (affirming award of enhanced damages based in part on fact that defendant "is a large company with extensive financial means"). Nor is it debatable that Defendants could have paid fair value for a license without forcing a small company to litigate the case to verdict. *See Maxwell v. Angel-Etts of*

---

Mr. Talaber's testimony—which related to whether 45 degrees appeared in any *claims*—prior to criticizing him). *Compare* TT at 1477:16–22 (Mr. Haas claiming there was no evidence of what Stryker did with the InteCap materials, based on Mr. Talaber's testimony), *with* TT at 1480 (Mr. Haas acknowledging that he had never seen PX719, an email where Stryker employee Al Zarnowski acknowledged receiving and considering the InteCap proposal).

*California*, No. CV9910516DT(AJWX), 2001 WL 34133507, at *20 (C.D. Cal. July 9, 2001) ("ACI took full[] advantage of the financial disparity facing Maxwell to try to verdict a case which involved damages that ACI could pay out of pocket change."), *aff'd* 53 Fed. Appx. 561 (Fed. Cir. 2002). This factor weighs in favor of significant enhancement, even treble damages.

### 5.     The Case Was Not Close.

The jury unanimously returned a verdict for Acantha on all issues, finding infringement and no invalidity for all claims, willfulness, and emphatically rejecting Defendants' proposed damages model—awarding over four times the low-end of Defendants' range. These facts alone show that this factor weighs in favor of enhancement. *See, e.g.*, *Whirlpool Corp.*, 2018 WL 1536874, at *7 ("While TST believes this was a close case because it presented what it views as a compelling case of non-infringement and invalidity, the sole judges of the facts of this case, the jury, did not arrive at a verdict which indicates a close case."); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, No. 511CV761GLSDEP, 2016 WL 6537977, at *7 (N.D.N.Y. Nov. 3, 2016) (weighing factor in favor of enhancement where patentee obtained willful infringement verdict on both asserted patents). This factor weighs in favor of enhancement regardless of whether the Court may believe one or some of Defendants' proposed defenses had some level of objective merit. *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 315 F. Supp. 3d 977 (N.D. Ill. 2018) (weighing factor in favor of enhancement despite "the fact that some of [infringer's] positions had merit"); *Stryker Corp. v. Zimmer, Inc.*, No. 1:10-CV-1223, 2017 WL 4286412, at *5 (W.D. Mich. July 12, 2017) ("The objective reasonableness the Federal Circuit found for a handful of Zimmer's litigation positions in no way detracts from the lopsided victory Stryker

18

garnered on the core issues of liability, damages, and willfulness"). In any event, as discussed below, the case was not close even if the Court were to evaluate the evidence independently.

*Invalidity.* Defendants' invalidity case was exceedingly weak. As described above, Defendants relied on effectively the same references at trial that had already been rejected in reissue proceedings and then again in Defendants' requested *inter partes* review proceedings, both of which had a lower standard of proof and a claim construction standard more favorable to invalidating the claims. Defendants' anticipation theory was so weak it was not put to the jury, and Defendants' obviousness theory was scarcely better; Defendants' obviousness "analysis" consisted of two minutes of testimony addressing only some of the limitations of one of the asserted claims. TT (Sherman) at 1253:9–1254:18. Mr. Sherman never explained, for example, how his proposed combination taught a head or enlarged integral portion that displaces the biased stopping member. Mr. Sherman even conceded that the result of his proposed combination made one reference, the Codman plate, worse. TT (Sherman) at 1303:18–21 ("Q. That same Cam-Loc that defendants have praised throughout this trial from Codman, you would toss that out and put in something from Errico? A. I'm not contending that it would be a better implant."). Further, although Defendants forced Acantha to prepare to address enablement, written description, and indefiniteness defenses, Defendants did nothing to support the defenses at trial, and the Court declined to submit those theories to the jury after the close of evidence.

In short—particularly in view of the questionable litigation tactics discussed above— Defendants' invalidity case did not reflect an honest dispute about validity. Instead, the weakness of Defendants' case reflects the promise made to Dr. Lloyd in 2014: Defendants were trying to punish Acantha for standing up for themselves. TT (Lloyd) at 376:11–377:7.

19

*Non-infringement*.  Defendants' non-infringement case was also weak.  As discussed above, Defendants' contention that Vectra did not infringe the asserted claims was inconsistent with their own documents and their own understanding of the term "between."  Similarly, Defendants' position nonsensically assumed that the licensed Reflex product did not practice the Acantha patent—despite Defendants' prior successful arguments that it did.  *See, e.g.*, Dkt. 156 at 5 n.4 (Defendants contending that Stryker's Reflex, Reflex Hybrid, and Dynatran are "products covered by the '008 patent").  Defendants also repeatedly attempted to imply that Acantha's claims were limited to preferred embodiments, explicitly arguing that the *figures* in the patent meant that no portion of the securing element could touch the stopping member.  TT (Sherman) at 1143:17–1144:5 ("Q.  Are there any *examples* in the Acantha patent where the stopping member surrounds the head in its final configuration?  A.  No.  It doesn't exist in the Acantha patent. . . .  Are there any *examples* in the Acantha patent where the screw head is retained in the anterior bore portion?  A. No" (emphasis added)).  Defendants also went so far as to imply that *all* the asserted claims required angulation—again based not on the words of the claims but on descriptions in the specification.  *See, e.g.*, TT (Sherman) at 1333:25–1334:9 ("Q. All right.  But is your view that the[re's] actually an angulation limitation?  A.  I think when I look at the purpose of the – of retaining the head of the screw in the posterior bore portion, the function of that is angulation.  That's how I applied the analysis.  Q.  So is it your view that these retention limitations are actually an angulation limitation?  A.  I think that's the function of retaining the head within the posterior passageway.").  Defendants' resort to confusing the jury by comparing the accused products with the patent figures instead of the claims demonstrates the weakness of their non-infringement positions.

20

The Zero-P VA infringement question was not any closer. Defendants focused more on a confusing scattershot approach than any strong defense. For example, Defendants claimed that the Zero-P VA did not hold the screw between the stopping member and the second opening. But they told the FDA differently, describing the screw as going "past" the "lock-catch"—*i.e.*, the stopping member. DTX 1042 at 34. Defendants' corporate representative, David Gerber, also testified in March of 2015 that the screw goes "past the blocking mechanism." *See* TT 762:5–18. Defendants also briefly contended that the "biased stopping member" was only the "pin" that stuck out into the bore because the spring was a "separate component" that did not contribute to preventing backout. TT (Sherman) at 1184:8–21. Yet Defendants' own witness Mr. McDonough confirmed that the snapper mechanism as a whole was a "mechanical component," meeting the Court's construction. TT at 1091:22–25. And Defendants' own FDA documents acknowledge that the Zero-P VA uses the full mechanism, "comprised of a TAV lock-screw and catch, *as well as an Elgiloy spring* to prevent the screw from backing out." DTX1042-31 (emphasis added). In fact, Defendants' *own opinion of counsel* (when discussing a claim not asserted against the Zero-P VA) confirmed that the snapper mechanism is a "biased stopping member" per Acantha's patent. DTX 1020 at 27 ("[T]he use of a finger-like snapper mechanism was dedicated to the public by Talaber because *such biased stopping members* are disclosed in the patent, but not within the scope of claim 2." (emphasis added)).

Defendants also barely mentioned their arguments concerning the alleged absence of "anterior" and "posterior" surfaces. This was for good reason. While Defendants' arguments appeared superficially plausible in connection with summary judgment briefing, this was because the argument was not based on the facts of the accused products; it was based entirely on

drafting ambiguities in Dr. Sachs's written report. Defendants offered no real testimony at trial

that Zero-P VA did not have a surface that was closer to the bone than the most anterior surface.

Mr. Sherman's testimony simply disagreed with Dr. Sachs in a conclusory fashion and, despite

the fact that Dr. Sachs was merely using it to identify the bone surfaces that abut the

intervertebral disc space, faulted Dr. Sachs's opinion simply because his demonstrative spine

model did not include a Zero-P VA plate installed. TT (Sherman) at 1192:15–1194:2; *id.* at

1194:3–11. As Dr. Sachs explained while specifically pointing to particular surfaces on a spine

model, a skilled artisan would understand that the Zero-P VA has a surface closer to the bone

because it has a surface through which the screw exits to attach to the bone. TT (Sachs) at

502:15–503:11. In short, all of these non-infringement defenses were substantively weak—it is

not surprising that none of them were included in Defendants' product clearance opinion for the

Zero-P VA product, and that the jury soundly rejected them.[9]

In light of these weaknesses, the majority of Defendants' trial presentation was focused

not on the actual merits of their positions, but on repeated attempts to confuse the jury, like the

reliance on the patent figures described above. As a further example, despite providing zero

---

[9] Acantha acknowledges that the Court did initially grant summary judgment concerning two of Defendants' non-infringement arguments. Dkt. 213. As mentioned above, Acantha believes that the Court's initial grant of summary judgment was based on Defendants' improper invitation to apply unduly rigid interpretations of Dr. Sachs's written expert report, which, as the Court later acknowledged at trial, is not a tight script for what the expert testimony will be. TT (the Court) at 1164:15–16. The true weakness of these positions was confirmed by Defendants' actual testimony and arguments at trial. When Acantha's infringement theories were fully explained, unfettered by confusing semantic arguments about what Dr. Sachs in fact meant in his written report, Defendants' non-infringement positions based on the arguments the Court initially credited receded into the background before the jury. This confirms that the Court's initial summary judgment views do not render the case "close" for purposes of enhancement.

22

analysis to support a separate-patentability defense, Defendants attempted to introduce their own patents at every opportunity—plainly seeking to exploit common lay misconceptions about the patent system and imply that the mere existence of their own patents showed non-infringement. *See, e.g.*, TT (the Court) at 1060:21–1061:11 (excluding patent on features in the Zero-P VA product). Despite litigating and losing the point during claim construction, Defendants also argued to the jury that a line in the middle of the bore was where the anterior bore portion ended and the posterior pore portion began—warranting a clarifying instruction during trial. *See* TT (the Court) at 647:5–14. And Defendants sought to convince the jury that the Vectra must not infringe because it looked like the ACCS. *See* TT (Closing Argument) 1672:15–17 ("So what's very interesting here is that ACCS was a commercial product and Acantha does not accuse it of infringement."). Yet that was entirely irrelevant to the issue the jury was tasked with deciding: whether the Vectra And Zero-P VA met the asserted claims of the patent. These largely non-merits-based arguments highlight the substantive weakness of Defendants' merit-based positions and confirm that this case was not close.

*Willfulness*. The willfulness question was also not close. There was no evidence, for example, that Defendants specifically designed around Acantha's patents. The only evidence before the jury was that Defendants paid outside counsel to draft opinions confirming that designs already developed did not infringe. But those same reasons were before the jury and the jury nevertheless concluded that Defendants acted despite an unjustifiably high risk of infringement when they released the accused products. Meanwhile, there was significant evidence that Defendants knew of Acantha's patent protection and copied either Acantha's patent or the licensed Reflex product. *See supra* Section II.B.1.

*Claim Construction*. There were also no close issues of claim construction. Defendants received none of their proposed constructions during the *Markman* proceedings. *See generally* Dkt. 64. Indeed, the weakness of Defendants' *Markman* positions confirm the weakness of Defendants' substantive non-infringement positions. If the positions pursued at trial were strong, Defendants would not have believed it necessary to urge an obviously incorrect position during *Markman*, such as Defendants' facially ridiculous position that Acantha's patent claimed only circular collars as stopping members. As the Court correctly observed, these arguments "violate[d] . . . fundamental claim construction rule[s]." Dkt. 64 at 8. The parties' claim construction disputes did not make this case close. This factor weighs in favor of enhancement.

### 6. The 13-Year Infringement Period Factors Enhancement

Courts also consider the length of the infringement in evaluating the amount of enhancement. Thirteen years of infringement plainly weighs in favor of enhancement. *See, e.g.*, *PPC Broadband, Inc.*, 2016 WL 6537977, at *8 ("Ten years of misconduct weighs in favor of an enhancement."); *I-Flow Corp. v. Apex Med. Tech., Inc.*, No. 07cv1200, 2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) (finding six years of misconduct was "substantial," favoring enhancement); *Broadcom Corp. v. Qualcomm Inc.*, No. SACV 05-467-JVS, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) ("The length of [the infringer's] infringement (approximately two years), coupled with the fact that infringement continued after [the patentee] filed its suit, supports an increase in damages."), *vacated on other grounds*, 2007 WL 8030058 (C.D. Cal. Nov. 21, 2007); *see also Arctic Cat Inc.*, 198 F. Supp. 3d at 1353 (finding that seven years of infringement favored enhancement and rejecting argument that infringement would have been

24

shorter if patentee has sued earlier because "[any] delay by Arctic cat . . . was not the cause of BRP's infringement").

This factor weighs particularly strongly in favor of enhancement in the circumstances of this case. Despite learning of Acantha's patent and its designs in 2002 before any of the accused products were designed, the jury's damages award involved infringing sales occurring on or after March 19, 2014—almost a decade after infringement began. Both because Stryker declined to enforce the patent against Synthes during its exclusive-licensee period and because Stryker failed to meet its contractual obligations to mark its patent-practicing products, Defendants have received an almost decade-long windfall of using Acantha's patented technology for free.

As the Court will recall, Acantha's damages were limited due to Stryker's failure to comply with 35 U.S.C. § 287. Despite marking Acantha's patent on surgical technique guides, the Court held that no reasonable jury could find that Stryker marked the actual "product" or its "packaging" to comply with the statute and therefore Acantha did not provide Defendants with the requisite "constructive notice" of Acantha's patent rights. *See* Dkt. 214 at 8. Yet the jury's willfulness verdict confirms that Defendants had more than "constructive notice" of their infringement of the '008 patent when they released the accused products; they acted despite an unjustifiably high risk of infringement. Thus, while the Court's Orders may hold that a strict interpretation of the marking statute limits compensatory damages to sales after the specific notice Acantha provided in 2014, the policy underlying the marking statute is to prevent innocent infringement. And the jury found that Defendants' infringement was anything but innocent.

The Court need not stand idly by in the face of this anomalous circumstance. In its *Read* factor analysis, the Court has the discretion to weigh this length-of-infringement factor heavily in

Case 1:15-cv-01257-WCG   Filed 09/21/18   Page 35 of 56   Document 313

the analysis and fashion an enhancement remedy that mitigates the impact of the marking statute.

Again, a purpose of enhancement is deterrence of both the adjudged infringer and others. To

allow Defendants a windfall of license-free infringement despite doing so intentionally or at least

recklessly would provide perverse incentives to other unauthorized users of technology. To not

weigh this factor considerably in the analysis, similarly situated infringers could simply

investigate the adequacy of any licensee's marking compliance rather than seeking to license the

technology—in other words, seeking a *de facto* free license by technicality. To guard against

these perverse incentives, the Court should weigh this factor heavily in favor of enhancement.

### 7.    Defendants' Lack of Remedial Measures Favors Enhancement.

A *Read* analysis also considers whether an infringer took any remedial action to address

its infringement. Courts consider whether a defendant took any remedial action after it received

notice of the patentee's rights, after it was sued for infringement, and after the jury's verdict.

*Chamberlain Grp., Inc. v. Techtronic Indus. Co*., 315 F. Supp. 3d 977, 1015 (N.D. Ill. 2018)

("Courts have concluded that continuing to sell the infringing products after notice of

infringement and during the course of litigation supports enhancement"); *Canon, Inc.*, 292 F.

Supp. 3d 1357, 1368 ("[F]or this seventh factor, the Court looks to the steps that Defendants

took *after* they learned of the patent and their potential infringement of it."); *Stryker Corp.*, 2017

WL 4286412, at *5 (similar).

There is no evidence in this case that Defendants took any remedial action to address

Acantha's patent rights at any point in time between when it learned of the Acantha patent in

2002 and today. Indeed, even after a willful infringement verdict, Acantha is unaware of any

planned remedial action to remove or redesign the infringing products in response to the jury's verdict.  *Id.*  This factor weighs in favor of enhancement.

8.    <u>Defendants' Motivation to Harm Weighs in Favor of Enhancement.</u>

Defendants' motion to harm also weighs in favor in enhancement.  This is so for at least two independent reasons.  First, as discussed above, Defendants have expressed disdain for Acantha.  Instead of engaging in legitimate licensing discussions, Defendants explicitly threatened Dr. Lloyd for alleging infringement—promising to "bankrupt" Acantha and making Dr. Lloyd feel like they were going to "drop the hammer" if Acantha filed suit.  TT (Lloyd) at 376:11–377:7.  Disdain for a party's patent rights—particularly in light of the compelling evidence that Defendants copied Acantha's patent or the licensed Reflex product—takes this far afield from a run-of-the-mill instance of patent infringement.  This unrebutted evidence reflects a motivation to harm Acantha simply for enforcing its government-issued property right.

The Court can also consider Defendants' motivation to harm Stryker and its licensed Reflex product because Defendants' motivation to harm Stryker and Stryker's sales in turn harmed Acantha by diverting royalty-bearing Stryker sales to Defendants.  Courts consider, for example, whether an infringer "used a copied design in order to avoid using a less desirable alternative," or whether the infringer "preferred taking the risk of infringement over designing a non-infringing device."  *Canon, Inc.*, 292 F. Supp. 3d at 1368 (describing traditional motivations to harm, citing cases); *see also Whirlpool Corp.*, 2018 WL 1536874, at *9 (intentionally undercutting competitor's profits by infringing constitutes motivation to harm);  *PPC Broadband, Inc.*, 2016 WL 6537977, at *8 (N.D.N.Y. Nov. 3, 2016) (weighing factor in favor of enhancement where company changed design in response to customer complaints because "the

27

evidence demonstrate[ed] that Corning would rather knowingly infringe than invest the time and resources to redesign its [product]" and also supported the inference that "Corning intended to harm PPC by diverting business away from PPC.").

As discussed regarding the copying factor, there is compelling evidence that Defendants copied the licensed Reflex product to deal with negative customer feedback from Defendants' ACCS product. By Defendants' own admission, the Vectra product was released to directly compete with the Reflex and "reclaim the leadership" in the anterior cervical market. PX359 at 3. Particularly in light of the evidence indicating that Defendants likely knew that the Reflex product was licensed to Acantha's patent, these circumstances also show a motivation for harm warranting enhanced damages.[10]

> 9. Defendants' Concealment of Certain Categories of Evidence Weighs At Least Slightly in Favor of Enhancement.

The final *Read* factor considers whether the willful infringer acted to conceal its wrongful conduct. Court look to various considerations for this factor, including deposition testimony, witness selection, and failure to produce certain categories of documents.

Here, while there is no evidence that Defendants concealed the operation of the infringing products from Acantha, there is evidence that Defendants concealed other information from both

---

[10] Acantha notes that some courts have reasoned that a pure "profit motive" should not weigh in favor of enhancement. The reasoning in these decisions seems wrongly decided—rarely, if ever will a company harbor more ill-will than simply stealing profits at the expense of the patent owner. *Cobalt Boats, LLC v. Brunswick Corp.*, 296 F. Supp. 3d 791, 804 (E.D. Va. 2017) (addressing the split among district courts, rejecting the narrow interpretation of the factor, and finding that "motivation to compete is motivation to harm"). In any event, this case presents the rare circumstance where Defendants possessed more than a profit motive; it threatened to bankrupt Acantha simply for asserting its rights.

Acantha and the jury. For example, as discussed in Factor 3 above, Defendants informed

Acantha in discovery that they had insufficient information to determine whether Defendants

were aware of the Stryker Reflex prior to designing the infringing products. PX704. Yet the

evidence plainly showed that Defendants were in fact aware of the product, and apparently

denied the request solely to make Acantha's job more difficult at trial. TT (Roth) at 1010–14. In

a similar vein, Defendants never produced a single copy of a surgical technique guide related to

any licensed Stryker product. Given the fact that Defendants specifically tested their products

against Reflex products, *see* PX315, and pasted images from the technique guides into their

marketing materials, PX251, it is simply not credible that Defendants had zero copies of any

actual Reflex technique guide. These circumstances show at least a reasonable inference that

Defendants have attempted to conceal the full scope of the facts related to Defendants' copying

of the Reflex. *Stryker Corp.*, 2017 WL 4286412, at *6 (W.D. Mich. July 12, 2017) (refusal to

produce negative information weighed in favor of enhancement under this factor).

      Defendants also engaged in additional concealment with their deposition testimony.

When Acantha deposed Dr. David Konieczynski, he claimed to know nothing about Dr. Lloyd,

one of the named inventors, other than that he was a surgeon. Ex. D at 22. He further testified

that the first information he received about Acantha's patent was two weeks before his December

19, 2017 deposition. *Id.* at 13. In truth, e-mail correspondence showed that he was part of a

small group of DePuy employees that discussed Acantha's technology back in 2006—when Joe

Ross told Dr. Lloyd that the Vectra product infringed[11]—before DePuy acquired Synthes and its

---

[11] *See generally* Dkt. 228 (Defendants' Motion *in Limine* to exclude Joe Ross's statements).

29

infringing product lines. PX74. Dr. Konieczynski's incorrect testimony hindered Acantha's ability to explore that history and prove its case. *See CleanCut, LLC v. Rug Doctor, Inc.*, No. 2:08-CV-836, 2013 WL 441209, at *4 (D. Utah Feb. 5, 2013) (finding concealment factor weighed somewhat in favor of enhancement because at trial "Ms. Johnson testified that she never met with Mr. Bonham. But Mr. Bonham and Mr. Holland testified they had met with her, and had told her about the '851 Patent.").

Finally, Defendants engaged in some level of concealment in its selection of trial witnesses. Defendants chose not to call any of the authors or the named recipients on their opinions of counsel. This includes Robert Rauker, the lawyer who received the Vectra non-infringement opinion and supposedly relied on it to form a good-faith belief of non-infringement or invalidity, but then later offered Acantha $12 million to purchase the patent. *See* PX717; TT at 1285–98 (discussing this issue); *cf. Arctic Cat Inc.*, 198 F. Supp. 3d at 1353–54 (weighing factor in favor of enhancement where infringer secretly hired a third party to buy their patent from them). While there are of course numerous reasons that a witness may or may not be called at trial, the totality of the circumstances permits at least some inference that Defendants' strategy was designed to insulate themselves at trial from damning information. *WBIP, LLC*, 2014 WL 585854, at *7–8 (failure to make available current and recent employees at trial that may have known more information than trial witnesses weighed slightly in favor of enhancement).

10.     <u>Summary Regarding Enhancement</u>.

As the analysis discussed above makes clear, each of the *Read* factors weighs in favor of enhancement at least to some extent. The jury's verdict alone compels the conclusion that Defendants' held no reasonable belief of non-infringement when they released the infringing

30

products (Factor 2). There is compelling evidence that Defendants copied Acantha's patent, or at least Stryker's patent-practicing Reflex product (Factor 1). Defendants knew of both the patent and the Reflex before even the predecessor ACCS product was developed. Defendants had an admitted motive to regain market share with a one-step blocking semi-constrained plate, and its first attempt into that market was a failure precisely because Defendants' original design did not look like the Reflex did. Despite this evidence, Defendants received an almost decade-long *de facto* license based only on a third-party's failure to comply with its contractual obligations to mark in a particular manner (Factor 6), and Defendants have given no indication that they attempted to stop their infringement in the 13 years they have infringed on Acantha's patent (Factor 7). Defendants are obviously sufficiently capitalized to withstand an award of enhanced damages (Factor 4). And as discussed, the case was not close (Factor 5). Instead, Defendants pursued questionable litigation positions (Factor 3) that reflected an attempt to bully a small company for deigning to assert its rights against a Johnson & Johnson company (Factors 4 and 8). Reflecting the weakness of their merits-based positions, Defendants also hindered Acantha's ability to prove its case, in discovery and at trial (Factor 9).

Taken together, these factors reflect the type of conduct warranting enhanced damages to deter future similar conduct. This conduct is squarely within the realm of the type of "willful" or "wanton" conduct for which enhancement is reserved.[12] There is no dispute that Defendants

---

[12] In *Halo*, 136 S. Ct. at 1932, the Supreme noted that enhanced damages were appropriate in cases "variously described as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." In the abstract, these words can lend themselves to varying meanings and connotations. However, in civil cases like this one, these terms are equivalent to the recklessness standard on which the jury found willfulness. *See, e.g.*, *Dukane*
(Cont'd on next page)

31

knew that there was a risk they were infringing Acantha's patent.  And the only effort to avoid that risk was receipt of clearance opinions that the jury's verdict necessarily concluded were unreasonable.  In the words of a fellow district court in the 7th Circuit:

> While perhaps one can find more troublesome cases—although that is certainly debatable—the test is not whether the case under consideration is the worst possible that can be imagined. The instant case is a good deal more distressing than most by any measurement.

*R-BOC Representatives, Inc. v. Minemyer*, 233 F. Supp. 3d 647, 689 (N.D. Ill. 2017).  To address this conduct, Acantha requests enhancement at least equal to the jury's award of $8,248,560.00—less than the treble damages the Court could award.  Indeed, this request is hardly even a punishment at all; were it not for Stryker's failure to comply with its contract, application of the jury's royalty rate to the excluded royalty base would have resulted in additional compensatory damages of over $10 million.  And given that each of the *Read* factors

---

*Precast, Inc. v. Perez*, 785 F.3d 252, 255–56 (7th Cir. 2015) (Posner, J.) (noting that "willfulness can be a synonym for recklessness" and that willfulness in connection with OSHA violations means recklessness in its "most commonly understood sense": "defendant was aware of the risk, knew that it was serious, and knew that he could take effective measures to avoid it, but did not."); *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 813 (7th Cir. 2017) ("In the context of premises liability, willful and wanton conduct includes an act committed with reckless disregard for the safety of others . . . ."); *Bernard v. Woodside Ranch, LLC*, No. 16-CV-461-SLC, 2017 WL 3524692, at *5 (W.D. Wis. Aug. 15, 2017) ("Given that the Wisconsin statute distinguishes between intentional and wanton or willful conduct, I conclude that its use of 'wanton or willful disregard' is consistent with a conscious disregard or indifference"); *Napoles v. Johnson*, No. 12 CV 10220, 2015 WL 755388, at *2 (N.D. Ill. Feb. 20, 2015) ("Defendant is correct that alleging recklessness is simply another way of alleging willful and wanton conduct.").  There is no question here that Defendant was aware of a risk of infringement and could have taken measures to avoid it.  And the jury's verdict forecloses any argument that Defendants knew about the risk but believed that it was not sufficiently "serious."  In short, this is a textbook case of "willful" and "wanton" conduct in the most commonly understood definition of the term.

*(Cont'd on next page)*

weighs in favor of enhancement at least to some extent, a 2x enhancement is well within the

norm for district courts across the country; even treble damages would be.[13]

---

[13] *See, e.g.*, *Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201-JRG, 2018 WL 1156284, at *7 (E.D. Tex. Mar. 5, 2018) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 2, 3, 4, 6, and 7); *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 723–24 (D. Del. 2017) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 3, 4, 5, and 8); *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72 DF, 2010 WL 5140718, at *5 (E.D. Tex. Sept. 27, 2010) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 1, 4, and 8); *Zenith Elecs. LLC v. Vizio, Inc.*, No. 5:06-CV-246-DF, 2010 WL 11475581, at *2 (E.D. Tex. July 13, 2010) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 1, 2, 3, 5, 6, 7, and 8); *Visto Corp. v. Seven Networks, Inc.*, No. 2:03-CV-333-TJW, 2006 WL 3741891, at *3 (E.D. Tex. Dec. 19, 2006) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 2 and 8); *Boston Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 281 (D. Del. 2012) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 2, 3, 4, 5, 7, and 8), *aff'd*, 497 F. App' x 69 (Fed. Cir. 2013); *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 846 F. Supp. 542, 549 (S.D. Tex. 1994) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 2, 5, and 9), *aff'd*, 78 F.3d 1575 (Fed. Cir. 1996); *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, No. 204-CV-01971-MCE-EFB, 2009 WL 113771, at *2 (E.D. Cal. Jan. 15, 2009) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 1, 2, 3, 5, 6, 7, and 9); *Carl Zeiss Vision Int'l GmbH v. Signet Armorlite, Inc.*, No. 07CV0894 DMS (DHB), 2012 WL 12845892, at *3 (S.D. Cal. Aug. 6, 2012) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 2, 4, 5, 6, and 7); *Briese Lichttenchnik Vertriebs Gmbh v. Langton*, No. 09 CIV. 9790, 2013 WL 12061874, at *6 (S.D.N.Y. Dec. 18, 2013) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 1, 2, 3, and 9); *ThermoLife Int'l, LLC v. Sechel Holdings, Inc.*, No. 11-CV-01256-PHX-PGR, 2012 WL 1038775, at *5 (D. Ariz. Mar. 28, 2012) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 2 and 9); *Alps S., LLC v. Ohio Willow Wood Co.*, No. 808CV1893T35MAP, 2013 WL 12164769, at *2 (M.D. Fla. May 10, 2013) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 2, 4, 5, and 7); *SDS Korea Co. v. SDS USA, Inc.*, No. 2:10-CV-4053 WJM, 2012 WL 3114753, at *3 (D.N.J. July 31, 2012) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 2 and 6); *Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*, 833 F. Supp. 2d 333, 341 (E.D.N.Y. 2011) (doubling damages based on evidence supporting enhancement, relating to *Read* factors 1, 2, 4, 6, and 7); *Advanced Display Sys., Inc. v. Kent State Univ.*, No. 3-96-CV-1480-BD, 2002 WL 1489555, at *8 (N.D. Tex. July 10, 2002) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 2, 3, and 9); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, No. A-01-CA-167-SS, 2006 WL 8435710, at *8 (W.D. Tex. Oct. 31, 2006) (trebling damages based on evidence supporting enhancement, relating to *Read* factors 2, 4, 6, 7, and 9); *SDS Korea*

*(Cont'd on next page)*

33

## III. THE COURT SHOULD DECLARE THIS CASE "EXCEPTIONAL" AND AWARD ACANTHA ITS ATTORNEYS FEES UNDER 35 U.S.C. § 285.

For the reasons related to the closeness of case and litigation conduct *Read* factors, discussed in detail *supra* at § II, this case is also an exceptional one under 35 U.S.C. § 285. The Patent Act provides that courts "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "The purpose of § 285 is, in a proper case and in the discretion of the trial judge, to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit." *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983). In *Octane Fitness*, the Supreme Court held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). The Supreme Court rejected the Federal Circuit's formerly rigid standard (requiring independently sanctionable behavior or objective baselessness) in favor of a flexible inquiry. *Id.*

That said, even under the older, more rigid standard, cases of willful infringement, like this one, could be exceptional on that basis alone. *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir. 2004). In fact, under that rule, "when a trial court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is *not* 'exceptional' within the meaning of the statute." *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d

---

*Co., Ltd. v. SDS USA, Inc.*, No. 2:10-cv-4053, 2012 WL 3114753 at *3 (D.N.J. July 31, 2012) (trebling damages where defendant's "infringement was willful and has been ongoing since 2006, despite previous litigation and attempts to prevent infringement").

34

538, 543 (Fed. Cir. 1990) (emphasis in original). There is no reason to deny Acantha's attorneys' fees in this case, especially under the more flexible standard of *Octane Fitness* and Defendants' unreasonable positions in this litigation.

As described *supra*, Defendants willfully infringed for years, and when confronted with that infringement, responded with threats, a kitchen sink approach to invalidity, and unreasonable litigation positions. The totality of these circumstances demonstrates that Defendants' litigation conduct was truly exceptional. Acantha respectfully requests that the Court award Acantha its reasonable attorneys' fees.[14]

## IV. THE COURT SHOULD AWARD ACANTHA COSTS

To be the "prevailing party" under Rule 54(d)(1), the Federal Circuit requires: (1) that the party "received at least some relief on the merits," and (2) "[t]hat relief must materially alter the legal relationship between the parties by modifying one party's behavior in a way that 'directly benefits' the opposing party." *Shum v. Intel Corp.*, 629 F.3d 1360, 1366-67 (Fed. Cir. 2010) (citations omitted). Because Acantha prevailed on all of its own claims and Defendants' invalidity counterclaims, Acantha requests that the Court find it to be the prevailing party pursuant to Federal Rule of Civil Procedure 54(d) and 28 U.S.C. §1920, and that it is entitled to costs consistent therewith. Pursuant to Civil Local Rule 54(a)(1), given the parties' pending

---

[14] Consistent with Rule 54(d) and this Court's precedent, Acantha requests the Court determine on this motion Defendants' liability for fees, following which Acantha will submit a detailed account of the amount of those fees. FED. R. CIV. P. 54(d)(2)(C) ("The court may decide issues of liability for fees before receiving submissions on the value of services."); *T&M Inventions, LLC v. Acuity Brands Lighting, Inc.*, Case No. 14-CV-947, 2016 WL 8290851, at *1 (E.D. Wisc. Sept. 21, 2016) (Griesbach, C. J.) (deciding liability for fees before receiving a request detailing the amount).

Rule 59 Motions, Acantha will file and serve its bill of costs following the resolution of this motion (and any motions filed by Defendants).

## V.   THE COURT SHOULD AWARD ACANTHA SUPPLEMENTAL DAMAGES

"District courts have discretion to award damages for periods of infringement not considered by the jury." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 38 (Fed. Cir. 2012).  For example, courts routinely award supplemental damages for infringement occurring after a jury verdict is returned, but before final judgment is entered.  *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 670 F. Supp. 2d 568, 600 (E.D. Tex. 2009) (finding that damages for post-verdict, prejudgment infringement should be granted to prevent the infringer from obtaining a windfall).  Supplemental damages are generally calculated consistent with the damages awarded in the jury verdict.  *See, e.g.*, *Smith & Nephew Inc. v. Arthrex, Inc.*, 603 Fed. App'x 981, 991 (Fed. Cir. 2015) (finding that "the district court could properly rely on [the jury's] calculation and bring it forward to the post-trial period")

The jury expressly awarded a 6.5% royalty rate on the revenue obtained from the infringed products.  The royalty base included only sales occurring prior to March 31, 2018.  *See* TT (Haas) at 1400:13–17.  Mr. Malackowksi estimates that Defendants have made $8,620,003 in infringing sales between April 1, 2018 and the date of the jury verdict, August 21, 2018. Malackowski Decl. at ¶ 6.  Awarding Acantha supplemental damages on those sales at the jury's 6.5% rate amounts to an additional $560,300.  *Id.* at ¶ 7.  Further, the estimated sales amount to $60,280 per day.  *Id.* at ¶ 11.  For *post-verdict* supplemental damages (on sales from August 22, 2018 through the eventual entry of judgment), Acantha requests that the Court use the 7.875%

36

royalty rate per Acantha's ongoing royalty request set out below. Supplemental damages at that rate amount to $4,747 per day through the date the Court enters judgment. *Id.* at ¶ 12.[15]

Further, all of these supplemental sales are willful and should be enhanced for the same reasons set forth above and below. Accordingly, Acantha also requests that the Court enhance all pre-verdict supplemental damages to the same extent as the jury's verdict, and all post-verdict supplemental damages to the same extent as Acantha's ongoing royalty, as requested below.

## VI. THE COURT SHOULD IMPOSE AN ENHANCED ONGOING ROYALTY

Acantha also requests that the Court impose an ongoing royalty. Where injunctive relief is either not requested or refused, it is common practice to impose an ongoing royalty for infringing sales occurring after judgment. *See, e.g.*, *Wisconsin Alumni Research Found. v. Apple, Inc.*, 261 F. Supp. 3d 900, 920–22 (W.D. Wis. 2017) (noting that it was undisputed that WARF was entitled to an ongoing royalty for continuing infringement). This is particularly true where both parties agree that a running royalty framework, rather than a lump sum, would have been agreed to at the original hypothetical negotiation—as was the case here. *Cf. Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1300–01 (Fed. Cir. 2015) (reasoning the ongoing royalty was properly denied where jury plainly awarded lump sum, not running royalty).

Except in cases where an ongoing royalty is imposed as a "sunset" before the effective date of an injunction, an ongoing royalty is essentially an equitable proceeding to determine what a monetary judgment would amount to if the patent owner filed a separate suit to address infringement not addressed in the trial. *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1297

---

[15] For all of these amounts, the Court may choose instead to order Defendants to produce the relevant actual sales figures following the judgment, and do an accounting thereafter.

37

(Fed. Cir. 2018) (describing ongoing royalty as replacement for separate trial proceeding).  Thus, in evaluating the amount to impose as an ongoing royalty, the Court is tasked with evaluating a new hypothetical negotiation occurring on the date of the verdict for continued use of the patented invention.  *Id.*  Additionally, because the process is designed to replace a subsequent case addressing ongoing infringement, courts also consider the extent to which the ongoing royalty should be increased from the jury's award because of the willful nature of the ongoing infringement, and to deter future infringement by both the infringer and others.  *See, e.g.*, *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, No. 14-cv-62369-BLOOM/Valle, 2017 WL 7732873, at *3 (S.D. Fla. Jan. 3, 2017) ("The purpose of an ongoing royalty is precisely to reduce the incentive to infringe."), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017);  *Paice LLC v. Toyota Motor Corp.*, 609 F. Supp. 2d 620, 626–27 (E.D. Tex. 2009) ("Once judgment is entered, ongoing infringement by the adjudged infringer is willful; that factor, along with the potential for enhancement, the potential impact of res judicata, and many additional factual factors significantly change the ongoing royalty negotiation calculus."), *dismissed by party agreement*, 455 F. App'x 955 (Fed. Cir. 2010).  Courts treat the jury's award as a "starting point" in that new negotiation.  *See Arctic Cat Inc.*, 2017 WL 7732873, at *1.  While the theories on which courts reach their results differ—some discuss it in terms of increased bargaining positions, some discuss it in terms of ongoing willfulness, and others analyze both considerations—most courts acknowledge that the ongoing royalty amount should be larger than that jury's award.  *See, e.g.*, *WBIP, LLC v. Kohler Co.*, No. CIV.A. 11-10374-NMG, 2014 WL 585854, at *9 (D. Mass. Feb. 12, 2014) ("Many district courts have therefore set the post-verdict rate higher than the pre-verdict rate based on the fact that the post-verdict infringer knows that it

38

is infringing and the post-verdict patentee has a strong claim to enhanced damages should it abandon the hypothetical royalty negotiations and pursue a patent infringement lawsuit."); *accord I/P Engine, Inc. v. AOL Inc.*, No. 2:11CV512, 2014 WL 309245, at *4 (E.D. Va. Jan. 28, 2014) (increasing rate based on hypothetical negotiation and based on willfulness), *vacated on other grounds*, No. 2:11-CV-512, 2016 WL 9667228 (E.D. Va. Jan. 29, 2016).[16]

The facts and circumstances here lead to a significantly increased ongoing royalty amount. In terms of the compensatory component of the royalty, numerous factors would tend to increase the jury's 6.5% royalty rate. For example, Georgia-Pacific Factor 5, the commercial relationship between the parties, weighs in favor of an increased royalty because it has been adjudicated that Defendants have infringed the patent; the relationship has thus changed and Acantha is now in a stronger bargaining position. *See WARF*, 261 F. Supp. 3d at 922 (noting that infringement and not invalid finding increased bargaining leverage). Similarly, factors 8 and 11—established profitability and the extent to which the infringer has made use of the

---

[16] Acantha notes that some recent decisions have questioned the Federal Circuit's reasoning that a patentee's bargaining position increases after a jury verdict, particularly where the patentee cannot prevail in obtaining an injunction. These courts point out that, since the hypothetical negotiation assumes infringement and validity, a legal decision confirming that assumption should not markedly change the relative bargaining positions and outcome. *See Cioffi v. Google, Inc.*, No. 2:13-CV-103, 2017 WL 4011143, at *6 (E.D. Tex. Sept. 12, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL 3034655, at *6 (E.D. Tex. July 18, 2017) (Bryson, J., sitting by designation). But the Federal Circuit has since reiterated that "when patent claims are held to be not invalid and infringed, this amounts to a 'substantial shift in the bargaining position of the parties.'" *XY*, 890 F.3d at 1297. The Federal Circuit has also confirmed the nature of the ongoing royalty as a short-circuit proceeding substituting for an additional case for ongoing infringement. *Id.* These later pronouncements seriously undermine the reasoning in this set of district court decisions. Given the nature of the remedy, an ongoing royalty analysis should include all facts that would be relevant to a later decision, including evaluating the certainly willful nature of the infringement and any appropriate enhancement related to that willfulness.

39

invention—weigh in favor of a higher royalty now than at the original negotiation in 2005. A hypothetical negotiation occurring after the verdict would take place with a backdrop of hundreds of millions in confirmed sales, making the "established profitability" and "commercial success" more compelling and the extent of use more certain.

The thirteen-year choice not to implement a non-infringing alternative or a prior art solution would also increase the royalty rate in a significant way. *Arctic Cat Inc.*, 2017 WL 7732873, at *3 (considering similar fact). While the original hypothetical negotiation assumes infringement and validity, the past damages award is nevertheless determined in a zone of uncertainty, particularly about the veracity of claims about non-infringing alternatives. *See Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008) (describing that past damages awards are determined in context of uncertainty). And in this particular case—where the jury awarded more than Defendants' request but less than the maximum number the evidence could support—it is impossible to know the extent to which Defendants' claims about the acceptability of its alleged alternatives impacted the damages awards. It is easy at trial to contend that, in a hypothetical negotiation that did not occur, an alternative is just as good as the infringing version—there is no ability to truly test those assertions. In contrast, when negotiating over an *ongoing* post-trial royalty, the patentee has an increased negotiating position because it could in fact put the infringer to the test: if the royalty demanded is too high, Defendants can simply cease its sale of the infringing products. Because the damages award could have been impacted by Defendants' alleged alternatives, this consideration also leads to an increased royalty rate. *See VirnetX Inc. v. Apple Inc.*, No. 6:13-CV-211, 2014 WL 12672822, at *4 (E.D. Tex. Mar. 6, 2014)

40

(enhancing implied royalty rate where infringer made non-infringing alternative claims at trial and arguments inconsistent with those claims post-trial).

Moreover, Acantha is also in a stronger negotiating position in this negotiation because of lock-in effects. While such effects may be inappropriate in an original hypothetical negotiation where the parties are hypothetically determining whether to start using the patented technology before the release of the product, Defendants in this negotiation will plainly be aware of the sunk costs already incurred in designing, manufacturing, and advertising the accused products and the costs required to release a new product or move surgeons to existing ones. These costs would also play a role at the new hypothetical negotiation. *Paice*, 609 F. Supp. 2d at 627 (reasoning that parties would consider all costs to switching to non-infringing alternative in post-verdict hypothetical negotiation). These considerations would also all occur against the backdrop of the relatively short life of the '008 patent, a consideration under Georgia-Pacific Factor 7. Defendants would likely agree to an increased royalty based on sales for the 10-month timeframe than they would have in deciding whether to implement the technology in the first instance. *Erfindergemeinschaft UroPep GbR,* 2017 WL 3034655, at *9 (noting that a short patent life increases patentee bargaining where infringer would prefer to pay an increased royalty for a short time frame rather the incur switching and marketing costs).

In light of the totality of these circumstances—all of which point toward an increased royalty award—Acantha requests that the compensatory aspect of the award be increased to at least 7.875%, the number proposed by a company that Defendants' own expert worked for as an opening offer to Stryker. PX47 at 18, 23; TT (Haas) at 1481:10–15. Given Acantha's increased bargaining position, this is a reasonable estimate of what Acantha could have demanded in a

41

second negotiation at the time of the verdict.  *Cf. WARF*, 261 F. Supp. 3d at 922 (imposing an ongoing royalty at the rate patentee requested at trial, which was higher than the jury's award).

Acantha also requests that the Court increase the 7.875% number based on the willful nature of Defendants' post-verdict infringement.  *See, e.g.*, *I/P Engine, Inc.*, 2014 WL 309245, at *4 (analyzing ongoing enhancement separate from newly negotiated royalty).  As an initial matter, most facts related to Defendants' past willful infringement would also counsel toward a similar enhancement of the ongoing royalty award.  Thus, the ongoing royalty amount should be increased at least to the same extent the Court determines is appropriate for past infringement.

However, even if the Court chooses not to enhance the pre-judgment damages to the full extent requested by Acantha, the "reasonable belief" and "closeness of the case" factors would weigh even more heavily in favor of enhancement in an ongoing royalty context than for past infringement.  *See, e.g.*, *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013) ("The district court found Defendants' conduct "egregious[ ]" in continuing, and even increasing, sales in the face of an infringement verdict. . . .  The district court made the appropriate determination for an award of enhanced damages.").  The jury's verdict forecloses any argument that Defendants are not infringing on Acantha's patent, and there can be no reasonable belief in non-infringement, invalidity, or any other issue leading to a close case. *Mondis Tech. Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 652 (E.D. Tex. 2011) (enhancing damages for post-verdict infringement despite defendant's argument that it had a good-faith belief in its appellate positions), *aff'd sub nom. Mondis Tech. Ltd. v. Innolux Corp.*, 530 Fed. Appx. 959 (Fed. Cir. 2013).  Indeed, in a separate follow-on trial rather than in an equitable post-trial proceeding, Defendants would lose on infringement and validity via summary

42

judgment proceedings based on the preclusive effects of the Court's Final Judgment. Because

Acantha's '008 Patent is still fundamentally a right to exclude, enhancement of the ongoing

royalty portion is warranted to enforce that right and provide an adequate incentive to deter the

profit motive of ongoing willful infringement.[17] *Arctic Cat Inc.*, 2017 WL 7732873, at *3

(considering willfulness and noting deterrence purpose of ongoing royalties); *VirnetX Inc. v.*

*Apple Inc.*, No. 6:13-CV-211, 2014 WL 12672822, at *4 (E.D. Tex. Mar. 6, 2014) (enhancing

ongoing royalty based on willfulness); *Paice LLC*, 609 F. Supp. 2d at 626.

---

[17] Acantha notes that in *Amado v. Microsoft Corp.*, the Federal Circuit addressed the royalty rate to be paid in a sunset period between the jury's verdict and the effective date of a granted-but-stayed injunction. The district court had increased the rate based on willfulness, and the Federal Circuit said that "willfulness, as such, is not the inquiry when the infringement is permitted by a court-ordered stay." 517 F.3d at 1362. Some district courts have applied this analysis to all ongoing royalties to say that court-imposed ongoing royalties essentially "permit" infringement where a patentee is unable to meet the strict requirements for injunctive relief. *See Erfindergemeinschaft UroPep GbR*, 2017 WL 3034655, at *9. However, these district courts' expansion of *Amado*'s statements to *all* ongoing royalties is likely incorrect in light of subsequent clarification in *XY*. Again, ongoing royalties are equitable shortcuts for a subsequent infringement case addressing the ongoing infringement. Acantha and any patentee could obviously wait until the patent expired, sue for the unaddressed infringement, and have an infringement and willfulness case that is essentially indisputable, and the Court would plainly be permitted to enhance damages then. No Federal Circuit case suggests that a patent owner foregoes that right simply by requesting that the Court exercise its broad equitable discretion to impose available remedies without the burden of a new proceeding, and the Court is permitted to consider the ongoing willful nature of the infringement in setting the ongoing royalty.

   To the extent it is legally significant, let Acantha be clear: Acantha's decision not to request an injunction in this brief is not a concession that Defendants' ongoing infringement is authorized. To the contrary, Acantha is cognizant of prevailing case law concerning the award of an injunction and is simply not making that request in light of that case law. Given Acantha's non-practicing status, its award of a prior license and desire to obtain additional licenses, and the short term left on this patent relating to a medical device, Acantha believes that its ability to obtain an injunction is exceedingly low and has elected not to burden the Court with that request. However, all else equal, Acantha would prefer to enforce its right to exclude Defendants from use of its property entirely, and Defendants should not be granted an ongoing license at only the rate set by the jury simply because Acantha has not burdened the Court with a likely fruitless request for injunction.

43

In light of the foregoing, Acantha requests that the Court set an ongoing royalty rate of 15.75%—the original Stryker offer doubled for willfulness—until the expiration of the patents. Such an award still provides Defendants with ample room to make a large profit on the sales of the accused products but provides economic incentives to respect Acantha's right to exclude. *See, e.g.*, TT (Malackowski) at 721:22–722:16 (describing Defendants' profit margins).

## VII. THE COURT SHOULD AWARD PRE- AND POST-JUDGMENT INTEREST.

### A.     The Court Should Award Pre-Judgment Interest.

Acantha also requests pre-judgment interest per 35 U.S.C. § 284.  Courts award pre-judgment interest "where necessary to afford the plaintiff full compensation for the infringement."  *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983).  "[A]n award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement."  *Id.* (citation omitted).  Except in unusual circumstances, complete compensation includes "forgone use of the money between the time of infringement and the date of judgment."  *Id.* at 655–56.

Acantha requests that the Court award this interest at the prime rate, compounded quarterly.  Other courts in this district have recognized that this rate is the "benchmark for pre-judgment interest" in part because that rate "represents the cost of borrowing money, which is 'a better measure of the harm suffered as a result of the loss of the use of money over time.'" *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 908–09 (E.D. Wis. 2017). *Accord Roy v. Forest Cty. Potawatomi Grp. Health Dental Vision & Short Term Disability Plan*, No. 03-C-1265, 2006 WL 416214, at *7 (E.D. Wis. Feb. 22, 2006) (Griesbach, J.) (awarding pre-judgment interest at the prime rate).  Acantha requests that this be compounded quarterly.

*Milwaukee Electric Tool Corp.*, 288 F. Supp. 3d at 908–09 (compounding quarterly).  Acantha further requests that pre-judgment interest be calculated beginning on March 19, 2014, the beginning of the damages period—although Acantha reserves the right to request additional pre-judgment interest if the Court's summary judgment order limiting damages is modified in any respect.  *Trustees of Boston Univ. v. Everlight Elecs. Co.*, 187 F. Supp. 3d 306, 323 (D. Mass. 2016) (where infringement started before 6-year damages lookback and before marking compliance, awarding pre-judgment interest from whenever damages began to accrue).  Mr. Malackowski estimates that pre-judgment interest on the damages through verdict amounts to $762,314, with an additional $1,311 per day from August 22, 2018 through the day the Court enters judgment.  Malackowski Decl. at ¶ 10.

### B.      The Court Should Award Post-Judgment Interest.

Acantha is also entitled to post-judgment interest under 28 U.S.C. § 1961, as of the date judgment is entered in this action and requests such an award by the Court.  Pursuant to 28 U.S.C. § 1961, interest is computed daily, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment, and shall be compounded annually.

## VIII.   CONCLUSION

For the reasons stated above, Acantha asks that the Court grant its requested relief.

45

Dated: September 21, 2018

Respectfully submitted,

**CALDWELL CASSADY & CURRY P.C.**

 _s/ Bradley W. Caldwell_
Bradley W. Caldwell
Texas State Bar No. 24040630
Email: bcaldwell@caldwellcc.com
Jason D. Cassady
Texas State Bar No. 24045625
Email: jcassady@caldwellcc.com
John Austin Curry
Texas State Bar No. 24059636
Email: acurry@caldwellcc.com
Christopher S. Stewart
Texas State Bar No. 24079399
Email: cstewart@caldwellcc.com
**CALDWELL CASSADY CURRY P.C.**
2101 Cedar Springs Road, Suite 1000
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

T. Wickham Schmidt
Wisconsin State Bar No. 1062002
Email: wschmidt@dkattorneys.com
**DAVIS & KUELTHAU, S.C.**
318 S. Washington Street, Suite 300
Green Bay, WI 54301
Telephone: (920) 431-2226
Facsimile: (920) 431-2266

**ATTORNEYS FOR PLAINTIFF
ACANTHA, LLC**