# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

ACANTHA LLC,

      Plaintiff,

    v.

DEPUY SYNTHES SALES, INC. and
DEPUY SYNTHES PRODUCTS, INC.,

      Defendants.

Civil Action No. 1:15-cv-01257

Judge William C. Griesbach

**REDACTED PUBLIC VERSION**

## DEFENDANTS' OPPOSITION TO ACANTHA'S RULE 59 MOTION FOR ENHANCED DAMAGES AND OTHER POST-TRIAL LEGAL AND EQUITABLE RELIEF

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................. 1

II.    SUMMARY OF THE ARGUMENT ................................................ 1

III.   ARGUMENT ................................................................................... 3

       A.    Enhanced Damages Are Appropriate Only As A Sanction For "Egregious Infringement Behavior" ........................................................... 3

       B.    The Totality Of The Circumstances Demonstrates, And The *Read* Factors Confirm, That Enhanced Damages Are Unwarranted ......................... 5

             1.    Defendants' independent development of the Accused Products weighs against enhancement ................................................ 5

                   a.    Defendants did not copy Acantha's invention .............................. 6

                   b.    The Accused Products are patentably distinct from the Acantha patent ........................................................................ 10

             2.    Defendants' good-faith belief that it did not infringe a valid patent weighs against enhancement .................................................. 11

                   a.    The jury's willfulness finding is not dispositive .......................... 12

                   b.    The independent development and patentability of the Accused Products support Defendants' reasonable belief .......... 12

                   c.    Defendants sought to avoid infringement .................................. 13

                   d.    Defendants reasonably relied on opinions of counsel ................. 14

                   e.    Stryker's failure to enforce the Acantha patent for a decade supports Defendants' reasonable belief ...................................... 18

             3.    Defendants' behavior as a party to the litigation was exemplary, stands in contrast to Acantha's vexatious behavior, and weighs against enhancement ...................................................... 18

                   a.    Defendants' behaved in an exemplary manner as litigants .......... 19

                   b.    Acantha's conduct further demonstrates why there should be no enhancement ................................................................. 22

                         (i)     Acantha ambushed Defendants with the false assertion of a bankruptcy threat ........................................ 23

                         (ii)    Acantha brought baseless claims against six defendants ................................................................. 25

                         (iii)   Acantha needlessly asserted an excessive number of patent claims ............................................................ 26

# TABLE OF CONTENTS

Page

          (iv)    Acantha concealed its copying allegation ....................... 27

          (v)    Acantha asserted improper damages arguments ............. 27

          (vi)    Acantha concealed evidence of Skyline screw breakage ................................................................... 30

    4.    The closeness of the case weighs against enhancement ......................... 31

    5.    Defendants' good-faith efforts to negotiate a license and settlement weigh against enhancement ................................................ 32

    6.    Acantha was never a direct competitor, and Defendants' lack of any motivation to harm Acantha weighs against enhancement .............. 33

    7.    Acantha's admission that Defendants never attempted to conceal the operation of the Accused Products weighs against enhancement ...... 34

    8.    Acantha cannot receive damages for any infringement prior to Defendants' actual notice ......................................................... 37

    9.    Defendants' size and financial condition would be relevant only to the amount of any enhancement, not whether to enhance damages ........ 38

C.    Acantha Has Been Fully Compensated ................................................. 39

D.    This Is Not An "Exceptional" Case ....................................................... 40

E.    Acantha's Request For Inflated Supplemental Damages Is Unwarranted And Premature .................................................................................. 40

F.    Acantha Is Not Entitled To Enhanced Ongoing Royalties .................... 41

    1.    Acantha's preference for an ongoing royalty warrants against enhancement .............................................................................. 41

    2.    Changed circumstances since the hypothetical negotiation, if anything, justify a lower ongoing royalty rate ......................................... 42

IV.    CONCLUSION ............................................................................................ 43

# TABLE OF AUTHORITIES

Page

CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001).........................................................................................9

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
198 F. Supp. 3d 1343, 1348 (S.D. Fla. 2016) ..............................................................17, 33

*Ariba, Inc. v. Emptoris, Inc.*,
567 F. Supp. 2d 914 (E.D. Tex. 2008).............................................................................42

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
No. CV 03-0597-PHX-MHM, 2013 WL 5670909 (D. Ariz. Oct. 17, 2013) ........................17

*Barry v. Medtronic, Inc.*,
250 F. Supp. 3d 107 (E.D. Tex. 2017).............................................................................33

*Bio-Rad Labs., Inc., v. 10X Genomics, Inc.*,
No. 15-152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018).........................................28

*Boston Scientific Corp. v. Cordis Corp.*,
838 F. Supp. 2d 259 (D. Del. 2012).................................................................................37

*Braun Inc. v. Dynamics Corp. of Am.*,
975 F.2d 815 (Fed. Cir. 1992).........................................................................................13

*Burlington Indus., Inc. v. Quigg*,
822 F.2d 1581 (Fed. Cir. 1987).......................................................................................16

*Cioffi v. Google, Inc.*,
No. 2:13-CV-103, 2017 WL 4011143 (E.D. Tex. Sept. 12, 2017).....................................23

*Credit Acceptance Corp. v. Westlake Servs.*,
859 F.3d 1044 (Fed. Cir. 2017).......................................................................................19

*Emcore Corp. v. Optium Corp.*,
No. 7-326, 2010 WL 235113 (W.D. Pa. Jan. 15, 2010) .....................................................39

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
No. 2:15-CV-1202-WCB, 2017 WL 3034655 (E.D. Tex. July 18, 2017)................41, 42, 43

*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed. Cir. 2008)..............................................................................14

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
No. 13-CV-03999-BLF, 2016 WL 3880774 (N.D. Cal. July 18, 2016)........................ passim

*Georgetown Rail Equip. Co. v. Holland L.P.*,
No. 6:13-CV-366, 2016 WL 3346084 (E.D. Tex. June 16, 2016) ....................................7, 34

*Graco, Inc. v. Binks Mfg. Co.*,
60 F.3d 785 (Fed. Cir. 1995)..................................................................................15

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
136 S. Ct. 1923 (2016)........................................................................................3, 4

*i4i Ltd. P'Ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010).................................................................................18

*Idenix Pharms. LLC v. Gilead Scis., Inc.*,
271 F. Supp. 3d 694 (D. Del. 2017)..............................................................12, 34, 38

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
203 F. Supp. 3d 755 (E.D. Tex. 2016) ........................................................................5

*Informatica Corp. v. Business Objects Data Integration, Inc.*,
489 F. Supp. 2d 1075 (N.D. Cal. 2007) ....................................................................39

*King Instrument Corp. v. Otari Corp.*,
767 F.2d 853 (Fed. Cir. 1985)................................................................................12

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995)..................................................................................15

*McKennon v. Nashville Banner Publ'g Co.*,
513 U.S. 352 (1995)...........................................................................................22

*Milwaukee Elec. Tool Corp. v. Snap-On Inc.*,
288 F. Supp. 3d 872 (E.D. Wis. 2017)........................................................... passim

*nCUBE Corp. v. SeaChange Int'l, Inc.*,
313 F. Supp. 2d 361 (D. Del. 2004)..........................................................................10

*Nox Med. Ehf v. Natus Neurology Inc.*,
No. CV 15-709-RGA, 2018 WL 4062626 (D. Del. Aug. 27, 2018)........................................12

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) .................................................................................................40

*Ortho Pharm. Corp. v. Smith*,
    959 F.2d 936 (Fed. Cir. 1992) ..................................................................................15

*Polara Eng'g Inc. v. Campbell Co.*,
    237 F. Supp. 3d 956 (C.D. Cal. 2017) .....................................................................31

*Polara Eng'g Inc v. Campbell Co.*,
    894 F.3d 1339 (Fed. Cir. 2018) ..............................................................................3, 4

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    762 F. Supp. 2d 710 (D. Del. 2011) .........................................................................38

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
    No. 5:11-CV-761 GLS/DEP, 2016 WL 6537977 (N.D.N.Y. Nov. 3, 2016)..........34

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
    875 F.3d 1369 (Fed. Cir. 2017) .............................................................................3, 12

*Radware, Ltd. v. F5 Networks, Inc.*,
    No. 5:13-CV-02024-RMW, 2016 WL 4427490 (N.D. Cal. Aug. 22, 2016).....................9, 20

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816, 827 (Fed. Cir. 1992) ...................................................................4, 5, 14

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
    719 F.3d 1305 (Fed. Cir. 2013) ................................................................................23

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
    No. CV 11-820 (JRT/HB), 2018 WL 3621206 (D. Minn. July 30, 2018)........12, 22

*Searfoss v. Pioneer Consol. Corp.*,
    374 F.3d 1142 (Fed. Cir. 2004) ................................................................................16

*Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co.*,
    226 F. Supp. 3d 520 (W.D.N.C. 2016) ................................................................31, 39

*Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*,
    No. 11-2686-JWL, 2017 WL 978107 (D. Kan. Mar. 14, 2017) ...............................33

*State Indus., Inc. v. A.O. Smith Corp.*,
    751 F.2d 1226 (Fed. Cir. 1985) ..................................................................................3

*Trivascular, Inc. v. Samuels*,
  812 F.3d 1056 (Fed. Cir. 2016).............................................................................17

*WBIP, LLC v. Kohler Co.*,
  No. 11-10374-NMG, 2014 WL 585854 (D. Mass. Feb. 12, 2014) .......................33

*WCM Indus., Inc. v. IPS Corp.*,
  721 F. App'x 959 (Fed. Cir. 2018) .......................................................................4

*Westvaco Corp. v. Int'l Paper Co.*,
  991 F.2d 735 (Fed. Cir. 1993)..............................................................................14

*Whirlpool Corp. v. TST Water, LLC*,
  No. 2:15-CV-01528-JRG, 2018 WL 1536874 (E.D. Tex. Mar. 29, 2018)..........4, 17

*Wis. Alumni Res. Found. v. Apple Inc.*,
  135 F. Supp. 3d 865 (W.D. Wis. 2015) .................................................................17

*Wis. Alumni Research Found. v. Apple, Inc.*,
  261 F. Supp. 3d 900 (W.D. Wis. 2017) .................................................................41

*XY, LLC v. Trans Ova Genetics, LC*,
  No. 13-cv-876 WJW/NYM, 2016 WL 6664619 (D. Colo. Nov. 10, 2016) ...........43

## STATUTES

35 U.S.C. § 284.............................................................................................4, 23, 41

35 U.S.C. § 287(a) .............................................................................................37

# TABLE OF ABBREVIATIONS

| Term | Abbreviation |
|---|---|
| Acantha LLC | Acantha or Plaintiff |
| DePuy Synthes Sales, Inc. and DePuy Synthes Products, Inc. | Defendants |
| DePuy Synthes, Inc., Johnson & Johnson, Synthes, Inc., Synthes USA, LLC, DePuy Orthopaedics, Inc., and DePuy Spine, LLC | Dismissed-Claims Defendants |
| judgment as a matter of law | JMOL |
| U.S. Patent No. RE43,008 | the '008 patent or the Acantha patent |
| Vectra, Vectra-T, Vectra One, and Zero-P VA | Accused Products |
| Vectra, Vectra-T, and Vectra One | Vectra |
| Transcript of Jury Trial Proceedings, Case No. CV 15-1257 (E.D. Wis. Aug. 13-21, 2018) (Dkt. 301-307) | Tr. |
| Transcript of Telephonic Scheduling Conference, Case No. CV 15-1257 (E.D. Wis. May 2, 2018) (Dkt. 222) | 5/2/18 Conf. Tr. |
| Anterior Cervical Compression System | ACCS |
| Stryker Corporation | Stryker |
| Reflex Anterior Cervical Plate System | Reflex |
| Codman Anterior Cervical Plating System | Codman or Codman ACP |
| U.S. Patent No. 6,258,089 (Campbell) | Campbell '089 |
| U.S. Patent No. 6,602,255 (Campbell) | Campbell '255 |
| U.S. Patent No. 7,857,839 (Duong) | the '839 patent |
| U.S. Patent No. 7,909,860 (Rathbun) | the '860 patent |
| U.S. Patent No. 9,192,419 (McDonough) | the '419 patent |

## I.    INTRODUCTION

Acantha's motion to amend the judgment should be denied.  Nothing about this case remotely justifies enhanced damages or attorneys' fees.  Indeed, Defendants are entitled to judgment as a matter of law that the Accused Products do not infringe and, even if the infringement finding is upheld, that any such infringement was not willful.  (Dkt. 316.)  Acantha's other requests—for supplemental damages, ongoing royalties at an inflated rate, and pre- and post-judgment interest—are premature and can be addressed, if necessary, at a later time.

## II.    SUMMARY OF THE ARGUMENT

Acantha acknowledges that the Court must consider the "totality of the circumstances" in evaluating whether or not to award enhanced damages (Dkt. 313 at 2-3), but ignores critical facts and mischaracterizes or distorts others.  A fair review of all the facts demonstrates why enhancement in this case would be wrong.

*First*, Defendants had a good-faith belief that the Accused Products do not infringe any valid claim of the Acantha patent.  Indeed, Defendants independently developed the Accused Products, consulted patent attorneys throughout product development, relied on the advice of counsel, and received their own patents covering the features of the Accused Products that the jury found to infringe.  Any doubt about the reasonableness of Defendants' belief was eliminated by the Court's initial grant of summary judgment of no direct infringement as to both Accused Products, and no infringement of any type by Zero-P VA.  (Dkt. 213.)  Notably, Acantha did not move for summary judgment of infringement with regard to either Accused Product, tacitly admitting that there were at least material fact disputes that precluded a finding of infringement.  Moreover, the allegedly infringing Vectra product is essentially indistinguishable from ACCS, a product that Acantha ***admits*** does not infringe.  The notion that Acantha is entitled to enhancement or attorneys' fees in these circumstances strains credulity.

*Second*, Acantha's argument that Defendants litigated this case in bad faith is meritless. Defendants' conduct in this litigation has been at all times exemplary. Unfortunately, the same cannot be said for Acantha, and its present motion only underscores that fact. For example, Acantha asserted at trial, and argues in its brief, that Defendants copied Acantha's invention. But Acantha never made that contention during the long pendency of this case—despite discovery requests calling for such contentions—and the evidence it now relies on was not even identified in discovery. Similarly, Acantha argues repeatedly that Defendants were motivated by animus, and accuses a former DePuy employee, Marc Peterman, of threatening Dr. Lloyd and Acantha with bankruptcy if it dared to sue for infringement. (Dkt. 313 *passim*.) The allegation is false, and—like its copying claim—Acantha concealed it until trial. Despite discovery directed specifically at the bases for Acantha's claim of willfulness, Acantha never identified this alleged threat until Dr. Lloyd took the stand. Acantha's trial-by-ambush tactics were unfairly prejudicial to Defendants and may have worked with the jury, but they should not be countenanced by the Court.

*Third*, Acantha's request for inflated and enhanced ongoing royalties is unwarranted. It is premised on forbearance of injunctive relief that Acantha never sought, knows that it could not get, and (as a non-practicing entity with no other conceivable way to further monetize its patent) *prefers* not to have. Acantha should not get enhanced damages for the continued sale of the Accused Products when that is precisely what Acantha wants Defendants to do. And Acantha's request to increase the jury's royalty rate is further evidence of Acantha's overreach; it ignores the changed circumstances since the June 2005 hypothetical negotiation that, if anything, justify a lower rate.

Defendants respectfully submit that the jury's verdict in this case was wrong, and Defendants are entitled to JMOL on the issues of infringement and willfulness. But even if the

Court is not inclined to grant Defendants' JMOL motion, it would be error to further reward Acantha with enhanced damages. At worst, Defendants' behavior in this case has been that of a typical litigant in a patent infringement case; if any party was guilty of litigation misconduct, it was Acantha. The Court should deny Acantha's motion.

## III.    ARGUMENT

### A.    Enhanced Damages Are Appropriate Only As A Sanction For "Egregious Infringement Behavior"

The Supreme Court has instructed that enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). "The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or— indeed—characteristic of a pirate." *Id.* Punitive damages are not appropriate where, as here, a defendant, in pursuit of its legitimate business, tries to avoid patent infringement while bringing its products to a competitive market. After all, the purpose of the patent system is to encourage alternatives to "a competitor's products, even when they are patented, thus bringing a steady flow of innovations to the marketplace." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985).

The jury's willfulness finding is not dispositive on the issue of enhancement. *Polara Eng'g Inc v. Campbell Co.*, 894 F.3d 1339, 1353 (Fed. Cir. 2018) ("A finding of willful infringement does not require the district court to award enhanced damages.") (citing *Halo*, 136 S. Ct. at 1933); *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017) ("[A]n award of enhanced damages does not necessarily flow from a willfulness finding."). "The district court thus retains 'the discretion to decide whether the case is sufficiently egregious

to warrant enhancing damages and to decide the amount of enhancement that is warranted.'" *Polara*, 894 F.3d at 1353 (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1342 (Fed. Cir. 2016)); *see also WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 971 (Fed. Cir. 2018) ("'[T]he channel of discretion [is] narrow[ ]' and damages are generally reserved for egregious cases of culpable behavior.") (quoting *Halo*, 136 S. Ct. at 1932); *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 899 (E.D. Wis. 2017) ("[P]romoting innovation and invention demands that district courts decline to award enhanced damages in 'garden-variety cases.'") (quoting *Halo*, 136 S. Ct. at 1935).

The Federal Circuit in *Read Corp. v. Portec, Inc.* identified the following factors the Court may consider when determining whether enhancement is warranted:

> (1) whether the infringer deliberately copied the ideas or design of another;
>
> (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;
>
> (3) the infringer's behavior as a party to the litigation;
>
> (4) defendant's size and financial condition;
>
> (5) closeness of the case;
>
> (6) duration of the misconduct;
>
> (7) remedial action by the defendant;
>
> (8) defendant's motivation for harm; and
>
> (9) whether defendant attempted to conceal its misconduct.

970 F.2d 816, 827 (Fed. Cir. 1992). These factors "provide 'useful guideposts' in the court's exercise of discretion but are not binding or exhaustive." *Whirlpool Corp. v. TST Water, LLC*, No. 2:15-CV-01528-JRG, 2018 WL 1536874, at *10 (E.D. Tex. Mar. 29, 2018) (citations omitted). Indeed, the Supreme Court in *Halo* "eschew[ed] any rigid formula for awarding enhanced damages under § 284." 136 S. Ct. at 1934. Instead, "[t]he paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all

the facts and circumstances." *Read*, 970 F.2d at 826; *see also Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 203 F. Supp. 3d 755, 763 (E.D. Tex. 2016) ("[A]n analysis focused on 'egregious infringement behavior' is the touchstone for determining an award of enhanced damages rather than a more rigid, mechanical assessment.").

### B. The Totality Of The Circumstances Demonstrates, And The *Read* Factors Confirm, That Enhanced Damages Are Unwarranted

The circumstances here do not merit enhancement. Defendants spent years developing the Accused Products, using their own innovative, patentable inventions. They did not take any shortcuts. They did not copy, and they did not engage in egregious, piratical behavior. They cautiously consulted with patent counsel to see if there were any patent issues with their innovative designs, and they were told that the designs were clear of others' patents. Following introduction of the Accused Products, neither Acantha nor its exclusive licensee (Stryker) gave Defendants any reason to believe the clearance opinions were wrong—they completely ignored the Accused Products for a decade. Each had the independent right to enforce the '008 patent, but it was not worth the bother and the risk. It was not even worth the hassle of sending a notice letter; Acantha did not care that much. Nothing about this case suggests in any manner that enhancement is appropriate. Not only does the totality of the circumstances demonstrate that Acantha's motion should be denied, so does analysis of the *Read* factors, as shown below.

#### 1. Defendants' independent development of the Accused Products weighs against enhancement

The record is devoid of evidence that Defendants deliberately copied either the '008 patent or any patented features of Reflex. Acantha's assertion to the contrary is merely conjecture based on Defendants' knowledge of the patent and/or Reflex, and the alleged visual similarity between Vectra and a blurry drawing of Reflex. (*See* Dkt. 313 at 3-7.) This evidence does not support an

inference of deliberate copying. Indeed, Acantha never alleged that Defendants deliberately copied either its patent or Reflex, until trial.

a. <u>Defendants did not copy Acantha's invention</u>

There is no dispute that the patented wishbone clip and screw arrangement found in Vectra was initially developed for use in ACCS, an admittedly non-infringing product. Chris Roth testified that the screw back-out prevention mechanism in ACCS was carried over into Vectra (Tr. at 951:19-23); the wishbone clip in ACCS and Vectra is essentially the same (*id.* at 954:2-15); the ACCS and Vectra plates are basically the same (*id.* at 958:3-24); and none of the modifications from ACCS to Vectra affected the way that the wishbone clip mechanism worked to prevent screws from backing out (*id.* at 965:23-24 ("That function really didn't change between ACCS and Vectra.")). ACCS is functionally indistinguishable from Vectra; neither is a copy of the Acantha patent or the Reflex product. Indeed, Acantha has never provided a cogent explanation for its contention that Vectra infringes while ACCS does not. Acantha's counsel also admitted that Defendants' inventors were unaware of the Acantha patent when they arrived at the ACCS design, which was carried over into Vectra. (*See* Tr. at 796: 10-11 ("[T]he people who are applying for that patent have no awareness of our patent."); Tr. at 1609:11-13 ("I believe she's [Ms. Duong] completely telling the truth when she says she didn't know about [our] patent, no one had informed her.").)[1] These facts alone defeat Acantha's copying allegation.

---

[1] Now that it is seeking enhanced damages, Acantha has disingenuously changed its position. (Dkt. 313 at 4-5 ("Yet despite being months into the ACCS development, it was not until mere weeks after Ms. Thongpreda received Mr. Talaber's letter (enclosing a copy of his patent) that Ms. Duong and her team turned their focus to a biased 'washer' design eerily similar to the preferred embodiment in Acantha's patent and practiced by Acantha's eventual licensee, Stryker.").)

Acantha argues that the Court can infer copying merely from a similar appearance between an accused product and a commercial embodiment of a patent, but that is incorrect. *Milwaukee Elec.*, 288 F. Supp. 3d at 900 (holding that similarities in products are "not conclusive proof of copying" where competitors had similar requirements, making it "unsurprising" that the accused infringer's design goals "were in many ways similar to [the patentee's]"). Acantha cites *Georgetown Rail Equip. Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 WL 3346084, at *17 (E.D. Tex. June 16, 2016), *aff'd*, 867 F.3d 1229 (Fed. Cir. 2017), for the proposition that the similarities between the Vectra product and the inventions claimed in the Acantha patent *alone* are strong evidence of copying. (*See* Dkt. 313 at 4.) *Georgetown Rail* says no such thing. The patentee and the defendant in *Georgetown Rail* had entered not one, but two non-disclosure agreements pursuant to which the patentee directly shared with the defendant all of the details (other than source code) of the patented system, which was a complicated system that included cameras, light sources, and a processor mounted to a track inspection vehicle that performed multiple specified steps to automatically inspect misaligned or sunken railway tie plates. 2016 WL 3346084, at *17. Thus, unlike *Georgetown Rail*, in which the patentee directly shared with the defendant the details of the invention, here Acantha resorts to speculation about an "eerily similar" design to infer Ms. Duong's awareness of the '008 patent, while at the same time admitting she was *unaware* of the patent.

Any visual similarity between Reflex and Vectra does not support an inference of copying here for a number of reasons. First, if Vectra looks "functionally similar" to Reflex, then so does ACCS, which admittedly does not infringe, demonstrating that visual or functional similarity is not in any way determinative of copying. Indeed, Vectra has even more visual similarity with the concededly non-infringing ACCS than it does with Reflex. Second, all anterior cervical plates are

fairly similar in appearance and function ████████████REDACTED████████████
████████████████████████████████ (*See* Ex. 1.)[2]  Dr. Lloyd even surmised that his

own hospital would agree:

> Q. And in that scenario, if your hospital either didn't have Vectra or Vectra never
> were a product to begin with, and all you could use was Skyline, could you then go
> to your hospital and convince them to buy Reflex?
>
> A. I may or may not.  You know, they may say that *a cervical plate is a cervical
> plate* and you're going to have to use it.

(Tr. at 362:10-15 (emphasis added).)  Thus, Acantha's "they-look-the-same" argument fails to

support an inference of copying where Defendants, Acantha, and other market competitors, were

all working in a crowded field of visually and functionally similar products.[3]  Even further,

Acantha does not rely on competent evidence (such as engineering prints of Reflex), relying

instead on unclear brochure drawings.

Acantha's evidence, moreover, fails to support an inference that Defendants deliberately

copied *patented* ideas or designs of Stryker's product into Vectra or Zero-P VA.  For example,

Acantha asserts that DePuy "contrast[ed] the negative ACCS feedback with the Reflex design and

not[ed] the Reflex had improved visibility" (Dkt. 313 at 5), but that assertion is irrelevant to the

issue of copying.  First, Vectra's screw back-out prevention mechanism had been designed earlier,

with the non-infringing ACCS.  Second, the '008 patent neither claims "improved visibility" nor

discloses it as a benefit.  Thus, even if Defendants had copied Reflex's visibility—and they did

not—that conclusion could not support an inference that Defendants copied Acantha's *patented*

---

[2]  All citations to an exhibit ("Ex.") herein are to the Koglman Declaration, filed
concurrently herewith.

[3]  The flawed nature of Acantha's argument is further demonstrated by Mr. Talaber.  He
admitted numerous similarities between the '008 patent and the prior-art Codman plate, and said
that such similarities did not mean that he had copied, because he "changed some things."  (Tr. at
214:3-218:2.)

features. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1366 (Fed. Cir. 2001) ("[E]vidence of copying [a] feature is legally irrelevant unless the [copied] feature is shown to be an embodiment of the claims.").

Further, keeping track of a competitor's products is not evidence of copying, despite Acantha's insinuations.[4] *See Radware, Ltd. v. F5 Networks, Inc.*, No. 5:13-CV-02024-RMW, 2016 WL 4427490, at *6 (N.D. Cal. Aug. 22, 2016) (not enhancing where defendant was trying to develop a product to compete with the features of the plaintiff's product, but there was no evidence that the defendant actually copied the plaintiff's design); *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2016 WL 3880774, at *16 (N.D. Cal. July 18, 2016) (finding discussion of plaintiff's products and capabilities "is simply evidence of normal business competition, perhaps fueled by the passion and desire to beat the competition, and not evidence of improper copying," and "[i]n any competitive industry, businesses monitor and discuss their competitors"), *aff'd-in-part and rev'd-in-part on other grounds*, 879 F.3d 1299 (Fed. Cir. 2018).

Acantha's only other argument—that Synthes conducted "detailed materials analyses of the Stryker product during the development of the ACCS and Vectra" (Dkt. 313 at 5 (citing PX 315))—also fails to support an inference of copying. Indeed, Acantha never explains how that analysis—testing the axial loads on Reflex screws (*see* PX 315)—is tied to any design change made to the non-infringing ACCS that thereby caused Vectra to infringe. Moreover, the document on which Acantha relies is dated in August 2004, more than two years *after* the conception of the screw back-out prevention design of ACCS that was used in Vectra.

---

[4] Acantha's assertion that "Vectra was specifically designed to 'go head to head with . . . Stryker's Reflex Hybrid . . . to reclaim the leadership position in [anterior plating]" is based on a mischaracterization of PX 359, the document from which it selectively quotes. (*See* Dkt. 313 at 6.) Synthes actually listed both Danek's Atlantis Vision and DePuy's Slim-Loc—admitted non-infringing products—as head to head competitors before Reflex. (PX 359-3.)

Acantha does not even suggest copying as to Zero-P VA. Presumably, even Acantha drew the line at this, and was unwilling to argue that the intricate snapper mechanism of Zero-P VA was copied from either the '008 patent or Stryker's Reflex product, neither of which have any feature remotely resembling the snapper mechanism, as the Court previously found. (*See* Dkt. 213 at 18 ("The operation of the Zero-P VA is significantly different than what is envisioned by the '008 Patent.").)

b. <u>The Accused Products are patentably distinct from the Acantha patent</u>

Defendants' own patents on the Accused Products, which disclose and were issued over both the Acantha patent and Reflex, demonstrate that the Accused Products are not copies of the Acantha patent, but are patentably distinct inventions.[5] The '839 patent (DTX 1001), filed in 2003, covers both ACCS and Vectra. A second patent—the '860 patent, filed in 2005—also covers Vectra. In both cases, the patentable difference involved the positional arrangement between the screw head (or enlarged integral portion) and the clip within the plate's passageway. This aspect of the design was at the crux of the infringement dispute, and establishes that Vectra is not a copy of either the '008 patent or Reflex, both of which were disclosed to the Patent Office during prosecution of the '839 and '860 patents. The Patent Office found the Vectra design to be *patentably* different. This is the antithesis of copying.

With respect to the '419 patent on the Zero-P VA design, once again the '008 patent was disclosed to the Patent Office during prosecution, and the Zero-P VA design was found to be patentably different. The claims of the '419 patent recite design features found in

---

[5] The '860 and '419 patents (Exs. 2 and 3, respectively) were not admitted into evidence but may be considered here. *See nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 388–89 (D. Del. 2004) ("[T]he Court recognizes that the Federal Circuit has stated that *Read* implicitly endorses the practice of using evidence not before the jury . . . .") (citations omitted), *aff'd*, 436 F.3d 1317 (Fed. Cir. 2006).

Zero-P VA's snapper mechanism (and its placement) that are patentably distinct from the '008 patent's "biased stopping member" limitation. This is the opposite of copying; it is ingenuity.

Acantha's copying allegation is so weak it was not even made until trial (even though any such contention was responsive to Defendants' discovery requests). (*See infra*, Section III.B.3.b.iv.) At trial, and even now, Acantha's claim is nothing more than conjecture, and does not support enhanced damages.[6] *See Milwaukee Elec.*, 288 F. Supp. 3d at 900 ("There is no need for a 'smoking gun' to prove copying, but there should be more than the conjecture Plaintiffs offer here.") (quoting *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 112 (E.D. Tex. 2017)). This factor weighs against enhancement.

### 2. Defendants' good-faith belief that it did not infringe a valid patent weighs against enhancement

Defendants' good-faith belief in non-infringement and invalidity has been demonstrated in several ways, including: (1) Defendants' independent development of, and patents on, the Accused Products; (2) Defendants' considerable efforts to avoid infringement during the development of the Accused Products; (3) Defendants' reliance upon opinions of counsel; and (4) Stryker and Acantha's failure to accuse Defendants of infringement, sitting on their rights for a decade.[7] Because Defendants investigated the Acantha patent and formed a good-faith belief that they did not infringe a valid patent, this factor weighs against enhancement.

---

[6] The jury's finding of willfulness does not compel the conclusion that the jury also found copying (or any other *Read* factor). Copying was just one of several factors the jury was invited to consider. (Dkt. 296 at 21-22.)

[7] Acantha has never accused ACCS of infringement, further demonstrating Defendants' good-faith belief that they did not infringe.

a.     <u>The jury's willfulness finding is not dispositive</u>

Acantha's enhancement argument relies heavily on the jury's finding of willfulness, but "an award of enhanced damages does not necessarily flow from a willfulness finding." *Presidio*, 875 F.3d at 1382. Acantha overstates the law when it asserts that this factor has "already been decided by the jury" and implies that the Court may not make up its own mind as to the reasonableness of Defendants' belief. (*See* Dkt. 313 at 7.) In fact, the jury's finding of willfulness does not prevent the Court from deciding for itself that Defendants had a good-faith belief in non-infringement or invalidity for purposes of determining whether to enhance damages. *See, e.g.*, *Nox Med. Ehf v. Natus Neurology Inc.*, No. CV 15-709-RGA, 2018 WL 4062626, at *4 (D. Del. Aug. 27, 2018) (despite jury's willfulness finding, the court concluded "it can be inferred that Defendant [had] a good-faith belief that the patent was invalid"); *Schwendimann v. Arkwright Advanced Coating, Inc.*, No. CV 11-820 (JRT/HB), 2018 WL 3621206, at *19 (D. Minn. July 30, 2018) (same, where infringer relied on the non-infringement opinion of an engineer); *Idenix Pharms. LLC v. Gilead Scis., Inc.*, 271 F. Supp. 3d 694, 701–02 (D. Del. 2017) (same, noting that more than two hours of post-trial oral argument on defendant's invalidity defenses were "a reflection of (at minimum) the reasonableness of those defenses and the challenging issues involved").

b.     <u>The independent development and patentability of the Accused Products support Defendants' reasonable belief</u>

As discussed above, Defendants' patents, which disclose and were issued over the Acantha patent and Reflex, cover inventions that are patentably distinct from the Acantha patent. Defendants' own patents are the result of significant effort, and are compelling evidence of the reasonableness of Defendants' belief in non-infringement. *See King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed. Cir. 1985) ("[B]y relying on the issuance of its patent, which even

cited the [plaintiff's] patent as prior art, Otari's management might reasonably have believed that its actions were protected as within its own patentably distinct claims, while falling outside the [plaintiff's] patent claims.").

### c. Defendants sought to avoid infringement

Not only did Defendants independently develop the Accused Products, but they also made a deliberate and careful effort to avoid infringement while doing so. The undisputed evidence demonstrates that it was Defendants' practice to involve patent attorneys early in the product development process, and that they followed that practice bringing the Accused Products to market. (*See, e.g.*, Tr. at 896:23-897:13 (Lan Anh Duong); *id.* at 972:12-982:9, 989:11-996:10 (Roth); *id.* at 1084:3-1090:5 (McDonough).) "On-going consultation with a patent lawyer is highly probative evidence of good faith." *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 822 (Fed. Cir. 1992)). Acantha offered no evidence to counter Defendants' testimony that they had a procedure to avoid infringement and that they followed that procedure; Acantha merely (and incorrectly) argues that "[no] employee actually considered the opinions [of counsel] and believed them. At most, the . . . employees blindly trusted their lawyers." (*See* Dkt. 313 at 8.)

Acantha's argument misses three very important points. First, it focuses only on the formal opinions from outside counsel, and ignores the process that Mr. Roth and Mr. McDonough described regarding the involvement of in-house patent attorneys early in the process to identify potential infringement problems. Second, Acantha's argument ignores the obvious fact that Defendants' inside counsel *are* Defendants' employees who considered the opinions of outside counsel (and also formulated their own opinions). In addition to the collaborative efforts of inside counsel, Mr. Roth testified that inside lawyers had responsibility for reviewing opinion letters from outside counsel (Tr. at 976:7-9), and he would not have signed off on the release of a product without receiving clearance from the legal department. (Tr. at 996:1-7.) Third, it disregards the

fact that Defendants' engineers reasonably relied on the advice of counsel. Acantha's argument seems to suggest that non-patent attorney employees may not reasonably rely on the advice of counsel unless they personally conduct a patent infringement and validity analysis and reach the same conclusion as counsel—but that is not the law. The standard is not whether non-patent attorneys formed independent opinions, but rather whether the "opinion of counsel was either ignored or found to be incompetent." *Read*, 970 F.2d at 829. Acantha has shown neither.

d. <u>Defendants reasonably relied on opinions of counsel</u>

Defendants obtained two opinions from independent, outside counsel, and both concluded that the Accused Products did not infringe a valid claim of the Acantha patent. (DTX 1019; DTX 1020; DTX 1238; DTX 1239.) Acantha never challenged the competence of Defendants' outside counsel, even though it was Acantha's burden to show that, other than merely being wrong, the opinions were so deficient that it was unreasonable to rely on them. *See Read*, 970 F.2d at 829.

Acantha tries to attack the competency of the opinions with four arguments: (1) the Zero-P VA opinion addressed only invalidity for some claims (Dkt. 313 at 8); (2) the Zero-P VA opinion was wrong (*id.* at 10-11); (3) the Vectra opinion relies on an unreasonable claim construction (*id.* at 9-10); and (4) the PTO considered the same prior art references relied upon in the opinions (*id.* at 11-12). None of these arguments has merit. [8]

*First*, it is settled law that a clearance opinion does not need to address both infringement and validity to be competent. *See, e.g.*, *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1339 (Fed. Cir. 2008) ("[A] competent opinion of counsel concluding either that DirecTV did not

---

[8] Acantha also asserts in a footnote that the opinions are incompetent because they do not address infringement under the doctrine of equivalents ("DOE"). (Dkt. 313 at 10 n.3.) A DOE analysis, however, is not a requirement. *See, e.g.*, *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 743–44 (Fed. Cir. 1993) (reversing enhanced damages where opinion failed to address DOE but was otherwise competent).

infringe the [asserted] patent *or* that it was invalid would provide a sufficient basis for DirecTV to proceed . . . .") (emphasis added); *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 793 (Fed. Cir. 1995). The fact that the Zero-P VA opinion does not address infringement for every claim is thus irrelevant to the question of competency.

*Second*, competency of an opinion of counsel is not measured by whether it is ultimately correct. Rather, Acantha must show that the opinions were so incompetent as to make reliance upon them unreasonable. *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992) (holding that the effect of an opinion of counsel "does not depend upon its legal correctness"). Acantha never attempts to do so.

*Third*, Acantha's assertion that the Vectra opinion is "cursory and contrary to Defendants' own documents" is simply not true, and depends entirely on a claim construction argument regarding the term "between," which was never presented to, or construed by, the Court. Specifically, Acantha argues that Defendants' opinion is incompetent because it "suggests that a screw head is not 'between' the stopping member and bottom of the plate." (Dkt. 313 at 9 (citing DTX 1239).) According to Acantha, this "overly restrictive interpretation of the term" is unreasonable. (*Id.* at 10.) For its broader construction, Acantha relies on (1) a Synthes' newsletter that uses the term "cover" (*id.* at 9 (citing PX 450)); (2) a Synthes' competitive analysis that uses the term "over" (*id.* (citing PX 709.2)); and (3) Mr. McDonough's trial testimony in which he agreed that Zero-P VA sits "between" the vertebral bodies even though it has two tabs that allegedly sit outside or on top of the vertebral bodies (*id.*; Tr. at 1096:4-8). Acantha's construction does not rely on *any* intrinsic evidence, and its argument is frivolous. First, Defendants' opinions of counsel cannot be faulted for asserting an interpretation of a claim term that is entirely consistent with the disclosures in the Acantha patent. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967,

979 (Fed. Cir. 1995) ("Claims must be read in view of the specification, of which they are a part."), *aff'd*, 517 U.S. 370 (1996). Second, the common vernacular may have no bearing at all on the meaning of words in a patent claim. *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1149 (Fed. Cir. 2004) ("Claim terms must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains. What the claim terms would mean to laymen is irrelevant.").[9]

Acantha next argues that the opinions are incompetent because they do not address "reissue claims that included the phrase 'enlarged integral portion.'" (Dkt. 313 at 9.) But Acantha's own expert, Dr. Sachs, opined that "the terms 'screw head' and 'enlarged integral portion' are substantially identical in scope for purposes of these claim limitations, and my opinion does not change depending on which term is used." (Dkt. 159-11 at 35.) Mr. Talaber agreed. (Tr. at 264:11-22 ("Q. And the screw head in this figure 5 . . . is also the enlarged integral portion, correct? A. That's correct.").) Acantha cannot argue that the opinion was incompetent on this basis when its own expert found the difference in the reissue claims to be irrelevant, and the inventor agreed.

*Fourth*, the fact that the prior art references relied upon in Defendants' opinions of counsel were disclosed to the PTO does not render the opinions incompetent.[10] An Examiner's *ex parte* decision during prosecution is not dispositive, nor is it binding on a district court. It does not render incompetent an opinion of counsel relying on that same prior art. *See Burlington Indus., Inc. v. Quigg*, 822 F.2d 1581, 1584 (Fed. Cir. 1987) (rejecting argument that "the district court

---

[9] Notably, Acantha does not challenge the propriety of a third opinion of counsel (on ACCS), which Acantha concedes is correct.

[10] Acantha's argument is also based on the premise that the same *arguments* were before the PTAB, but this is false. (*See* Defs.' MIL No. 1 to exclude evidence relating to IPR petitions (Dkt. 227).)

cannot reach a different conclusion on the same evidence that was before the PTO").  Regarding

the PTAB's decision to not institute IPR:

> The IPR proceeding is subject to different standards, purposes and outcomes than both the original prosecution and this court proceeding.  Not only is PTAB's decision not binding in these proceedings, the law is not even clear on whether and how much the PTAB's decision denying [Defendants'] request for review should affect the *weight* given to the two prior art references presented during the IPR proceedings.

*Wis. Alumni Res. Found. v. Apple Inc.*, 135 F. Supp. 3d 865, 874-75 (W.D. Wis. 2015); *see also*

*Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) (PTAB not bound by its own

institution decisions).  It was for these reasons that this Court *granted* Defendants' motion *in limine*

to exclude evidence of the IPR decisions.  (Dkt. 259 at 4-6.)

The cases cited by Acantha are inapposite.  In *Arctic Cat Inc. v. Bombardier Recreational*

*Prods., Inc.*, the defendant relied on an opinion that was not written by an attorney.  198 F. Supp.

3d 1343, 1348 (S.D. Fla. 2016), *aff'd in relevant part*, 876 F.3d 1350 (Fed. Cir. 2017).  According

to the court, "whatever the quality of his work, [the defendant] cannot legally rely on him to

establish the advice of counsel defense."  *Id.*  The Court also noted that it was not dispositive that

the defendant relied on prior art that was before the PTO.  *Id.*  In *Whirlpool*, the defendant admitted

that it had always assumed the patent-at-issue was valid before the lawsuit was filed, and conceded

that none of the prior art references disclosed all the limitations of the asserted claims.  2018 WL

1536874, at *4.  The court also found that the defendant's testimony regarding its investigation

and good-faith belief was undermined by the lack of a written record.  *Id.*  In *Bard Peripheral*

*Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, the invalidity opinion relied on a reference that the

PTO considered, but ignored the fact that the defendant had argued during an interference

proceeding that the same reference was not relevant to validity because it was not enabling.  No.

CV 03-0597-PHX-MHM, 2013 WL 5670909, at *11 (D. Ariz. Oct. 17, 2013), *aff'd*, 776 F.3d 837 (Fed. Cir. 2015).  None of these facts is found in this case.

e.   Stryker's failure to enforce the Acantha patent for a decade supports Defendants' reasonable belief

The reasonableness of Defendants' good-faith belief is further demonstrated by the fact that Stryker, one of Defendants' largest competitors, refused to sue for nearly a decade.  Dr. Lloyd and Mr. Talaber testified that they believed that Vectra was infringing by March 2005.  (Tr. at 203:5-10, 423:8-10.)  Acantha's licensee and partner—Stryker—also knew about Vectra, and Mr. Talaber testified that Acantha "repeatedly approached Stryker about potentially infringing products and nothing happened."  (Tr. at 204:19-23.)  To avoid the unmistakable inference from Stryker's refusal to sue, Acantha concocted an excuse—that "the big players all leave each other alone"—but this was false.  (Tr. at 305:9-308:16; DTX 1314.)  The only reasonable inference on these facts is that Stryker believed that Defendants did not infringe or that Defendants had reasonable defenses.  This further supports the reasonableness of Defendants' good-faith belief in non-infringement or invalidity.

3.   **Defendants' behavior as a party to the litigation was exemplary, stands in contrast to Acantha's vexatious behavior, and weighs against enhancement**

The bar is high for litigation behavior to justify enhanced damages.  *See i4i Ltd. P'Ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010) (holding that litigation misconduct "[t]ypically . . . refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation").  Indeed, courts routinely find that this factor weighs against enhancement absent a clearly vexatious litigation strategy.  *See, e.g.*, *Finjan*, 2016 WL 3880774, at *16 (finding this factor weighed against enhancement because "this

was a hard fought case but did not cross the line into improper conduct"). Acantha cannot come close to meeting its burden here. This factor weighs against enhancement.

### a. Defendants' behaved in an exemplary manner as litigants

Throughout this litigation, Defendants' behavior was exemplary, and was certainly consistent with litigants in typical patent infringement suits. Indeed, Acantha's primary complaint seems to be that Defendants pursued invalidity defenses and petitioned for IPR. (Dkt. 313 at 13.) But this is routine, common practice. Nor was it improper to move to stay the litigation prior to the institution decision; indeed, the Court actually granted Defendants' motion. (Dkt. 43.) The Court rejected Acantha's claim that a stay would be prejudicial and, far from wasting resources as Acantha contends, the Court noted that the IPR had the potential to streamline the case and simplify the issues. (*Id.* at 3.) Defendants' IPR petitions were a good-faith effort to resolve this case expeditiously; this is the opposite of misconduct.

Nor was it misconduct for Defendants to pursue invalidity defenses in the litigation after IPR was denied. The law is clear that no estoppel applies when IPR is not instituted. *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1052 (Fed. Cir. 2017) (citing *Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1316 (Fed. Cir. 2016)). Yet, Acantha is effectively arguing for estoppel when it asserts misconduct in continuing to pursue invalidity defenses. Moreover, Defendants also asserted new and different references as well. (*See* Dkt. 227 at 2-4.) This belies Acantha's repeated assertion that Defendants presented the same invalidity arguments in the litigation. (*See, e.g.*, Dkt. 242 at 2-4; Dkt. 313 at 10-12.) Rather, Defendants advanced different combinations than were presented in the IPR, as this Court already recognized when granting Defendants' motion *in limine* seeking to exclude the PTAB's non-institution decisions. (Dkt. 259 at 4-6.)

Acantha's assertion that it was misconduct to assert invalidity in view of Campbell '255 (Dkt. 313 at 13-14) is also frivolous. The issue with Campbell '255 was not whether it discloses the invention claimed in the Acantha patent—it plainly does. The only issue with Campbell '255 was whether it was § 102(g) prior art, which would require Defendants to show that, despite a later filing date, it was conceived and reduced to practice before the Acantha patent. Defendants timely asserted that patent, and sought discovery from Stryker (Campbell '255's assignee) in order to determine whether it was, in fact, a § 102(g) prior invention. Stryker refused to provide the requested discovery. Having been denied the requested evidence, Defendants therefore dropped Campbell '255. There was nothing improper about the initial assertion and subsequent withdrawal. "[F]or better or worse, it is typical for patent litigants to narrow their cases for trial, and enhanced damages 'are not to be meted out in a typical infringement case.'" *Radware*, 2016 WL 4427490, at *7 (quoting *Halo*, 136 S. Ct. at 1932).

Acantha's claim that Defendants' assertion of Codman and Campbell '089 constituted litigation misconduct (Dkt. 313 at 14) is equally meritless. First, the Court explicitly rejected Acantha's challenge to Defendants' use of the Codman reference, finding that "Defendants have demonstrated good cause to amend their invalidity contentions [to include Codman] and were diligent in doing so." (Dkt. 137 at 6.) Second, although Campbell '089 and Mr. Sherman's anticipation opinion based on it had been disclosed for nearly a year, Acantha's counsel never raised an inherency argument until the second to the last day of trial.[11] (*See* Tr. at 1212:12-1213:9.) And the Court granted JMOL of no anticipation by Campbell '089 based solely on the Court's

---

[11] Mr. Sherman testified that Campbell '089 anticipates every limitation in the asserted claims. (Tr. at 1200:20-1208:8, 1223:1-1246:18.) The only elements of Mr. Sherman's testimony that Acantha disputed was whether Campbell '089 discloses that the screw head displaces the biased stopping member and whether the locking rim it discloses is a biased stopping member. (Dkt. 290 at 2-4.)

determination that "it does not inherently include a self – a one-step insertion of the bone screw into the device with the stopping member then automatically closing." (Tr. at 1555:13-1556:11.) This was a determination with which Mr. Sherman disagreed. (*See* Dkt. 292 at 5-9.) Acantha cannot credibly claim that the use of those references at trial was misconduct.

Acantha's argument that Defendants' assertion of an inequitable conduct defense constitutes litigation misconduct (Dkt. 313 at 14-16) is equally off base. As an initial matter, Defendants did not assert this defense in their Answer. Rather, Defendants took discovery and, when that discovery uncovered conduct that provided a factual basis for inequitable conduct, Defendants sought and were granted leave to amend the Answer and assert the defense. (Dkt. 81; Dkt. 83.) This is not the type of perfunctory inequitable conduct allegation that the Federal Circuit described as a "plague." Defendants had a good-faith basis for their claim. In deposition, Mr. Talaber testified that the claims added in the reissue had the same scope as the original claims. (Dkt. 93-3 at 118:5-10.) That testimony contradicted Mr. Talaber's declaration to the PTO that the reissued claims had a broader scope. (Dkt. 93-2 at 6.) Again, the mere fact that a claim does not prevail does not mean it was misconduct to assert it.

Nor was there was anything improper in Defendants' maintenance of its unclean hands allegation. Although the Court granted Acantha's motion for summary judgment, it did so based on procedural grounds. (Dkt. 212 at 3.) Notably, Defendants' inability to plead this defense with particularity sooner was due to Acantha's own conduct. After Mr. Talaber's deposition, Acantha chose to selectively produce certain privileged communications while withholding others in its effort to prove an earlier invention date. (Dkt. 137 at 11.) Defendants were forced to file a motion to compel to obtain a complete production and a further deposition of Mr. Talaber, all of which occurred after the close of fact discovery. The improperly withheld (and late-produced) documents

demonstrated that Acantha's alleged basis for seeking reissue was not an inadvertent mistake (as required for a reissue), but rather was a deliberate and considered decision. (*See* Dkt. 170 at 8-11.) Defendants' conduct was entirely appropriate given Acantha's delayed production.

Acantha's remaining allegations—relegated to a series of footnotes (Dkt. 313 at 16 nn.5-8.)—are so weak they barely deserve mention. However, Defendants note that (1) Acantha's requests for admission were directed to eight corporate defendants, and Defendants' responses had to take into account the knowledge, or lack of knowledge, of all eight defendants to which the requests were directed; (2) Mr. Haas was not evasive; (3) Defendants did not violate the Court's *in limine* ruling; and (4) it was entirely fair to question the credibility of Acantha's witnesses.

Acantha seeks enhancement based solely on typical litigation conduct. That is insufficient. *See Milwaukee Elec.*, 288 F. Supp. 3d at 902 ("The Court will not delve into such minutiae. After reviewing the parties' disagreements about each other's litigation choices, the most it can say is that the case was hard-fought and involved no more than ordinary strategic decisions (and blunders) on both sides."). This factor weighs against enhancement.

        b.   <u>Acantha's conduct further demonstrates why there should be no enhancement</u>

The Court can—and should—consider Acantha's own litigation conduct as part of the totality of the circumstances. *See Schwendimann*, 2018 WL 3621206, at *19 ("Although the Court is evaluating [defendant's] litigation conduct, [defendant's] conduct was no more egregious—if not less—than [plaintiff's]."). Acantha does not make its request for equitable relief with clean hands, and its own misconduct throughout this litigation should preclude enhanced damages, attorneys' fees, and an ongoing royalty. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360 (1995) ("Equity's maxim [is] that a suitor who engaged in his own reprehensible conduct in

the course of the transaction at issue must be denied equitable relief because of unclean hands . . . .").[12]

The tone of Acantha's trial conduct was set early with the very first substantive question to Mr. Gerber, Defendants' corporate representative. Acantha called Mr. Gerber as an adverse witness, and began by asking him a question that was irrelevant to any issue in the case, and plainly designed to inflame the passions of the jury. (*See* Tr. at 739:15-16 ("Does your company charge more for the accused products in the United States than they do in other countries?").) And it did not get better from there.[13]

        (i)    *Acantha ambushed Defendants with the false assertion of a bankruptcy threat*

Acantha's assertion of litigation misconduct (and a primary justification for its claim for enhanced damages) is premised on the false allegation that Defendants threatened to bankrupt Acantha before this suit was even filed. Acantha made this allegation for the very first time at trial, and improperly concealed the contention from Defendants during discovery.

At trial, Dr. Lloyd testified that during a 2014 conversation with Marc Peterman, then a Vice President at DePuy Synthes Spine, Mr. Peterman threatened that "they would bankrupt our company." (Tr. at 376:6-377:7.) Dr. Lloyd further testified that he "felt like he was basically telling me that the hammer was going to fall if we dared to do anything" and the "few conversations

---

[12] Enhanced damages and ongoing royalties are forms of equitable relief. *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1315 (Fed. Cir. 2013) ("Congress combined the equitable and legal remedies . . . with the creation of 35 U.S.C. § 284."); *Cioffi v. Google, Inc.*, No. 2:13-CV-103, 2017 WL 4011143, at *7 (E.D. Tex. Sept. 12, 2017) ("[A]n ongoing royalty [is] an equitable form of relief . . . .").

[13] The Court recognized Acantha's strategy of encouraging the jury to decide this case on emotion rather than facts following the examination of Dr. Lloyd, who spent over 15 minutes of his direct examination discussing his wife, his children, and his father. (Tr. at 442:18-21 ("But this [case] is about facts. . . . So let's try and keep to evidence that really is material.").)

I had with him were not cordial." (*Id.* at 377:7-9, 376:15.) Acantha now relies on this previously undisclosed, uncorroborated threat to support almost every one of its grounds for equitable relief. (*See* Dkt. 313 at 3, 13, 19, 27, 28 n.10, and 31.)

During discovery, Acantha hid this contention. For example, in response to Defendants' Interrogatory No. 3, which sought the bases of Acantha's willfulness claim, Acantha never identified this alleged threat, but instead incorporated by reference Dr. Lloyd's deposition testimony (which does not mention any threat). (Dkt. 235-1; Dkt. 235-3.) While Acantha did identify statements Dr. Lloyd alleged to have been made by a different DePuy employee, Joe Ross, those alleged statements were entirely different and, in any event, were properly excluded by the Court as unreliable hearsay. (Dkt. 259 at 6-8.) Left without any hook on which to base its dubious willfulness allegations, Acantha concocted a story about Mr. Peterman, which it sprung on Defendants on the second day of trial.[14] By concealing this allegation, Acantha deprived Defendants of the opportunity to refute Dr. Lloyd's claim.

Acantha had good reason to hide this contention: The record contradicts Dr. Lloyd's self-serving trial testimony. Though Dr. Lloyd testified at trial that the "few conversations I had with [Mr. Peterman] were not cordial" (Tr. at 376:15), emails recording Mr. Peterman and Dr. Lloyd's interactions paint an entirely different picture.[15] There is no hint of any threat or anything less than cordiality in the emails between Mr. Peterman and Dr. Lloyd, and the emails even show that Dr. Lloyd circumvented Acantha's attorney and specifically sought out Mr. Peterman in 2015— after the alleged threat. (Ex. 8.) The emails also indicate that the last telephone conversation

---

[14] Acantha alleged in its original complaint that it "spoke directly with Marc Peterman" in 2014 and 2015, yet said nothing about him allegedly threatening Dr. Lloyd. (Dkt. 1 at 6.)

[15] For closer review, Defendants have attached the entirety of the substance of the parties' document production regarding Mr. Peterman and Dr. Lloyd's conversations. (*See* Exs. 4-10.)

between Dr. Lloyd and Mr. Peterman occurred before May 1, 2015, and Mr. Peterman's final email to Dr. Lloyd concluded: "It sounds like we are still w[h]ere we were before, but ***I am always free to discuss further***." (Ex. 10 (emphasis added).) The tone was hardly threatening. Regarding that final conversation, Mr. Magnani, Acantha's attorney, attested that "Marc encouraged Jim to speak with him about the technology" and "in Jim's mind the invitation remained open." (Ex. 8.) Dr. Lloyd's belief that "the invitation remained open" is incompatible with his purported belief that "the hammer was going to fall if we dared to do anything."

If Acantha had properly disclosed its bankruptcy threat contention, Defendants could have refuted it. They could have taken Mr. Peterman's deposition (he is no longer an employee of any of the defendants), and perhaps could have called him as a trial witness. Mr. Peterman, in fact, denies that he ever made such a threat. (Ex. 11.) Likewise, with timely notice, Defendants could have addressed the allegation with Dr. Lloyd at his deposition (as they had done with Dr. Lloyd's allegation concerning Mr. Ross). Such evidence could have and would have been marshalled to refute the false allegation in any number of ways, but Acantha's improper ambush tactics thwarted any such effort.[16]

### (ii) *Acantha brought baseless claims against six defendants*

From the beginning of this case, Acantha has taken every opportunity to drive up Defendants' costs. Acantha insisted on suing eight separate Johnson & Johnson companies, including six that had absolutely nothing to do with making and/or selling the Accused Products. (Dkt. 1.) It also falsely asserted that each and every defendant actually made, used, or sold the Accused Products. (Dkt. 33 at 7.) Defendants moved to dismiss the complaint on this basis

---

[16] The implausibility of a bankruptcy threat is underscored by the fact that, despite Acantha's suit, Defendants did not bankrupt Acantha, and never attempted to do so.

(Dkt. 30), but Acantha opposed, arguing that "it is inexplicable that Johnson & Johnson could have 'nothing to do with this case.'" (Dkt. 33 at 4 n.2.) Although the Court denied Defendants' motion to dismiss (Dkt. 49), almost three years later Acantha finally admitted the "inexplicable," and agreed to dismiss Johnson & Johnson along with the rest of the Dismissed-Claims Defendants. (*See* Dkt. 277.) There was never any proper basis for Acantha's claims.

(iii) *Acantha needlessly asserted an excessive number of patent claims*

Another example of Acantha driving up Defendants' costs was its vexatious assertion of *sixty-eight* of the '008 patent's claims against Defendants. Acantha resisted reducing the number to a manageable amount until ordered to do so. Defendants attempted over a nine-month period to get Acantha to voluntarily reduce the asserted claims to a reasonable number, but Acantha responded by trying to extract concessions from Defendants regarding the number of prior art references they were relying on. (*See* Dkt. 109 at 1.) Acantha's recalcitrance forced Defendants to move the Court to order Acantha to reduce the number of asserted claims. (Dkt. 108.) Acantha opposed the motion, feigning "surprise" at Defendants' "brashness about this strategy" and accusing Defendants of "believ[ing] themselves exempt from that simple reciprocity." (Dkt. 119 at 1.) The Court, however, saw through Acantha's hyperbole and granted Defendants' motion, ordering Acantha to reduce the number of asserted claims to ten. (Dkt. 137 at 7.) The Court also rejected Acantha's specious "reciprocity" argument, noting that "Defendants' second amended final invalidity contentions lists only five prior art references" and "Defendants had good cause to amend their invalidity contentions to include the Codman ACP as a prior art reference." (*Id.* at 8.)

But Defendants were forced to incur substantial (and unnecessary) expense as a result of Acantha's tactics. For example, Defendants' expert had to address all sixty-eight originally asserted claims in his opening invalidity report, which tallied 268 pages without attachments.

(Dkt. 201-4.) In the meantime, Acantha had secretly determined that it would reduce the number of asserted claims to twenty-nine, but it did not tell Defendants until two days before opening expert reports were due. (Dkt. 136-1.) Acantha was not so discourteous to its own expert, who addressed only twenty-nine claims, having been given advance notice by Acantha. Acantha conserved its own resources and was able to focus its own expert's efforts on a reduced number of claims, deliberately placing Defendants at a distinct and costly disadvantage.

### (iv) *Acantha concealed its copying allegation*

During the three-year pendency of this case, Acantha never alleged that Defendants deliberately copied either the Acantha patent or Reflex until springing this allegation at trial. In response to Defendants' Interrogatory No. 3, which requested the bases of Acantha's willfulness claim, Acantha never identified any alleged copying.[17] (Dkt. 235-1.) Yet, the copying contention is now central to Acantha's enhancement argument. Furthermore, the two centerpiece documents in Acantha's copying claim at trial, PX 272 (ACCS Test Market Update) and PX 315 (Materials Analysis), were never identified by Acantha as bearing upon willfulness, and Acantha never questioned any of Defendants' trial witnesses about these documents in deposition.

### (v) *Acantha asserted improper damages arguments*

Yet another example of Acantha's dubious litigation behavior was its persistent attempts to present unreasonably high royalty rates untethered to the facts of this case, in an effort to mislead the jury into awarding an inflated reasonable royalty. Acantha predetermined that it wanted a 15% royalty rate based on a jury award in an unrelated case involving different parties and unrelated patents—the *Globus* litigation. (*See* Dkt. 215 at 9-12.) Acantha's damages expert submitted an

---

[17] Likewise, copying was not alleged in Acantha's Complaint (Dkt. 1), proposed Amended Complaint (Dkt. 36-1), or Pre-Trial Reports (Dkt. 238; Dkt. 270).

initial opinion that a reasonable royalty rate in this case was 10-15%—a range lifted directly from the *Globus* litigation. The Court correctly granted Defendants' *Daubert* motion, holding that Mr. Malackowski's opinion failed to meet the apportionment requirement and was not tethered to the facts of this case. (*Id.* at 11-12.) In so doing, the Court found that "Malackowski refers to the *Georgia-Pacific* factors simply to confirm what he already concluded based on his flawed analysis regarding the Acantha/Stryker license and the *Globus* litigation documents" and "merely stated what a reasonable royalty would be based on the Acantha/Stryker license and the *Globus* litigation documents without explaining how any of the factors support his conclusion." (*Id.*) Later, emboldened by the Court's subsequent decision to let Mr. Malackowski offer a *Georgia-Pacific* analysis to the jury despite this exclusion, Acantha managed to put before the jury the excluded 10-15% royalty rate and a wholly unsupported and wildly exaggerated 26% rate. [18]

Whether from coaching by Acantha's attorneys or Mr. Malackowski's own personal disregard for the Court's *Daubert* ruling, Mr. Malackowski repeatedly volunteered during cross-examination that he had an opinion as to what the royalty rate should be, and he also mischaracterized what Acantha hired him to do. (*See* Tr. at 731:23-25 ("I have my own opinion as to what this royalty rate should be. But my assignment here was to teach, not to opine."); 732:11-12 ("I include several calculations, that was one, as was the 4.25, as were other higher numbers."); 732:16-17 ("[M]y report overall includes other calculations."); 732:24-733:1 ("Well, all of my calculations are characterized as a minimum because that's what the statute provides. I mean, I can explain the other ones that go higher if you like.").) Mr. Malackowski gave this

---

[18] Since the Court's *Daubert* ruling, another court has likewise excluded Mr. Malackowski's unreliable damages opinion. *Bio-Rad Labs., Inc., v. 10X Genomics, Inc.*, No. 15-152-RGA, 2018 WL 4691047, at *6 (D. Del. Sept. 28, 2018) ("[F]ind[ing] Mr. Malackowski's testimony regarding the two-supplier market to be divorced from any economic analysis, and therefore to be excludable.").

misleading testimony knowing full-well that Defendants were prohibited from telling the jury that he, in fact, *had* been assigned to render an opinion, and that his opinion had been excluded as unreliable.

And Acantha's counsel did their part as well. During Mr. Haas' cross-examination, counsel for Acantha conjured up a ***whopping 26.3%*** royalty rate from no more than attorney argument, a single document (PX 472)[19], and a "methodology" never applied by any expert in this case—or by any witness at all. (*See* Tr. at 1485:13-1488:1.) When presented with this farce, Mr. Haas stated "I'm guessing the numbers are proper if you represent that. I don't know what they mean, but –" and was then cut-off. (Tr. at 1487:24-1488:1.) On redirect, he testified that Acantha's counsel's "methodology" was not one that he has "ever used before to calculate a reasonable royalty" and neither had Mr. Malackowski. (*Id.* at 1489:5-12.) If Mr. Malackowski could have used even a semi-plausible methodology to come up with a 26.3% royalty rate, he would have included it in his report, but even he would not go along with such a dubious theory.[20]

The final act of placing artificially inflated royalty rates before the jury came in closing argument. Acantha's counsel remarkably arrived at the excluded 15% royalty rate, to which no expert opined during trial, by averaging a 5% rate at the low end (ignoring lower rates from both the Stryker License and Mr. Haas, the only expert allowed to opine to a rate) with the fantastical 26% at the high end, to arrive at 15.8%. (*See* Tr. at 1638:21-1640:8.) In so doing, Acantha's

---

[19] Acantha never asked any DePuy Synthes witness about PX 472, and its author, purpose, and meaning are unknown. Tellingly, Mr. Malackowski cited this document in his expert report for its description of the features and benefits of the Vectra product, but neither cited nor made mention of the "valuation" chart referred to by Acantha's counsel, nor did he use any such methodology to support his later-excluded opinions.

[20] And, once again, a contention was concealed from Defendants during discovery. Acantha's 26.3% rate and "methodology" used to arrive at it were not disclosed in any interrogatory responses or expert reports.

counsel went so far as to characterize the 26% rate (derived from an undisclosed theory not even relied on by its own expert) as "evidence." (Tr. at 1639:1-3 ("[Y]ou've seen **evidence** [the rate] would be anywhere from 5 percent to **26**.") (emphasis added).)[21]

(vi)    *Acantha concealed evidence of Skyline screw breakage*

Acantha also ambushed Defendants at trial with previously undisclosed evidence of screw breakage in Defendants' Skyline product. (Tr. at 358:12-359:10; PDX 003.18.) Acantha had this evidence in April 2018, four months before trial, yet never disclosed it until two days before trial began. (Tr. at 358:19-359:2, 367:11-370:11, 413:3-5.) The Court ordered Acantha to produce the related files (Tr. at 371:4-5), but they were not produced until October 12, 2018.[22] (*See* Decl. ¶ 14, filed concurrently herewith.) Acantha's reason for concealing this evidence is apparent: Dr. Lloyd's recently-produced records show REDACTED ████████████████████████ ████████████████████████ (Ex. 12 at 6.) This belies Acantha's assertion that screw breakage in Skyline is such a "major problem" that it is not an acceptable non-infringing substitute. (*See* Tr. at 470:19-471:8, 570:1-6.)

*        *        *

Space does not permit a complete catalogue of Acantha's misconduct, but the few examples cited herein are more than sufficient to deny Acantha the relief it seeks.

---

[21] On a number of occasions, the Court had to admonish Acantha's counsel on their improper attempts to qualify evidence as admissible. For example, when Defendants objected to a demonstrative, which plainly revealed Dr. Sachs intent to improperly testify as to Defendants' state of mind, Acantha's counsel brazenly told the Court that "he's not going to testify about their state of mind." (Tr. at 438:7-8.) The Court reviewed the slides, and confronted Acantha's counsel. (*Id.* at 439:4-5 ("Mr. Stewart, why do you tell me one thing when your report and your slides say another?").) Even after being caught red-handed, Acantha's counsel incredibly persisted. (*See id.* at 439:6-21.)

[22] What Acantha eventually produced still appears incomplete because, *e.g.*, REDACTED ████████████████████████ (Ex. 12 *passim*.)

#### 4. The closeness of the case weighs against enhancement

This was and remains a very close case. None of the claims in this case—infringement or validity—was "easily decided against the infringer." *See Milwaukee Elec.*, 288 F. Supp. 3d at 903.

The infringement case was exceptionally close. Not only were Defendants' infringement defenses on both Vectra and Zero-P VA reasonable, requiring a jury trial to adjudicate, but as described in detail in Defendants' Renewed Motion for JMOL (Dkt. 317, incorporated by reference), Defendants should prevail. Indeed, the Court originally granted summary judgment of non-infringement as to Zero-P VA and no direct infringement as to both Vectra and Zero-P VA. (Dkt. 213.) The Court's May 19, 2018 decision to reconsider and amend its summary judgment decision as to Zero-P VA was evidently such a close call that over a period of less than twenty-four hours the Court first denied (Dkt. 251), and then granted, this portion of Acantha's reconsideration motion (Dkt. 253). *See Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co.*, 226 F. Supp. 3d 520, 532 (W.D.N.C. 2016) ("[I]t would be difficult to conjure up a defense which would be more 'reasonable' than one expressly adopted by a federal judge.") (quoting *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 692 F. Supp. 2d 487, 504 (M.D. Pa. 2010)), *aff'd*, 721 F. App'x 989 (Fed. Cir. 2018). And even after the Court partially reversed its summary judgment decisions, Defendants still maintained reasonable defenses that warranted a jury trial. Enhanced damages are not warranted. *See Polara Eng'g Inc. v. Campbell Co.*, 237 F. Supp. 3d 956, 993 (C.D. Cal. 2017) ("[T]he record reveals little behavior by either side that cannot be fairly characterized as zealous and aggressive advocacy. [Defendant's] . . . defenses required a trial, indicating that neither position was vexatious or unjustified."), *vac'd on other grounds*, 894 F.3d 1339 (Fed. Cir. 2018).

The invalidity case was also close. Defendants' invalidity defenses were not challenged in summary judgment; Defendants' anticipation defense survived until the last day of trial; and the

obviousness defense went to the jury. (*See* discussion *supra*, Section III.B.3.a.) In *Milwaukee Electric*, this Court found the closeness of the case factor weighed against enhancement where the plaintiff did not challenge the defendant's obviousness defense at summary judgment and it was decided by the jury. 288 F. Supp. 3d at 903 ("Notably, Plaintiffs did not seek summary disposition of the obviousness defense. A claim that proceeds to trial is not strong *per se*, yet there is no clear sign that the jury summarily dismissed the defense.") (citation omitted); *see also Finjan*, 2016 WL 3880774, at *17 ("The fact the jury sided with Finjan over Blue Coat does not negate the fact Blue Coat's positions survived summary judgment and reached a jury."). This factor weighs against enhancement.

### 5. Defendants' good-faith efforts to negotiate a license and settlement weigh against enhancement

The next factor asks "whether [Defendants] took action to avoid or remediate infringement once it was a real danger. . . . [T]he emphasis here is whether conduct during the pendency of the suit evinces an unrepentant defendant." *Milwaukee Elec.*, 288 F. Supp. 3d at 904. In *Milwaukee Elec.*, this Court held that this factor did not support enhancement because the defendant "developed several vigorous non-infringement and invalidity defenses which it pursued here and in the USPTO" and "did not act vexatiously in fighting the case to its conclusion." *Id.* Thus, a defendant is not required to avoid or remediate infringement until it is in "real danger." This makes perfect sense, otherwise, an accused infringer would be placed in a Catch-22 position and risk enhanced damages if it did remediate the infringement that it reasonably believed it was not committing. *See Finjan*, 2016 WL 3880774, at *17 (finding this factor neutral because the infringer "continues to challenge the jury verdict" despite lack of remedial measures).

In any event, Defendants did attempt, in good-faith, to negotiate a license with Acantha. Courts have found that approaching the patentee about a license is a form of remedial action. *See,*

*e.g.*, *Arctic Cat*, 198 F. Supp. 3d at 1353 ("BRP has never engaged in remedial action either . . . such as approaching Arctic Cat about a license . . . ."). Defendants tried to negotiate a settlement of this case before and throughout litigation, and it was Acantha's unreasonable positions that prevented early settlement.[23]

Finally, Acantha never sought injunctive relief and favored seeking an ongoing royalty (as would be expected of a non-practicing entity); therefore, Defendants should not face additional penalties for any post-verdict conduct. S*ee WBIP, LLC v. Kohler Co.*, No. 11-10374-NMG, 2014 WL 585854, at *6 (D. Mass. Feb. 12, 2014) ("[D]eny[ing] injunctive relief in favor of an ongoing royalty weighs against penalizing Kohler for failing to take remedial action post-verdict.") (citing *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990)).

Because Defendants were not required to take remedial action, and did, in fact, seek settlement, this factor weighs against enhancing damages.

> **6.    Acantha was never a direct competitor, and Defendants' lack of any motivation to harm Acantha weighs against enhancement**

For the next factor, "the Court must discern whether [a defendant's] infringement was done with a 'pernicious' intent to harm Plaintiffs." *Milwaukee Elec.*, 288 F. Supp. 3d at 904 (quoting *Read*, 970 F.2d at 827). Defendants had no intent to harm Acantha and no motivation to harm its licensee, Stryker.

Motivation to harm requires showing more than normal economic pressure and competition in the marketplace. *See, e.g.*, *Barry*, 250 F. Supp. 3d at 116-17 (factor neutral because "no evidence that Medtronic was motivated to infringe or continue infringing for any reason other than its own commercial business interest"); *Sprint Commc'ns Co. L.P. v. Time Warner Cable, Inc.*,

---

[23] REDACTED

████████████████████████████████

████████████ (Ex. 13.)

No. 11-2686-JWL, 2017 WL 978107, at *14 (D. Kan. Mar. 14, 2017) ("Indeed, the fact that the infringer acted pursuant to a financial motive does not distinguish this case from the garden-variety infringement case."); *Georgetown Rail*, 2016 WL 3346084, at *20 (factor neutral; "there is nothing to suggest that Holland acted out of spite or ill-will toward Georgetown or for any reason other than a desire to capture a piece of the market"). Defendants' motivation to develop, make, and sell the Accused Products was to advance their commercial business and help patients in need— the same as Stryker's. *See Idenix*, 271 F. Supp. 3d at 702 ("Similarly, there is no evidence of a 'motivation for harm' that would support enhancement. The record can only reasonably be understood as showing that [defendant's] 'motivation'—in addition to a healthy profit motive, which [plaintiff] (quite rightly) shares—was to develop a cure to a devastating, life-threatening disease.").

Acantha points to two reasons why this factor should weigh in favor of enhancement: (1) a purported threat from Mr. Peterman to Dr. Lloyd; and (2) Defendants' competition with Stryker. (Dkt. 313 at 27.) The first is a fabrication (*see* discussion *supra*, Section III.B.3.b.i.), and the second is legally insufficient to justify enhanced damages. This factor does not support enhancement.

### 7. Acantha's admission that Defendants never attempted to conceal the operation of the Accused Products weighs against enhancement

"In the Court's view, this factor is limited to instances of overt misconduct, which may not exist in every case." *Milwaukee Elec.*, 288 F. Supp. 3d at 904. The standard for finding concealment is high, and Acantha has not met it. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, No. 5:11-CV-761 GLS/DEP, 2016 WL 6537977, at *8 (N.D.N.Y. Nov. 3, 2016) (concealment found where infringer identified and advertised the infringing product in the same way as its older, non-infringing version, infringer's engineers admitted infringing features

were "invisible," and patentee was lead to believe the products had not been redesigned to infringe).

Acantha's admission that "there is no evidence that Defendants concealed the operation of the infringing products from Acantha" should end this inquiry. (Dkt. 313 at 28.) But Acantha again goes too far, and alleges that the following are egregious acts of concealment warranting enhanced damages: (1) Dr. Konieczynski's deposition testimony regarding his recollection of events eleven years prior; (2) Defendants not calling the authors or recipients of their opinions of counsel to testify at trial; (3) Defendants not producing a Stryker surgical guide; and (4) Defendants' discovery response that "they had insufficient information to determine whether Defendants were aware of Stryker Reflex prior to designing the infringing products." (Dkt. 313 at 29-30.) Far from showing overt misconduct on Defendants' part, Acantha's laundry list of minutia only serves to highlight Acantha's own habit of misrepresentation.

Dr. Konieczynski's inability to remember an email he was copied on over a decade earlier did not "hinder[] Acantha's ability to explore that history and prove its case," and was not Defendants' fault. (*See* Dkt. 313 at 30.) In fact, Acantha already had the email correspondence it refers to (PX 74) when it deposed Dr. Konieczynski, but chose not to show it to him or attempt to refresh his memory. (*See* Ex. 14 at 3 (noting no exhibits were used); Dkt. 314-4.) The only thing that hindered Acantha's ability to explore any history was its own delay in bringing suit. (*See* Tr. at 861:14-863:14 (testifying that he could not recall communicating with Dr. Lloyd in 2006).)

Defendants had no duty to call the named authors or recipients of the opinions of counsel; Acantha bore the burden of challenging the competence of the opinions. If Acantha wanted them to testify, Acantha should have called them or taken their depositions.

Defendants inability to produce a Reflex surgical guide is not indicative of concealment. The only evidence Acantha has that Defendants *ever* had a copy of a Reflex surgical guide comes from Acantha's inference from a 2003 slide presentation that Defendants produced. (PX 251.) But Acantha's inference does not evince misconduct; the more plausible inference is that by the time this case was in discovery, no one still had a thirteen-year-old surgical guide for a competitor's unimportant and largely unsuccessful product.

Finally, Acantha's complaint that Defendants could not admit when they were first "aware of" Reflex in response to Acantha's RFA No. 50 is a red herring. The issues preventing admission were (1) the RFA was directed to eight different corporate entities; (2) different employees may have known about Reflex at different times and in different contexts; and (3) whether such individual knowledge could be imputed to Defendants and for what purposes. Defendants' witnesses testified to the extent of their knowledge of Reflex, but due to Acantha's delay in bringing suit, could not remember when they gained that knowledge. (*See, e.g.*, Tr. at 773:2-5 (Gerber); 939:8-16, 941:17-942:12 (Duong); 1010:3-12 (Roth).) The documents and testimony Acantha points to merely confirm that the earliest date that Defendants can attest to their awareness of Reflex is in 2003, which was *after* the development of the Accused Products began and thirteen years before Acantha served its RFA. This is not concealment, but rather uncertainty created by Acantha's delay in enforcing its patent.

Acantha's argument that this factor favors enhancement is based entirely on weak inferences mainly born from Acantha's own action or inaction; this is a far cry from the sort of "overt misconduct" that could warrant enhanced damages. *See Milwaukee Elec.*, 288 F. Supp. 3d at 904 ("[V]ague allegations cannot and should not support enhancement."). This factor weighs against enhancement.

### 8. Acantha cannot receive damages for any infringement prior to Defendants' actual notice

Acantha again overreaches and now seeks enhancement to make up for damages that the Court has ruled it is precluded from recovering. Acantha failed to comply with 35 U.S.C. § 287(a), and the Court ruled that Acantha was therefore limited to recovering damages from March 19, 2014, the date Acantha provided actual notice. (Dkt. 214 at 12.) Enhancement cannot be based on conduct for which Acantha could not seek compensatory damages in the first place. *See Finjan*, 2016 WL 3880774, at *17 (factor neutral where plaintiff limited its damages to acts occurring after a certain date because plaintiff "cannot seek to achieve enhanced damages for infringement for which it did not even seek regular damages"). Thus, the duration of any misconduct is not thirteen years, as Acantha contends, but would extend only back to March 19, 2014, a time frame that hardly supports vindictive sanction. *See Boston Scientific Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 280 (D. Del. 2012) (approximately three years insufficient to favor enhancement), *aff'd,* 497 F. App'x 69 (Fed. Cir. 2013).

Acantha's attempt to re-litigate the Court's summary judgment decision on marking by blaming Stryker is both desperate and contrary to the Court's ruling and the marking statute. Acantha characterizes the effect of the Court's proper application of § 287(a) as an "anomalous circumstance" that "allow[s] Defendants a windfall of license-free infringement" (Dkt. 313 at 25-26), but ignores the purpose of the marking statute—to prevent patentees from collecting damages for periods of infringement during which they failed to comply with the statute. (Dkt. 214 at 6 ("[A] licensee's failure to mark the article bears consequences for the patentee seeking damages for infringement.") (citation omitted).) The Court should not allow Acantha to regain via enhanced damages what it gave up by its failure to mark.

Moreover, Acantha ignores the fact that it and Stryker sat on their rights for over a decade and did nothing during that time to mitigate any damages (not even sending a simple letter). The time lapse here is attributable entirely to the negligence of Stryker and Acantha—or to Stryker's apparent belief that any infringement case would not be a strong one. Because the duration of any misconduct for which Acantha would be entitled to receive enhanced damages is short, this factor is neutral or weighs only slightly in favor of enhancement.

### 9. Defendants' size and financial condition would be relevant only to the amount of any enhancement, not whether to enhance damages

This factor is often given weight only in situations either where it militates *against* enhancement, *i.e.*, in situations where enhancement endangers an infringer's business, or where the Court has already decided to enhance damages and this factor weighs merely in determining the amount of enhancement. *See, e.g.*, *Idenix*, 271 F. Supp. 3d at 701 (defendants "large and healthy" size and financial condition "do not merit any weight" because "[t]his factor is often given weight *against* enhancement"); *Finjan*, 2016 WL 3880774, at *17 ("Since the Court finds enhanced damages are not appropriate in this case, this factor is not relevant and neutral."); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 762 F. Supp. 2d 710, 722 (D. Del. 2011) ("The defendant's financial condition typically is used as a reason ***not*** to grant enhanced damages to the fullest extent.") (citations omitted), *decided on other grounds*, 711 F.3d 1348 (Fed. Cir. 2013). Because the other *Read* factors weigh against enhancement, this factor is neutral.

Acantha, however, goes so far as to assert that this factor supports *treble* damages simply because Defendants' parent company, Johnson & Johnson, is a large company with extensive financial means. (Dkt. 313 at 17-18.) Once again, Acantha overreaches. Acantha stipulated to the dismissal of Johnson & Johnson with prejudice (Dkt. 277), thus Johnson & Johnson's financial condition as a non-party, non-infringer is completely irrelevant to the question of enhanced

damages. *See Emcore Corp. v. Optium Corp.*, No. 7-326, 2010 WL 235113, at *2 (W.D. Pa. Jan. 15, 2010) (agreeing that the court "should be viewing the size relative to [defendant], the accused infringer, not [the parent]").

*     *     *

The *Read* factors confirm that Defendants do not deserve punishment. Defendants did not deliberately copy Acantha's patented invention; they investigated Acantha's patent and held a good-faith belief that they do not infringe a valid patent; they did not engage in litigation misconduct; the case was close; Defendants had no motivation to harm Acantha; and they did not conceal their conduct. The period that Acantha would be entitled to damages is short, and Acantha prefers a reasonable royalty to an injunction. Because the other *Read* factors do not justify enhanced damages, Defendants' size and financial condition are irrelevant. The *Read* factors confirm that the Court should deny Acantha's motion for enhanced damages.

### C.      Acantha Has Been Fully Compensated

Finally, the jury's award fully compensates Acantha, and is an additional reason to deny further, unwarranted compensation. *See Informatica Corp. v. Business Objects Data Integration, Inc.*, 489 F. Supp. 2d 1075, 1085 (N.D. Cal. 2007) ("In the totality of facts and circumstances, the Court may consider the size of the damages award upon ruling of enhancement.") (citing *Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1314 (Fed. Cir. 2002)); *Sociedad Espanola*, 226 F. Supp. 3d at 533 (not enhancing in part because "[plaintiff] recovered a significant damages award for the Defendants' culpable conduct"). Acantha's damages expert was not allowed to offer a conclusion on what the reasonable royalty rate should be (5/2/18 Conf. Tr. at 4:5-19), and the highest royalty rate the jury saw in a comparable non-exclusive license was 3.25% (PX 94). Thus, the jury's award of a 6.5% royalty rate (Dkt. 297) already compensated Acantha at *twice* the amount supported by the evidence. Further, the jury's award of $8.2 million, for a damages period

of approximately four and a half years, more than compensates Acantha; Stryker paid Acantha approximately $11 million in royalties over a period of ten years for an exclusive license and less than $3 million lump-sum for a non-exclusive license for approximately six years. (Tr. at 195:22-196:24, 205:20-206:14, 281:4-18; PX 94.)

Furthermore, if Acantha's complaints about Stryker are true, then Acantha apparently has a cognizable claim against Stryker for failure to mark. (*See* Dkt 313 at 25 (accusing Stryker of breach of contract).) That failure should not be held against Defendants.

### D.     This Is Not An "Exceptional" Case

For the same reasons that enhanced damages are inappropriate, the Court should deny Acantha's request for fees. This is not an "exceptional" case and does not "stand[] out from others" either on the substance of Acantha's case or Defendants' litigation behavior. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

### E.     Acantha's Request For Inflated Supplemental Damages Is Unwarranted And Premature

Acantha's request for supplemental damages is premature, and the Court should withhold judgment on this issue until after the parties' rights to appeal are exhausted. Furthermore, Acantha's increased royalty rate on those damages is unreasonably high, once again demonstrating Acantha's propensity to over-reach.

First, the prudent course is to stay the Court's judgment on supplemental damages until after the parties exhaust their rights to appeal at which time Defendants can provide actual sales numbers.[24]

---

[24] Acantha concedes as much in its Motion. (Dkt. 313 at 37 n.15 ("[T]he Court may choose instead to order Defendants to produce the relevant actual sales figures following the judgment, and do an accounting thereafter.").)

Second, there is no reason for the Court to impose a higher royalty rate for supplemental damages than the already inflated rate the jury awarded. Acantha points to no circumstances that changed between April 1, 2018 and August 21, 2018 that would justify a higher rate than the jury's 6.5%. Assuming the jury verdict stands, the Court should apply the jury's rate to all damages up through the entry of judgment. *See Wis. Alumni Research Found. v. Apple, Inc.*, 261 F. Supp. 3d 900, 923 (W.D. Wis. 2017) (awarding supplemental damages through the date of judgment at the jury's rate), *decided on other grounds*, No. 2017-2265, 2018 WL 4654732 (Fed. Cir. Sep. 28, 2018).

**F.    Acantha Is Not Entitled To Enhanced Ongoing Royalties**

Not only does Acantha seek enhanced ongoing royalties under § 284, but Acantha also wants the Court to apply a higher royalty rate as well. (Dkt. 313 at 37-39.) As discussed above, enhancement is not warranted in this case on any damages, and certainly not on an ongoing royalty that Acantha prefers to an injunction. Furthermore, the jury's award of a 6.5% royalty rate was already inflated, and Acantha is not entitled to an even more overly inflated rate on ongoing royalties. In fact, present circumstances suggest a *lower* rate for ongoing royalties. The Court should deny Acantha's meritless request.

**1.    Acantha's preference for an ongoing royalty warrants against enhancement**

Acantha never sought an injunction in this case and admits that the Court would not likely grant one. (Dkt. 43 at 2 ("Plaintiff has not sought immediate injunctive relief."); Dkt. 313 at 43 n.17 ("Acantha believes that its ability to obtain an injunction is exceedingly low . . . .").) It is "improper to use willfulness as a basis to enhance the ongoing royalty in a situation in which the equities would not even permit the issuance of an injunction in the first place." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-WCB, 2017 WL

3034655, at *9 (E.D. Tex. July 18, 2017) (Bryson, J., by designation) (citing *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1362 (Fed. Cir. 2008)).  "And it may be even more improper in a case such as this one, which involves a non-competitor, in which the plaintiff chooses not to seek an injunction, and in which the defendant's continuing infringement in fact benefits the plaintiff by generating sales from which ongoing royalties can be awarded." *Id.*  Because Acantha's preferred remedy is an ongoing royalty, that requires Defendants' continued sale of the Accused Products, Acantha cannot fairly claim that such conduct is "egregious" and deserving of punitive sanction.

Acantha's claim that it "would prefer to enforce its right to exclude Defendants from use of its property entirely" strains credulity.  Acantha will collect no further revenue from Stryker; it has been unsuccessful in finding any other licensees; its patent is about to expire; and an ongoing royalty in this case is the only conceivable way for Acantha to further monetize its patent.  Acantha does not want to enjoin Defendants, but, to have any chance at enhanced ongoing royalties, it must *say* that it does.  The Court should not reward such disingenuousness.

### 2. Changed circumstances since the hypothetical negotiation, if anything, justify a lower ongoing royalty rate

The hypothetical negotiation date for the jury's reasonable royalty rate determination was June 2005.  (Dkt. 296 at 27.)  The jury was told to "assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement." (*Id.* at 28.) Neither assumption has changed post-verdict.  First, the jury's verdict merely confirms what the parties to the hypothetical negotiation assumed; therefore, this does not change their respective bargaining positions.  *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 918 (E.D. Tex. 2008) ("[I]t is logically inconsistent to argue that a calculation based upon assumptions of infringement and validity would change when those assumptions are replaced by jury findings of the same facts.").  Second, there is no threat of any injunction that could affect the assumed willingness of

the parties.  *See UroPep*, 2017 WL 3034655, at *5 (citing *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, No. 08-CV-335, 2010 WL 3070370 (S.D. Cal. Aug. 5, 2010)).

If anything, changed circumstances since June 2005 warrant a lower ongoing royalty rate. *See XY, LLC v. Trans Ova Genetics, LC*, No. 13-cv-876 WJW/NYM, 2016 WL 6664619, at *1-2 (D. Colo. Nov. 10, 2016) (adopting a post-verdict royalty rate lower than the pre-verdict royalty rate selected by the jury).  The two most significant economic changes since June 2005 are the steadily declining popularity and commercial success of one-step blocking mechanisms (*Georgia-Pacific* factor 8)[25] and the declining royalties received by Acantha since June 2005, especially the low effective royalty rate in the 2013 Stryker license (factor 1).[26]  The Court should deny Acantha's request for enhanced and inflated ongoing royalties.

## IV.  CONCLUSION

For the foregoing reasons, the Court should deny Acantha's request for enhanced damages, attorneys' fees, enhanced ongoing royalties, and any royalty rate greater than 6.5%.[27]

---

[25] Unrefuted evidence shows that sales of one-step systems have been in steady decline for both Stryker and Defendants.  (Tr. at 282: 6-8, 291:16-23, 293:10-12, 295:16-20; DTX 1023 (Stryker); *id.* at 1431:18-22; DTX 1119 (Vectra).)  This decline in popularity and commercial success would factor into a post-verdict negotiation and warrants a lower royalty rate.

[26] In a post-verdict negotiation, the parties would also consider the 2013 Stryker license. Defendants' damages expert, Mr. Haas, testified that the effective royalty rate for the this license was 1.27%.  (Tr. at 1413:17-1414:6.)  And Mr. Talaber estimated an effective rate of 2.995%. (DTX 1015; Tr. at 281:13-15.)  This factor also warrants a lower royalty rate.

[27] Defendants concede that the ultimately prevailing party may be entitled to costs and that Acantha may be entitled to interest on any affirmed judgment.  Defendants contend, however, that such determinations are premature, and the Court should withhold judgment on these issues.

Dated: October 19, 2018                    Respectfully submitted,

                                           */s/ Thomas S. Koglman*
                                           Calvin P. Griffith
                                           Patrick J. Norton
                                           Kenneth S. Luchesi
                                           Thomas S. Koglman
                                           **JONES DAY**
                                           North Point
                                           901 Lakeside Avenue
                                           Cleveland, OH  44114-1190
                                           Telephone:  (216) 586-3939
                                           Facsimile:  (216) 579-0212
                                           cpgriffith@jonesday.com
                                           pjnorton@jonesday.com
                                           kluchesi@jonesday.com
                                           tkoglman@jonesday.com

                                           Tracy A. Stitt
                                           **JONES DAY**
                                           51 Louisiana Avenue NW
                                           Washington, DC 20001
                                           (202) 879-3939
                                           tastitt@jonesday.com

                                           John P. Fredrickson
                                           **BOYLE FREDRICKSON**
                                           840 North Plankinton Avenue
                                           Milwaukee, WI  53203
                                           Telephone:  (414) 225-9755
                                           Facsimile:  (414) 225-9753
                                           Email:  jpf@boylefred.com

                                           Jonathan T. Smies
                                           **GODFREY & KAHN, S.C.**
                                           200 South Washington Street
                                           Suite 100
                                           Green Bay, WI  54301
                                           Telephone:  (920) 432-9300
                                           Facsimile:  (920) 436-7988
                                           Email:  jsmies@gklaw.com

                                           *Attorneys for Defendants*